382 P.3d 195

**Kilakila 'O HALEAKALÂ,
Petitioner/Appellant–
Appellant,**

v.

**BOARD OF LAND AND NATURAL RE-SOURCES, Department of Land and Natural Resources, Suzanne Case,[1] in her official capacity as Chairperson of the Board of Land and Natural Resources, and University of Hawai'i, Respondents/Appellees–Appellees.**

SCWC–13–0003065

Supreme Court of Hawai'i.

OCTOBER 6, 2016

As Corrected October 27, 2016

See also 317 P.3d 27

1. State of Hawai'i Board of Land and Natural Resources (BLNR) chairperson Suzanne Case was automatically substituted as a respondent/appellee-appellee in place of former BLNR chairperson William J. Aila, Jr., who was sued in his official capacity. Hawai'i Rules of Appellate Procedure (HRAP) Rule 43(c)(1) (2010).

David Kimo Frankel, Honolulu and Sharla Ann Manley for petitioner Kilakila 'O Haleakalâ.

Linda L.W. Chow for respondents Board of Land and Natural Resources, Department of Land and Natural Resources, and Suzanne Case, in her official capacity as Chairperson of the Board of Land and Natural Resources.

Lisa Woods Munger, Lisa A. Bail, Kimberly A. Vossman and Christine A. Terada, Honolulu, for respondent University of Hawai'i.

RECKTENWALD, C.J., NAKAYAMA AND McKENNA, JJ., WITH McKENNA, J., CONCURRING SEPARATELY, AND POLLACK, J., DISSENTING SEPARATELY, WITH WHOM WILSON, J., JOINS IN PART, AND WILSON, J., DISSENTING SEPARATELY

## OPINION OF THE COURT BY RECKTENWALD, C.J.

This case concerns a conservation district use permit for construction of the Advanced Technology Solar Telescope (ATST) on the island of Maui, in an area at the summit of Haleakalâ that was set aside for astronomical observatories in 1961. Haleakalâ is a site of great cultural and spiritual importance to the Native Hawaiian community. It also bears scientific significance for astronomical studies, and is a popular visitor destination.

The Board of Land and Natural Resources (Board or BLNR) granted a permit for the University of Hawai'i (UH) to construct the ATST.[2] Kilakila 'O Haleakalâ (Kilakila), an organization "dedicated to the protection of the sacredness of Haleakalâ[,]" challenged BLNR's approval of the permit to construct the ATST. Kilakila appealed to the Circuit Court of the First Circuit and the Intermediate Court of Appeals, and both courts affirmed BLNR's decision.

This court granted certiorari review. We conclude that the permit approval process was not procedurally flawed by prejudgment because BLNR's initial permit was voided. Nor was it flawed by impermissible ex parte communication because BLNR removed the original hearing officer after he communicated with a party, and the BLNR Chairperson's meeting with non-parties did not address the merits of the permit approval process. We further conclude that BLNR validly determined that the ATST met the applicable permit criteria and was consistent with the purposes of the conservation district.

---

2. The ATST has been the subject of much litigation, including Kilakila 'O Haleakalâ v. Bd. of Land & Nat. Res., 131 Hawai'i 193, 317 P.3d 27 (2013) (Kilakila I), Kilakila 'O Haleakalâ v. Univ. of Hawai'i, 134 Hawai'i 86, 332 P.3d 688 (App. 2014), cert. granted, SCWC–13–0000182, 2014 WL 4545916 (Sept. 12, 2014), which we are deciding today, and the case at bar.

Accordingly, we conclude that BLNR properly granted the permit and affirm the ICA's judgment.

## I. Background

### A. Haleakalā, the Haleakalā High Altitude Observatory, and the Proposed Advanced Technology Solar Telescope

The summit of Haleakalā has important cultural significance to Native Hawaiians. Cultural assessments performed for the ATST determined that the Haleakalā summit is one of the most sacred sites on Maui, and the Haleakalā Crater is known as "where the gods live." The summit was traditionally used by Native Hawaiians as a place for religious ceremonies, for prayer to the gods, to connect to ancestors, and to bury the dead. Native Hawaiians continue to engage in some of these practices at the summit.

The Haleakalā summit consists of three volcanic cones, and all are partially developed. One volcanic cone includes facilities belonging to the County of Maui, the State of Hawai'i, and the federal government. The second cone houses Haleakalā National Park's popular visitor outlook. In 1961, Hawai'i Governor William Quinn set aside 18.166 acres on the third volcanic cone, Pu'u Kolekole, as the site of the Haleakalā High Altitude Observatory (HO). Since this designation by Governor Quinn, the site has been used for astronomical observatories and is the only site at Haleakalā used for these purposes. The HO currently consists of eight research facilities "for advanced studies of astronomy and atmospheric sciences" owned by UH and managed by the UH Institute of Astronomy (UHIfA).

The HO is located in a conservation district, as categorized by the State Land Use Commission. Land within a conservation district is divided into subzones. See HAR § 13–5–10 (1994). The HO is in a "general subzone," which seeks to "designate open space where specific conservation uses may not be defined, but where urban use would be premature." HAR § 13–5–14(a) (1994). Several types of land use are permitted in the general subzone, including astronomical facilities. See HAR § 13–5–24 (1994) (listing "[a]stronomy facilities under an approved management plan" as one of the allowable uses in a resource subzone); HAR § 13–5–25 (1994) (stating that "[i]n addition to the land uses identified [for general subzones], all identified land uses ... for the protective, limited, and resource subzones also apply to the general subzone, unless otherwise noted").

Over the past two decades, the proposed ATST was developed through the work of the Association of Universities for Research in Astronomy, the National Solar Observatory, and the National Science Foundation. Astronomers and other scientists determined that there was a world-wide need for a telescope capable of taking high-resolution images of the sun to study its solar magnetic fields and its relation to solar energy, sunspots, and flares. No current or planned ground-based or space-based telescope in the world has this capability. The ATST would consist of an 142.7–feet tall telescope observatory structure, a support and operations building, a utility building, a parking lot, a wastewater treatment plant, and modifications to an existing observatory. In 2004, after studying 72 potential sites, Haleakalā was chosen as the best site for the ATST because it met or exceeded all requirements.

### B. Application for Conservation District Use Permit

The ATST requires a conservation district use permit (CDUP) because the HO is located in a conservation district. On March 1, 2010, UHIfA submitted a conservation district use application (CDUA) to BLNR pursuant to HAR § 13–5–31(a) [3] and HAR § 13–

---

3. HAR § 13–5–31(a) (1994) details the requirements for a permit application:

(1) A draft or final environmental assessment, draft or final environmental impact statement, or proof of an exemption or request for an exemption from the chapter 343, HRS, process, as applicable;

(2) Associated plans such as location map, site plan, floor plan, elevations, and landscaping plans drawn to scale;

(3) The proposed land use shall address their relationship with county general plans and development plans;

5–39(a)[4]. The CDUA provided a range of detailed information about the ATST, including a final environmental impact statement (FEIS) and a management plan (MP).

### 1. Final environmental impact statement

The FEIS[5] was completed in July 2009 and addressed the environmental impacts associated with the construction and operation of the proposed ATST Project.[6] The impacts were "analyzed under three alternatives, two action alternatives located within HO: the Mees Alternative (the Preferred Alternative) and the Reber Circle Alternative, and a No–Action Alternative."

The FEIS analyzed the environmental impacts from the ATST in the following categories: (1) land use and existing activities, (2) cultural, historic, and archeological resources, (3) biological resources, (4) topography, geology, and soils, (5) visual resources and view planes, (6) visitor use and experience, (7) water resources, (8) hazardous materials and solid waste, (9) infrastructure and utilities, (10) noise, (11) climatology and air quality, (12) socioeconomics and environmental justice, (13) public services and facilities, and (14) natural hazards.[7]

Most relevant to this appeal are the FEIS's conclusions about the impacts on cultural and visual resources from the construction and operation of the ATST. Regarding the cultural resources category, the FEIS determined:

> Construction and operation of the proposed ATST Project at either the Preferred Mees or Reber Circle sites would result in major, adverse, short- and long-term, direct impacts on the traditional cultural resources within the ROI [Region of Influence[8]]. No indirect impacts are expected. Mitigation measures would be implemented; however, those measures would not reduce the impact intensity: impacts would remain major, adverse, long-term and direct.

In addition, the FEIS found that "under the No-Action Alternative, there would continue to be major, adverse, long-term, direct impacts to traditional cultural resources."

In the visual resources and view planes category, the FEIS analyzed the impacts from two general viewpoint areas: (1) land within Haleakalā National Park and (2) various areas on the island of Maui, where the current HO facilities are visible. The FEIS determined that from either the preferred Mees site or the Reber Circle site, the direct impact on visual resources within the Park would be moderate, adverse, and long-term:

---

(4) Any other information as determined by the department;
(5) Signature of the landowner;
(6) Applicable fees;
(7) A minimum of twenty copies (only one original copy required for site plan approvals) of the application and all attachments.

**4.** HAR § 13–5–39(a) (1994) states, "Where required, management plans shall be submitted with the board permit application[.]" A management plan was required for the ATST because the site is located in a general subzone. See HAR §§ 13–5–24,–25.

**5.** An environmental impact statement is "an informational document ... which discloses the environmental effects of a proposed action, effects of a proposed action on the economic welfare, social welfare, and cultural practices of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects." HRS § 343–2 (Supp. 2008).

**6.** The FEIS was completed in accordance with several environmental laws: (1) the Federal National Environmental Policy Act (NEPA) Title 42, U.S.C. § 4321 and 40 CFR Parts 1500–1508, (2) Hawai'i Environmental Policy Act (HEPA) HRS § 343 and HAR § 11–200, and (3) BLNR's requirement for an EIS to obtain a CDUP under HAR § 13–5–31(a)(1). The National Science Foundation was the lead agency responsible for completing the FEIS, and will be funding the construction of the ATST.

**7.** The FEIS reported the impacts in each category in several ways. The impacts were described as direct, indirect, or cumulative, and categorized as negligible, minor, moderate, or major. The FEIS also determined whether the impacts were long-term or short-term in duration. Lastly, the FEIS considered whether mitigation measures would reduce the duration, intensity, or scale of the impacts.

**8.** "Region of Influence" refers to the HO site and surrounding areas, including Haleakalā National Park.

No mitigation would adequately reduce this impact. The new structure would be visible to the point of co-dominance with other nearby structures. It would intensify the already developed appearance in its immediate surroundings, and would also appear to increase slightly the amount of horizontal space occupied by structures in views from within the Park. The new structure would not substantially alter the existing visual character visible in any view.

Further, the FEIS concluded that from outside the Park, the impact of building the ATST at either the Mees site or the Reber Circle site "would result in minor, adverse and long-term impact to visual resources[,]" and therefore "[n]o mitigation would be necessary."

The FEIS also analyzed each category for cumulative impacts, defined as "impacts from past, present, and reasonably foreseeable future actions within the ROI ... combined with the potential impacts from the proposed ATST Project." In the cultural resources category, the FEIS found that the cumulative impacts would be major, adverse, and long-term at either site and that implementation of mitigation measures would not reduce these impacts. In the visual resources category, the FEIS found that the cumulative impacts would be major, adverse, and long-term from areas within the Haleakalā National Park, and negligible, adverse, and long-term from other areas on Maui.

### 2. Management plan

UHIfA submitted a draft MP with its CDUA on March 1, 2010, and submitted the final MP to BLNR on June 8, 2010.[9] The MP "is the governing document used for existing and future development at HO." It "specifies the design and environmental criteria that would be followed when implementing devel-

opment, and presents strategies for managing, monitoring, and protecting the various natural and cultural resources[.]"

The Executive Summary section of the MP summarized the strategies offered by UHIfA to protect cultural, historic, and archeological resources:

Monitoring strategies are presented to ensure the protection of cultural, historic, and archeological resources through policies, practices, and procedures developed in consultation with Native Hawaiian practitioners, agencies, interested individuals, and the Maui community, to ensure that historic preservation concerns are met. Monitoring strategies are also presented to prevent introduction of alien invasive species (AIS), to protect endangered species, and to educate all workers and contractors as to the potential impacts of construction and operations on the cultural and biological resources. Monitoring for construction practices to protect all resources at the site is described. Finally, the MP imposes certain design criteria on new facilities to minimize inappropriate design elements within the natural environment at the summit.

A final environmental assessment (FEA) was completed on October 25, 2010. The FEA examined the anticipated impacts from the MP's implementation. The purpose of the FEA was to "inform the relevant state agencies and the public of the likely environmental consequences of the MP on ongoing and future actions at HO in support of astronomical research." The FEA concluded that the MP would "either have beneficial, less than significant, or no impacts on the environment." [10]

### C. BLNR Administrative Proceedings

BLNR's review and ultimate approval of UHIfA's application involved a series of

9. The MP was meant to supersede and replace the management planning policies and practices in UHIfA's Long Range Development Plan (LRDP) from January 2005. The LRDP described the general conditions at the HO site, the principles behind the current and future scientific projects that UH planned at the HO site, and the planning process to protect the Haleakalā summit.

10. The sufficiency of the FEA was challenged on appeal to this court in Kilakila 'O Haleakalā v. Univ. of Hawaiʻi, 134 Hawaiʻi 86, 332 P.3d 688 (App. 2014), cert. granted, SCWC–13–0000182, 2014 WL 4545916 (Sept. 12, 2014).

events which are relevant to this appeal. As set forth below, these included BLNR's grant of a permit, Kilakila's appeal of that permit, a contested case hearing, ex parte communications involving the hearing officer, BLNR's dismissal of that hearing officer and appointment of a new hearing officer, Kilakila's motions for disclosure of any additional ex parte communications, the new hearing officer's recommendation to BLNR, and BLNR's grant of a second permit.

### 1. BLNR approval of the first ATST permit: CDUP MA–3542

On November 22, 2010, BLNR held its first public hearing on the ATST's MP and CDUA. On December 1, 2010, BLNR approved the MP and granted CDUP MA–3542 during its regular board meeting. CDUP MA–3542 permitted the construction of the ATST, subject to several conditions. Kilakila made three requests for a contested case hearing [11] prior to and immediately after BLNR's approval, and BLNR took no action on the requests. Kilakila subsequently appealed to the circuit court, arguing that BLNR erred in denying Kilakila's request for a contested case hearing and in granting CDUP MA–3542.[12] See Kilakila I, 131 Hawai'i at 207, 317 P.3d at 41.

### 2. Contested case hearing

While the appeal of CDUP MA–3542 was pending, BLNR granted Kilakila's request for a contested case hearing, and on February 11, 2011, Steven Jacobson was appointed as the hearing officer.

On June 2, 2011, Kilakila filed a motion to disqualify deputy attorneys general Linda Chow and Julie China from advising Jacobson or BLNR at the contested case hearing. Kilakila asserted that Chow and China could not serve as counsel for BLNR because "[t]hey have filed documents in circuit court arguing that the BLNR could legally grant a conservation district use permit for the [ATST]." On June 28, 2011, Jacobson denied Kilakila's motion because he would not be relying on advice from Chow or China in making his recommendation to BLNR. Jacobson dismissed the motion without prejudice so that Kilakila could renew its motion after Jacobson issued his recommendation to BLNR.

The contested case hearing was held over four days, from July 18–20 and on August 26, 2011. On February 23, 2012, Jacobson issued his proposed findings of fact, conclusions of law, and decision and order, recommending approval of the permit.

On March 2, 2012, Kilakila renewed its motion, this time to BLNR, to disqualify Chow and China. Kilakila argued that Chow and China have "appeared as adversaries to [Kilakila] at hearings regarding the conservation district use application." On March 12, 2012, Jacobson issued his final findings of fact, conclusions of law, and decision and order, which recommended that BLNR approve the permit to construct the ATST. On March 16, 2012, BLNR denied Kilakila's March 2, 2012 motion, noting that while Chow and China appeared as counsel for BLNR in a prior circuit court proceeding, "the appearance by the deputy attorneys general as counsel for the Board in that circuit court proceeding does not disqualify the deputy attorneys general from advising the Board in this administrative proceeding."

### 3. Minute Order No. 14 regarding ex parte communication

On March 19, 2012, BLNR filed Minute Order No. 14 "RE: EX PARTE COMMU-

---

11. A contested case hearing is a quasi-judicial administrative hearing conducted pursuant to HAR § 13–1–28 (2009), which states:

 (a) When required by law, the board shall hold a contested case hearing upon its own motion or on a written petition of any government agency or any interested person.

 (b) The contested case hearing shall be held after any public hearing which by law is required to be held on the same subject matter.

 (c) Any procedure in a contested case may be modified or waived by stipulations of the parties.

12. That appeal ultimately resulted in this court's decision in Kilakila I, in which we held that the circuit court had jurisdiction over the appeal pursuant to HRS § 91–14 and that Kilakila's request for a contested case hearing should have been granted prior to BLNR's approval of the permit. 131 Hawai'i at 205–06, 317 P.3d at 39–40. We remanded to the circuit court regarding Kilakila's request for stay or reversal of CDUP MA–3542. Id. at 206, 317 P.3d at 40. The parties then stipulated to void CDUP MA–3542, which ended the appeal.

NICATION[.]" The order explained to the parties that BLNR had been notified that Jacobson sent an email to UHIfA's counsel on March 15, 2012. In the email, which was attached to the order, Jacobson stated that he had received "inappropriate ex parte pressure and activity by US Senator [Daniel] Inouye's and the Governor's offices" which "essentially required" him to submit an incomplete report and recommendation to BLNR. Jacobson had contacted "appropriate ethical offices" and was informed that disclosures were not required where:

(1) neither UHIfA nor its counsel had anything to do with what the Senator's and Governor's offices were doing, (2) the Board and courts disregard the interim [proposed] report and recommendations and consider only the final report and recommendations (to the extent they consider them at all), and (3) Kilakila is not prejudiced by being shortchanged in time to respond to the final report and recommendations.

The email from Jacobson concluded with a question to UHIfA's counsel as to "whether any of you had anything to do with what the Senator's and Governor's offices were doing."

BLNR's order noted that the email between Jacobson and UHIfA's counsel "was an unpermitted ex parte communication[,]" which "call[ed] into question the Hearing Officer's impartiality" in relation to his report and recommendation to BLNR. BLNR stated that it was considering the following actions in response to the ex parte communication:

1. Striking the Report and Final and Amended Report from the record;

2. Discharging the Hearing Officer, Steven Jacobson, as the hearing officer in this case; and

3. Retaining a new hearing officer to review the record of the proceedings in this case and to issue a new hearing officer's report and proposed findings of fact, conclusions of law, and decision and order. The new hearing officer would be authorized to conduct additional fact finding as necessary.

BLNR scheduled a hearing and invited the parties to file comments or objections to the proposed actions.

On March 20, 2012, Jacobson filed a response to BLNR's order, describing what he characterized as the pressure placed on him by the Governor's office to release his recommendation and to consult deputy attorney general Chow:

In this file, while preparing my report and recommended decision, considerable ex parte pressure was placed upon me to simply spit out a recommended decision quickly, so that the Board would have something before it, to approve. That pressure included requiring me to make daily reports to both the Health Department and the Board's Chair as to how soon I contemplated finishing, what else I thought I needed to do, why I thought I had to do it, etc.

The pressure included a "suggestion" that Deputy General Chow be given a role in completing the decision.

I was advised that the pressure was generated by a staffer in US Senator Inouye's office, and applied through the Governor's office. I was not asked to recommend a particular result, although the result Senator Inouye's office wanted from the Board was clear. I did not see any evidence that anyone else (i.e., anyone in State Government), wanted any particular result, and the Board's Chair, in particular, made clear that all he wanted to know was when this matter could be put on the Board's calendar.

My initial [proposed] report and recommended decision herein were filed as a result of "or else" pressure. The only way the pressure affected my initial [proposed] report and recommended decision was that they were incomplete. I made no substantive changes in light of comments by Ms. Chow.

I then completed my final report and recommendations. In completing them, the only effect of the previous pressure upon me (which had been withdrawn) was that I very carefully went through everything UHIfA submitted, again, to be sure that I hadn't missed something that those favor-

ing the ATST Project might be hoping that I would miss.

Again, nothing substantive was changed due to anything said by Ms. Chow. The final report and recommendations are entirely mine.

UH responded to Minute Order No. 14 by "urg[ing]" BLNR to review the record and issue a decision without appointing a new hearing officer. In the alternative, UH requested that: "(1) the additional fact finding should be limited to a site visit; and (2) the new Hearing Officer should be required to respond to the Board within a reasonable time frame." Kilakila also responded, requesting the appointment of a new hearing officer as well as disclosures of "any communications tending to show that external pressure was applied to affect the outcome of [the] proceeding."

### 4. Minute Order No. 15 discharging hearing officer Jacobson

On March 29, 2012, following a hearing on the issue of the ex parte communications, BLNR filed Minute Order No. 15, which discharged Jacobson and authorized the appointment of a new hearing officer "to avoid even the appearance of impropriety." BLNR concluded that the email from Jacobson to UHIfA's counsel was "an unpermitted ex parte communication in violation of Hawai'i Administrative Rules (HAR) § 13–1–37." [13] BLNR also struck Jacobson's recommendation from the record and authorized the new hearing officer to make a ruling regarding Kilakila's standing, issue a new recommendation within sixty days of appointment, schedule a site visit with the parties, hold additional evidentiary hearings as necessary, and consider a supplemental environmental assessment dated February 10, 2012.

13. HAR § 13–1–37 (2009) provides:
(a) No party or person petitioning to be a party in a contested case, nor the party's or such person's to a proceeding before the board nor their employees, representatives or agents shall make an unauthorized ex parte communication either oral or written concerning the contested case to the presiding officer or any member of the board who will be a participant in the decision-making process.

### 5. Kilakila's motion for disclosure

On March 30, 2012, Kilakila filed a motion for disclosure of BLNR's communications regarding the ATST. Kilakila's motion sought:

[T]o have each member of the BLNR disclose any and all communication (written, electronic and oral) that mentioned or related to the University's proposed Advanced Technology Solar Telescope except for (a) communications between board members; (b) communications between any board member and the Board's counsel; (c) any board meeting when the ATST was a subject matter of the agenda.

The request included "any and all communication with Senator Inouye or his staff, the Governor or his staff, politicians, union leaders and members and construction industry representatives that mentioned or related to the [ATST]."

In support of the motion, Kilakila cited hearing officer Jacobson's statements regarding the ex parte communications, as well as testimony from a former superintendent of Haleakalā National Park who also noted pressures from Senator Inouye's office regarding the ATST:

While serving as superintendent, I was well aware of Senator Inouye's displeasure with my statements/comments against the construction of the ATST. His staff assistant, James Chang placed heavy pressure on me to mute objections that the National Park Service had regarding the impacts of the ATST. For example, in a meeting with Mr. Chang, he strongly encouraged me to go along with the construction of the ATST project. When I stated it was my job to guard against such extreme impacts to this majestic national park, he indicated that he would go to the Secretary of the Interior to override my objections.

(b) The following classes of ex parte communications are permitted:
(1) Those which relate solely to matters which a board member is authorized by the board to dispose of on ex parte basis.
(2) Requests for information with respect to the procedural status of a proceeding.
(3) Those which all parties to the proceeding agree or which the board has formally ruled may be made on an ex parte basis.

UH opposed Kilakila's motion, arguing that the request was a "fishing expedition" with no factual or legal basis. In reply, Kilakila asserted that it was aware of at least one ex parte communication between a member of BLNR and the Governor's office. Kilakila attached emails obtained pursuant to a records request from the Governor's office, which provided evidence of a meeting on March 21, 2012 between the Governor's office, the Attorney General's office, Senator Inouye's office, and BLNR Chairperson William Aila to discuss the ATST. These include a March 21, 2012 email between Bruce Coppa, the Governor's chief of staff, and another staff member. The staff member informs Coppa, "Jennifer [Sabas, Senator Inouye's chief of staff,] requested a meeting today at 3 p.m. to discuss the telescope, hearings officer and funding issue. AG will be coming in and Chair Aila is pending."

### 6. Minute Order No. 23 partially granting Kilakila's motion for disclosure

On June 24, 2012, BLNR issued Minute Order No. 23 granting Kilakila's motion only "with regard to the meeting held on March 21, 2012[.]" BLNR informed Kilakila and UHIfA that a meeting occurred on March 21, 2012, in which Aila participated. BLNR noted that "[d]uring the meeting the sole topic of discussion was when the recommended decision in this contested case would be issued by the hearing officer, Steven Jacobson." BLNR concluded that no further action was warranted:

In as much as no party was present during the meeting, there was no ex parte communication with the hearing officer or any member of the Board. Even if a party were present, the discussion … comes within the purview of Hawai'i Administrative Rule (HAR) § 13–1–37 as a permitted communication related to requests for information with respect to the procedural status of a proceeding. No further action is required regarding this communication.

BLNR noted that Kilakila failed to "provide a time frame or context for the requested disclosures" and thus its "motion may encompass communications that occurred long before this matter was the subject of a contested case." BLNR further noted that Kilakila failed to show any communications beyond what was allowed under HAR § 13–1–37 and that its motion was "based, at most, upon mere speculation." Finally, BLNR concluded that it had not "acted in any manner other than as an impartial adjudicator" and that any prejudice to Kilakila had been rectified by the discharge and replacement of hearing officer Jacobson.

### 7. Kilakila's motion to reconsider Minute Order No. 23

On June 8, 2012, Kilakila filed a motion to reconsider Minute Order No. 23. Kilakila alleged that the "sole topic" of the March 21, 2012 meeting could not have been the timing of the release of Jacobson's recommendation because Jacobson had already issued his initial and final decisions at this point. Kilakila also requested communications between any member of BLNR and "anyone else" that related to the ATST:

[F]or the sake of appellate court review, this Board should respond definitively as to whether or not there were any communications (oral, written or electronic) between any member of the Board and anyone else that mentioned or related to the University's proposed Advanced Technology Solar Telescope with anyone (except for (a) communications between board members; (b) communications between any board member and the Board's counsel; (c) any board member when the ATST was a subject matter on the agenda) from the time that Kilakila 'O Haleakalâ requested a contested case hearing.

On July 13, 2012, BLNR granted Kilakila's motion in part, amending Minute Order No. 23: "During the meeting, the sole topic of discussion was when the final decision in the contested case would be issued, in light of Minute Order No. 14 [regarding Jacobson's ex parte communication], filed on March 19, 2012."

### 8. Hearing officer Ishida's recommendation

On July 16, 2012, the new hearing officer, Lane Ishida, filed a report, proposed findings of fact and conclusions of law, decision, and

order, which recommended that BLNR grant the CDUP, subject to several conditions. To support his recommendation, Ishida made several findings, including that the ATST was consistent with the purposes of the conservation district and general subzone, would not cause substantial adverse impact to existing natural resources, and would not be materially detrimental to public health, safety, and welfare.

### 9. Kilakila's second motion to reconsider Minute Order No. 23

On September 27, 2012, Kilakila filed a second motion to reconsider Minute Order No. 23. Kilakila attached additional documents obtained from UH pursuant to a records request. Most relevant to this appeal are six email communications, which are summarized as follows:

- January 30, 2012: Mike Maberry (UH-IfA), emailed Jennifer Sabas, Senator Inouye's chief of staff, regarding the ATST. Maberry stated that he knew that Sabas had already spoken with Aila, "but as previously mentioned, Steve Jacobsen [sic] doesn't work for Aila he works for Fuddy. Would it be possible for you or someone to talk with Fuddy to see if it could be clarified that Steve's work priority is to complete the Finding of Facts, Conclusions of Law and Recommendation in the ATST Contested Case?"
- January 30, 2012: In response to Maberry's email, Sabas emailed Bruce Coppa, the Governor's chief of staff, stating: "can you reach out to loretta fuddy who apparently the hearing officer is on contract with rather than dlnr—uh and my feds are getting really really nervous about losing the money for the atst."
- January 30, 2012: Coppa responded to Sabas, stating: "I will speak with Loretta. I also spoke with Bill and asked to please help[.]"
- January 31, 2012: Sabas responded to Coppa noting, "Thanks. This will be bad if we lose it."
- January 31, 2012: Maberry emailed Sabas regarding a potential meeting between the Governor's office, Senator Inouye's office, and BLNR regarding the ATST. Maberry noted that UH could not meet with BLNR until after BLNR acted on the hearing officer's recommendation "or it could jeopardize the Contested Case."
- January 31, 2012: Sabas responded to Maberry regarding his inability to attend the proposed ATST meeting and noted that she could "carry the message and [could] also carry the uh message."

Kilakila contended that these documents demonstrated that "the applicant has acted in bad faith; immense political pressure has been applied in this case that is even greater than prior documents had revealed; and Williams Aila Jr. has received more ex parte communication than has been previously revealed." Kilakila then sought the following disclosure:

> At a minimum, the BLNR must disclose information about Bruce Coppa's ex parte communication with William Aila, Jr. and Jennifer Sabas' ex parte communication with William Aila, Jr. .... If, in any of the ex parte communications, anyone communicated to any member of the Board the reasons that a decision needed to be expedited, this should be disclosed to Kilakila 'O Haleakalâ.

On November 9, 2012, BLNR issued an order denying Kilakila's second motion to reconsider Minute Order No. 23. BLNR noted that Kilakila "fails to show that any unpermitted ex parte communications occurred between the former hearing officer or any Board members and one of the parties in this case that would be a basis to reconsider this Board's prior Order No. 23."

### 10. BLNR's approval of the second ATST permit: CDUP MA–11–04

On November 9, 2012, BLNR issued its findings of fact, conclusions of law, decision and order approving a second permit for the ATST, CDUP MA–11–04. BLNR made findings of facts concerning the parties to the contested case hearing, the procedural background of the permit application, the ATST

project description, the Section 106 consulta-
tion[14], the FEIS, and the anticipated bene-
fits of the ATST. BLNR then made conclu-
sions of law under HAR § 13–5–30(c)(1)–(8)
(1994), which provides the criteria for "evalu-
ating the merits of a proposed land use" and
granting a CDUP:

(c) In evaluating the merits of a proposed
land use, the department or board shall
apply the following criteria:

(1) The proposed land use is consistent
with the purpose of the conservation dis-
trict;

(2) The proposed land use is consistent
with the objectives of the subzone of the
land on which the use will occur;

(3) The proposed land use complies
with provisions and guidelines contained in
chapter 205A, HRS, entitled "Coastal Zone
Management", where applicable;

(4) The proposed land use will not
cause substantial adverse impact to exist-
ing natural resources within the surround-
ing area, community, or region;

(5) The proposed land use, including
buildings, structures, and facilities, shall be
compatible with the locality and surround-
ing areas, appropriate to the physical con-
ditions and capabilities of the specific par-
cel or parcels;

(6) The existing physical and environ-
mental aspects of the land, such as natural
beauty and open space characteristics, will
be preserved or improved upon, whichever
is applicable;

(7) Subdivision of land will not be uti-
lized to increase the intensity of land uses
in the conservation district; and

14. In its order, BLNR explains, "Section 106 of
the [National Historical Preservation Act] re-
quires federal agencies to take into account the
impacts of the agencies' undertakings on historic
properties and to afford the Advisory Council on
Historic Preservation ... a reasonable opportu-
nity to comment on such undertakings."

15. The Honorable Rhonda A. Nishimura presid-
ed.

16. Kilakila contended that the circuit court erred
because:
(1) the Board's approval did not comply with
Hawai'i Administrative Rules (HAR) § 13–5–
3(c) (1994);

(8) The proposed land use will not be
materially detrimental to the public health,
safety, and welfare.

The applicant shall have the burden of
demonstrating that a proposed land use is
consistent with the above criteria.

"Based upon the evidence and testimony
presented in this case," BLNR concluded
that the ATST satisfied each of the eight
criteria, UH "met its overall burden of
proof[,]" and a CDUP for ATST was ap-
proved, subject to twenty conditions.

D. Circuit Court Proceedings

Kilakila appealed BLNR's decision to the
Circuit Court of the First Circuit.[15] On July
11, 2013, after holding oral argument and
reviewing the parties' briefings, the circuit
court issued its Order affirming BLNR's de-
cision to grant CDUP MA–11–04. The circuit
court filed its Final Judgment on August 20,
2013.

E. ICA Proceedings

Kilakila appealed to the Intermediate
Court of Appeals.[16] The ICA rejected each of
Kilakila's points of error in its October 17,
2014 Memorandum Opinion, which affirmed
the circuit court's judgment and BLNR's de-
cision. The ICA's Judgment on Appeal was
filed on November 13, 2014. Kilakila timely
applied for writ of certiorari on December 1,
2014.

II. Standards of Review

■ Appellate court review of a circuit
court's review of an administrative decision is
a secondary appeal. "The standard of review

(2) the Board erred by considering economic
factors;
(3) the Board erred by weighing the lack of
alternatives against the Solar Telescope's ad-
verse impacts,
(4) the correct entity did not apply for the
conservation district use permit (CDUP),
(5) the Solar Telescope is inconsistent with
the June 8, 2010 Management Plan (Manage-
ment Plan) prepared by the University of Ha-
wai'i Institute for Astronomy (UIA),
(7) [sic] the Board violated Kilakila's proce-
dural due process rights; and
(8) [sic] the Board acted pursuant to unau-
thorized procedure.

is one in which this court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91–14(g) (1993) to the agency's decision." Save Diamond Head Waters LLC. v. Hans Hedemann Surf, Inc., 121 Hawai'i 16, 24, 211 P.3d 74, 82 (2009) (citing Citizens Against Reckless Dev. v. Zoning Bd. of Appeals, 114 Hawai'i 184, 193, 159 P.3d 143, 153 (2007); Korean Buddhist Dae Won Sa Temple of Hawai'i v. Sullivan, 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998)).

HRS § 91–14(g), "Judicial review of contested cases," provides as follows:

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"Under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects are reviewable under subsection (3);

findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." Save Diamond Head Waters, 121 Hawai'i at 24–25, 211 P.3d at 82–83 (quoting Paul v. Dep't of Transp., 115 Hawai'i 416, 426, 168 P.3d 546, 556 (2007)) (internal brackets omitted).

"Pursuant to HRS § 91–14(g), an agency's conclusions of law are reviewed de novo." United Pub. Workers, AFSCME, Local 646, AFL–CIO v. Hanneman, 106 Hawai'i 359, 363, 105 P.3d 236, 240 (2005) (internal quotation marks and citation omitted). "A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." Save Diamond Head Waters, 121 Hawai'i at 25, 211 P.3d at 83 (quoting Del Monte Fresh Produce (Hawai'i), Inc. v. Int'l Longshore and Warehouse Union, Local 142, AFL–CIO, 112 Hawai'i 489, 499, 146 P.3d 1066, 1076 (2006)).

An agency's interpretation of its own rules is generally entitled to deference unless "plainly erroneous or inconsistent with the underlying legislative purpose." Panado v. Bd. of Trs., Emps.' Ret. Sys., 134 Hawai'i 1, 11, 332 P.3d 144, 154 (2014). An agency's exercise of discretion "will not be overturned unless 'arbitrary, or capricious, or characterized by ... [a] clearly unwarranted exercise of discretion.' " Paul's Elec. Serv. Inc. v. Befitel, 104 Hawai'i 412, 416–17, 91 P.3d 494, 498–99 (2004) (citing HRS § 91–14(g)(6)).

## III. Discussion

Kilakila's application for writ of certiorari raises several issues,[17] many of which overlap

---

**17.** Kilakila's application raised the following thirteen points of error:

1. Did the ICA err in affirming the Circuit Court's affirmation of the BLNR's decision? More specifically, the questions presented include:

2. Did the ICA err when it held that an agency can use decisionmaking criteria that are not identified in its own rules—despite this Court's rulings in Aluli v. Lewin, 73 Haw. 56, 61, 828 P.2d 802, 805 (1992), Mahuiki v. Planning Comm'n, 65 Haw. 506, 519–20, 654 P.2d 874, 882–83 (1982), Ainoa v. Unemployment Compensation Appeals

Div., 62 Haw. 286, 614 P.2d 380 (1980), and Aguiar v. Hawai'i Hous. Auth., 55 Haw. 478, 522 P.2d 1255 (1974)?

3. In determining whether the ATST project is consistent with the purposes of the land use law and the conservation district, did the ICA err by (a) confusing an "as applied" challenge with a "facial" challenge; (b) failing to employ this Court's analysis in Neighborhood Bd. No. 24 (Waianae Coast) v. State Land Use Comm'n, 64 Haw. 265, 639 P.2d 1097 (1982); and (c) refusing to consider whether the proposed ATST project itself "frustrates the state land use law's basic

or were raised without any supporting argument. See HRAP 40.1(d) (applications for writ of certiorari shall contain a "short and concise statement of the questions presented" and a "brief argument with supporting authorities"). Therefore, we address the following questions, which we consider controlling and dispositive:

(1) Did the ICA err in concluding that the permit approval process was not procedurally flawed, specifically that BLNR did not prejudge CDUP MA–11–04 and was not improperly influenced by ex parte communications?

(2) Did the ICA err in concluding that BLNR's findings under HAR § 13–5–30(c)(4),(5), and (6) were valid?

(3) Did the ICA err in concluding that the ATST was not inconsistent with the purposes of conservation districts and general subzones?

## A. The permit approval process did not suffer from procedural infirmities

Kilakila alleges that the approval process for CDUP MA–11–04 suffered from two procedural defects: (1) BLNR prejudged the permit approval and (2) BLNR engaged in impermissible ex parte communications and

failed to disclose them. We address each of these issues below.

### 1. BLNR did not prejudge the permit prior to the contested case hearing

Before addressing the issue of prejudgment, it is necessary to review the underlying sequence of events. At the first public hearing regarding the ATST's CDUA, Kilakila requested that BLNR conduct a contested case hearing. Without granting Kilakila's request, BLNR approved the first permit for the construction of the ATST, CDUP MA–3542. Kilakila then appealed BLNR's decision to grant the permit prior to holding a contested case hearing.

That appeal resulted in this court's decision in Kilakila I, in which we held that the circuit court had jurisdiction over the appeal pursuant to HRS § 91–14 and that Kilakila's request for a contested case hearing should have been granted prior to BLNR's approval of the permit. 131 Hawai'i at 205–06, 317 P.3d at 39–40. We remanded to the circuit court regarding Kilakila's request for stay or reversal of CDUP MA–3542. Id. at 206, 317 P.3d at 40. On remand, the parties entered into a stipulation, titled "Stipulation That the

objectives," Curtis v. Board of Appeals, 90 Hawai'i 384, 396, 978 P.2d 822, 834 (1999)?
4. Should the courts take a close look at the record in cases affecting the environment?
5. Did the ICA err in concluding that the ATST project would not have substantial impacts when (a) the applicant repeatedly admitted that the impacts would be substantial; (b) the BLNR and the ICA failed to point to any evidence that the impacts to cultural resources would not be substantial, as required by In re Kauai Elec. Div., 60 Haw. 166, 184, 590 P.2d 524, 537 (1978); (c) there was no evidence that the mitigation measures would reduce the intensity of the impacts to less than substantial; and (d) the BLNR relied on the final environmental impact statement (FEIS) to reach certain conclusions, but without any explanation ignored other portions of the FEIS?
6. Did the ICA err by relying on grounds not "invoked by the agency," In re Water Use Permit Applications, 94 Hawai'i 97, 163, 9 P.3d 409, 475 (2000)?
7. Did the ICA err in interpreting HAR § 13–5–30(c)(6) in a manner that excludes consideration of natural beauty and open space characteristics?

8. Did the ICA err in assuming that the lease of a portion of land does not subdivide it despite the plethora of law to the contrary?
9. Did the ICA err in holding that the ATST project is consistent with a valid management plan?
10. Did the BLNR prejudge the issue by granting the CDUP before the contested case was held and then authorizing some construction activities to proceed pursuant to that permit prior to completion of the post hoc contested case hearing?
11. Did the ICA err in relying on HRS § 171–6(20) to justify the BLNR's conduct pursuant to HRS chapter 183C when chapter 183C is not part of HRS chapter 171?
12. Was the BLNR's post hoc contested case hearing tainted by political pressure, ex parte communication, the refusal to fully and timely disclose the extent of ex parte communication, the dual role of the deputy attorney general as adversary and advisor to the tribunal, and the arbitrary deletion of key findings by the hearing officer?
13. Did the ICA err in holding that the applicant was authorized to apply for the permit?

Conservation District Use Permit (CDUA MA–3542) Is Void": [18]

IT IS HEREBY STIPULATED by and amongst the parties described below, through their respective undersigned counsel that the conservation district use permit (CDUA MA–3542) granted by the Board of Land and Natural Resources and the Department of Land and Natural Resources in December 2010 is void.

This stipulation ended the appeal.

While the appeal regarding CDUP MA–3542 was pending, BLNR granted Kilakila's request for a contested case hearing. After the contested case hearing, on November 9, 2012, BLNR issued an order approving a second permit for the construction of the ATST, CDUP MA–11–04. It is that permit that is the subject of the instant appeal.

■ Kilakila now asserts that BLNR prejudged the permit at issue in this case, CDUP MA–11–04, because it approved construction prior to the completion of the contested case hearing. However, this construction was for the removal of an unused foundation at the Reber Circle site. BLNR did not approve any construction of the ATST itself. The removal of the unused foundation was previously supported by Kilakila and was required by other agreements, such as the Archaeological Recovery Plan that BLNR approved in 2006. Furthermore, no construction ultimately occurred prior to the completion of the contested case hearing.

■ Kilakila also argues that BLNR prejudged the second permit, CDUP MA–11–04, by voting on the first permit, CDUP MA–3542, prior to a contested case hearing. The issue of prejudgment was recently addressed by this court in Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawai'i 376, 363 P.3d 224 (2015), in which we held that

BLNR's decision to approve a permit prior to a contested case hearing violated appellants' due process rights. Id. at 391, 363 P.3d at 239. This case is dissimilar to Mauna Kea, insofar as here Kilakila entered into a stipulation with BLNR and UH to void the first permit. Since BLNR's initial approval of CDUP MA–3542 was voided, appellants' due process rights were adequately protected by the contested case hearing and subsequent vote by BLNR. See Hawai'i Elec. Light Co. v. Dep't of Land & Nat. Res., 102 Hawai'i 257, 266, 75 P.3d 160, 169 (2003) (holding that, when BLNR's initial vote on a permit was later invalidated, "the constitutional right of due process was adequately protected through the contested case hearing process and the subsequent votes by the Board").

Indeed, the stipulation rendered the first permit "of no validity or effect." Black's Law Dictionary 1805 (10th ed. 2014) (defining "void" as "[t]o render of no validity or effect; to annul"). Because the first permit was deemed invalid by the stipulation, Kilakila received the relief sought in its previous appeal. Kilakila cannot now seek to vacate the second permit based on the first permit, which Kilakila voluntarily stipulated to void.

In sum, the permit approval process for CDUP MA–11–04 met procedural due process requirements. BLNR did not approve any construction of the ATST itself prior to the completion of the contested case hearing. Since BLNR's initial approval was voided, appellants' due process rights were protected by the contested case hearing and subsequent vote by BLNR.

### 2. Ex parte communications with BLNR were not improper

Kilakila argues that the ICA erred in concluding that BLNR's permit approval pro-

18. The stipulation was not included in the record for this case, but in the record of the pending case Kilakila 'O Haleakalā v. Univ. of Hawai'i, 134 Hawai'i 86, 332 P.3d 688 (App. 2014), cert. granted, SCWC–13–0000182, 2014 WL 4545916 (Sept. 12, 2014). We may therefore take judicial notice of the stipulation. See Hawai'i Rules of Evidence 201(b) ("A judicially noticed fact must be one not subject to reasonable dispute that is ... capable of accurate and ready determination

by resort to sources whose accuracy cannot be reasonably be questioned."); see also State v. Puaoi, 78 Hawai'i 185, 190, 891 P.2d 272, 277 (1995) ("[A]n appellate court may take judicial notice of facts despite the failure of the trial court to do so, provided that the facts are capable of immediate and accurate demonstration by resort to easily accessible sources of indisputable accuracy.") (internal quotation marks and citation omitted).

cess was not subject to impermissible ex parte political pressure. Kilakila alleges that the Governor and Senator Inouye's offices exerted pressure on BLNR Chairperson Aila in order to attain approval of the telescope, and that BLNR failed to disclose these ex parte communications.

The ICA rejected Kilakila's argument on the basis that BLNR promptly removed Jacobson as the hearing officer and disregarded his recommendation, curing any allegation of partiality involving Jacobson. The ICA also noted that Kilakila did not contend that hearing officer Ishida, who ultimately made the recommendation to BLNR, was subject to any ex parte communication or political pressure.

■ We agree with the ICA that any concern of impropriety was cured when BLNR replaced Jacobson with Ishida. Indeed, this is precisely the relief that Kilakila requested.

However, the ICA did not consider whether any ex parte communications involving Aila tainted the permit approval process or whether BLNR improperly denied Kilakila's discovery requests for additional communications involving the ATST. Though we note that Kilakila never moved to disqualify Aila as it did with Jacobson, we address these questions now.

The communications at issue here are: (1) the March 21, 2012 meeting between Aila, the Governor's office, the Attorney General's office, and Senator Inouye's office, (2) the January 30-31, 2012 emails between Jennifer Sabas of Senator Inouye's office and Mike Maberry of UHIfA, and (3) the January 30-31, 2012 emails between Sabas and Bruce Coppa of the Governor's office.

■ We first determine whether the communications violated the relevant administrative rule, HAR § 13-1-37. HAR § 13-1-37 governs ex parte communication in contested case proceedings and provides:

(a) No party or person petitioning to be a party in a contested case, nor the party's or such person's to a proceeding before the board nor their employees, representatives or agents shall make an unauthorized ex parte communication either oral or written concerning the contested case to the pre-

siding officer or any member of the board who will be a participant in the decision-making process.

(b) The following classes of ex parte communications are permitted:

(1) Those which related solely to the matters which a board member is authorized by the board to dispose of on ex parte basis.

(2) Requests for information with respect to the procedural status of a proceeding.

(3) Those which all parties to the proceeding agree or which the board has formally ruled may be made on an ex parte basis.

HAR § 13-1-37 does not apply to the January 30-31, 2012 communications because they were not sent to "any member of the board who will be a participant in the decision-making process." HAR § 13-1-37(a). Nor would it apply to the March 21, 2012 meeting between Aila, the Governor's office, the Attorney General's office, and Senator Inouye's office. Although Aila was a "member of the board" as BLNR Chairperson, the other meeting participants were not "part[ies] … to a proceeding" or a party's "employees, representatives or agents." HAR § 13-1-37(a) (emphasis added). There is no evidence that UH or Kilakila attended the meeting.

Even if the Governor's office and Senator Inouye's office were considered "representatives or agents" of UH, the meeting would not violate HAR § 13-1-37 because the "sole topic" of the discussion during the meeting was the timing of BLNR's final decision following the contested case hearing. The timing of BLNR's decision falls under the category of permitted ex parte communications, as "[r]equests for information with respect to the procedural status of a proceeding." HAR § 13-1-37(b)(2).

■ Though the communications were not impermissible ex parte communications in violation of HAR § 13-1-37, they may nevertheless demonstrate that improper outside influences tainted BLNR's permit approval. In In re Water Use Permit Applica-

tions (Waiāhole), this court determined whether external political pressure on an agency violated due process and invalidated the agency's decision. 94 Hawai'i 97, 123, 9 P.3d 409, 435 (2000). We noted:

> External political inference in the administrative process is of heightened concern in a quasi-judicial proceeding, which is guided by two principles. First, the appearance of bias or pressure may be no less objectionable than the reality. Second, judicial evaluation of the pressure must focus on the nexus between the pressure and the actual decision maker. As we have previously observed, the proper focus is not on the content of communication in the abstract, but rather upon the relation between the communications and the adjudicator's decisionmaking process.

Id. (internal quotation marks, brackets, and citations omitted; emphases in original).

This court then evaluated an allegation of improper political pressure based on these principles. The petitioner in Waiāhole alleged that the Governor exerted improper influence on the Commission on Water Resource Management by publicly criticizing the Commission's proposed decision. Id. Consistent with the focus on "the relation between the communications and the adjudicator's decisionmaking process," this court noted that other instances of improper political influence involved "at minimum, some sort of direct contact with the decisionmaker regarding the merits of the dispute." Id. (emphases added).

The Governor's comments in Waiāhole did not meet this minimum standard. Although the Governor had made several statements that "related directly to the dispute before the Commission," there was not sufficient evidence of "direct and focused interference" in the Commission's decision-making. Id. at 124, 9 P.3d at 436. Thus, there was not a nexus between the Governor's comments and the Commission that demonstrated improper

pressure on the Commission's decision. Id. at 124–25, 9 P.3d at 436–37.

Similar to Waiāhole, the communications here do not show evidence of "direct contact" with BLNR over the "merits of the dispute." The January 30–31, 2012 emails do not discuss the merits of the contested case hearing. Rather, as the ICA described, the emails appear to indicate concerns over "the possibility of losing funding for the [ATST] if construction did not begin by a certain date." The email communications are also unclear on whether there was any direct contact with Aila. Only one email mentions Aila and states that "[Coppa, the Governor's chief of staff] spoke with [Aila] and asked to please help." The Governor's office and Senator Inouye's office did have direct contact with Aila at the March 21, 2012 meeting, but there is no evidence that they discussed anything other than the timing of BLNR's final decision following the contested case hearing.[19]

Undoubtedly, the public criticisms in Waiāhole and the timing concerns voiced here both placed pressure on the respective agencies. However, the question is not whether there was any pressure placed on the agency, but whether the pressure was directed at the merits of the agency's decision. While the communications here concerned the permit approval process for the ATST and therefore "related directly to the dispute before" BLNR, we are not presented with evidence of communications relating to the merits that would constitute "direct and focused interference" in BLNR's decision-making. Id. at 124, 9 P.3d at 436. In sum, we do not find that the political pressure placed on BLNR rose to the level of impropriety.

██ We now turn to Kilakila's three requests for communications regarding the ATST. In its March 30, 2012 motion for disclosure, its June 12, 2012 motion to reconsider Minute Order No. 23, and its September 27, 2012 second motion to reconsider

---

**19.** The March 21, 2012 email from a member of the Governor's staff to Coppa stated that "[Sabas] requested a meeting today at 3 p.m. to discuss the telescope, hearings officer and funding issue." Similar to the January 30–31, 2012 emails, the email indicates an interest in knowing when the final BLNR decision will be made given funding deadlines. It was also sent prior to the March 21, 2012 meeting by someone who appears to have helped schedule the meeting, but did not actually attend it. Thus, the fact that this email mentions "funding" does demonstrate that Aila discussed the merits of the case at the March 21, 2012 meeting.

Minute Order No. 23, Kilakila sought the release of oral, written, and electronic communications involving BLNR members. Kilakila was specifically concerned with ex parte communications involving Aila, though it never moved to disqualify Aila or any other BLNR member. BLNR provided information about the March 21, 2012 meeting in response to the first two requests, and dismissed the third request outright.

We have concerns about BLNR's handling of Kilakila's requests. For example, in light of Kilakila's receipt of the January 30–31, 2012 emails, BLNR could have granted discovery limited to the parties involved in the emails, rather than dismissing the request outright. In future contested case hearings, BLNR could certainly do more to remove doubts of impropriety and build confidence in its permit approval process.

Despite these concerns, we cannot say that BLNR abused its discretion when it denied Kilakila's requests. "[A] determination made by an administrative agency acting within the boundaries of its delegated authority will not be overturned unless 'arbitrary, or capricious, or characterized by ... [a] clearly unwarranted exercise of discretion.'" Paul's Elec. Serv., 104 Hawai'i at 419, 91 P.3d at 501 (citing HRS § 91–14(g)(6)); see also Save Diamond Head Waters, 121 Hawai'i at 24, 211 P.3d at 82 (stating that an agency's exercise of discretion is reviewable under the arbitrary and capricious standard).

BLNR had broad discretion over Kilakila's discovery requests, and it did in fact provide additional information in response to the requests. See Hawai'i Ventures, LLC v. Otaka, Inc., 114 Hawai'i 438, 472, 164 P.3d 696, 730 (2007) (stating that courts have "considerable latitude and discretion" over discovery requests). In its Minute Order No. 23, BLNR disclosed the participants and nature of the March 21, 2012 meeting. Later, BLNR clarified that the meeting's topic of discussion concerned the timing of BLNR's decision in light of the dismissal of hearing officer Jacobson. Contrary to Kilakila's argument, BLNR was not required to provide all of the disclosures sought in the requests. See id. (determining that the circuit court did not abuse its discretion when it "did not grant all of the requests for discovery[,]" but did require an opposing party provide a financial statement which addressed concerns of improper payment underlying the discovery requests).

BLNR also provided its reasoning for not disclosing more information. It concluded that Kilakila's first request was too broad, noting that it did not provide a time frame for the request and encompassed communications beyond the subject of the contested case hearing. BLNR also concluded that Kilakila failed to show any improper ex parte communications, and as discussed above, we agree that the communications did not constitute an impermissible ex parte communication in violation of HAR § 13–1–37 or an improper political influence under the reasoning in Waiāhole.[20]

This reasoning was not unreasonable or unlawful. See Del Monte Fresh Produce, 112 Hawai'i at 509, 146 P.3d at 1086 (Hawai'i Labor Relations Board did not abuse its discretion when its disputed action was not "unreasonable or in disregard of principles of law"); see also Hac v. Univ. of Hawai'i, 102 Hawai'i 92, 100, 73 P.3d 46, 54 (2003) ("[T]he extent to which discovery is permitted ... is subject to considerable latitude and the discretion of the trial court.") (quoting Wakabayashi v. Hertz Corp., 66 Haw. 265, 275, 660 P.2d 1309, 1315 (1983)) (internal brackets omitted).

---

**20.** In circumstances such as these, we have never held that procedural communications with agency officials raise due process concerns. Thus, we need not employ any constitutional analysis, but instead must refer to the applicable statute and administrative rule, neither of which preclude procedural communications. See HRS § 91–13 ("No official of an agency who renders a decision in a contested case shall consult any person on any issue of fact except upon notice and opportunity for all parties to participate, save to the extent required for the disposition of ex parte matters authorized by law.") (emphasis added); HAR § 13–1–37. The communications here were permissible as they did not address the merits of the contested case or any issues of fact. Given that this issue involves a question of administrative law, the appropriate standard of review of BLNR's denial of Kilakila's disclosure requests is abuse of discretion. See Paul's Elec. Serv., 104 Hawai'i at 419, 91 P.3d at 501.

Therefore, we cannot conclude that BLNR abused its discretion. However, we caution public officials and other interested parties that contacts of the type involved here carry significant risk of creating the appearance of impropriety, and—as Jacobson's filings indicate—of having an effect on the process.

**B. BLNR properly analyzed the criteria under HAR § 13–5–30**

Kilakila argues that BLNR's decision to grant the permit was not supported by the evidence and does not satisfy HAR § 13–5–30(c), which provides eight criteria that BLNR must consider prior to approving a permit. Specifically, Kilakila argues that the ICA erred in affirming BLNR's findings under HAR § 13–5–30(c)(4), (5), and (6). We address these three criteria below.

**1. BLNR did not err in determining that the ATST would not have a substantial adverse impact under HAR § 13–5–30(c)(4)**

HAR § 13–5–30(c)(4) states: "The proposed land use will not cause substantial adverse impact to existing natural resources within the surrounding area, community, or region[.]" "Natural resource" is defined as "resources such as plants, aquatic life and wildlife, cultural, historic, recreational, geologic, and archeological sites, scenic areas, ecologically significant areas, watersheds, and minerals." HAR § 13–5–2.

Kilakila argues that the ICA erred in "rubberstamp[ing]" BLNR's findings of no substantial adverse impact on existing natural resources, specifically cultural and visual resources. Kilakila argues that the ICA, the circuit court, and BLNR erred by failing to cite any evidence that the impacts to cultural resources would be less than substantial and that mitigation measures would reduce the intensity of the impacts. Kilakila further asserts that BLNR erred in disregarding certain findings in the FEIS to conclude that the ATST would not have a substantial impact on scenic vistas.

Despite Kilakila's contentions, we do not find that BLNR's treatment of the FEIS and its analysis under HAR § 13–5–30(c)(4) was clearly erroneous. See Save Diamond Head Waters, 121 Hawai'i at 25, 211 P.3d at 83 ("A conclusion of law that presents mixed questions of fact and law is reviewed under the clearly erroneous standard[.]").

It is undisputed that the FEIS concluded that there would be adverse impacts on cultural and visual resources from the construction and operation of the ATST. The FEIS determined that there would be "major, adverse, short- and long-term, direct impacts" on cultural resources and that mitigation measures "would not reduce the impact intensity[.]" It also determined that the direct impact on visual resources within the Haleakalā National Park would be "moderate, adverse and long-term" and that "[n]o mitigation would adequately reduce this impact." From outside the Park, the impact of building the ATST "would result in minor, adverse and long-term impact to visual resources[,]" and therefore "[n]o mitigation would be necessary."

Kilakila suggests that the FEIS findings required BLNR to determine that HAR § 13–5–30(c)(4) was not satisfied. While BLNR was required to consider the findings in the FEIS, it was not bound by these findings and still retained discretion over its decision. See Mauna Kea Power Co. v. Bd. of Land & Nat. Res., 76 Hawai'i 259, 265, 874 P.2d 1084, 1090 (1994) (affirming BLNR determination despite conflicting conclusions in EIS). In other words, BLNR was not required to conclude that the ATST would not satisfy HAR § 13–5–30(c)(4) solely because the FEIS determined there would be major adverse impacts on cultural resources. Rather, an environmental impact statement is "merely an informational document," and its findings neither presume approval nor denial of a conservation district use application. Id.; see also HRS § 343–2 (defining "environmental impact statement" as "an informational document").

As such, in making its decision to grant the permit, BLNR properly considered the FEIS, along with the information provided by the permit application, the site visits and maps, the public hearing testimony, the contested case hearing testimony and evidence, the hearing officer's recommendation, and

other documents. See HAR §§ 13–5–31, 13–5–40 (1994), 13–1–28; see also Camara v. Agsalud, 67 Haw. 212, 216, 685 P.2d 794, 797 (1984) ("[I]n deference to the administrative agency's expertise and experience in its particular field, the courts should not substitute their own judgment for that of the administrative agency where mixed questions of fact and law are presented. This is particularly true where the law to be applied is not a statute but an administrative rule promulgated by the same agency interpreting it.") (citation omitted).

■ Next, Kilakila argues that BLNR did not sufficiently explain how it reached its decision despite the conflicting findings in the FEIS. More specifically, Kilakila asserts that BLNR should have provided "supporting analytical data" for its decision, rather than "a perfunctory description or mere listing of mitigation measures[.]" Kilakila takes this language from Makua v. Rumsfeld, in which the U.S. District Court for the District of Hawai'i concluded that a supplemental environmental assessment's finding of no significant impact on endangered species "contain[ed] no analysis or evidence of the effectiveness of [the] mitigation measures" and therefore was insufficient. 163 F.Supp.2d 1202, 1218 (D. Haw. 2001).

■ In addition to not being binding on this court, Makua is not analogous because the issue in that case was whether an environmental impact statement should have been prepared. Id. at 1216. Here, an environmental impact statement was completed, and BLNR subsequently determined "[b]ased upon the evidence and testimony presented in this case, and the files and records herein," that a permit approval was warranted. Furthermore, this court has never required an agency to provide "supporting analytical data" to uphold its findings. Instead, our court requires that "where the record demonstrates considerable conflict or uncertainty in the evidence, the agency must articulate its factual analysis with reasonable clarity, giving some reason for discounting the evidence rejected." Waiāhole, 94 Hawai'i at 163–64, 9 P.3d at 475–76 (emphasis added).

We therefore consider whether BLNR articulated with reasonable clarity why the ATST would not result in a substantial adverse impact on natural resources, despite the apparently conflicting findings in the FEIS.

BLNR noted that "[t]he impacts of the ATST Project must be viewed in the context of the HO site[,]" which has "housed astronomy facilities since the 1950's and was specifically created for astronomy uses." There are eleven facilities currently located within the HO site, and the ATST would leave only one vacant location, the Reber Circle site.

Due to these existing facilities in the HO, the FEIS found that there would be "major, adverse, long-term, direct impacts" on cultural resources even under the No–Action Alternative. The No-Action Alternative refers to the scenario in which "no construction [of the ATST] would take place and operations [in the HO] would continue unaltered." These impacts are almost identical to the impacts that would result from the construction of the ATST, which the FEIS described as "major, adverse, short- and long-term, direct." Therefore, regardless of whether or not the ATST was constructed, the FEIS determined that there would be major, adverse impacts on cultural resources.

Consistent with this finding in the FEIS, BLNR concluded that "because of the past construction of man made structures[,]" the ATST's additional impact on cultural resources would be "incremental[.]" BLNR concluded that the impact on visual resources would be similarly incremental: "[T]he ATST would be visible to a point of co-dominance with other nearby structures" and "would not substantially alter the existing visual character visible in any view." In other words, BLNR concluded that the ATST would have an impact on cultural and visual resources, but given the existing buildings in the HO, BLNR concluded that the impact would not be substantial.

BLNR also considered mitigating measures when determining whether ATST would have a substantial adverse impact on natural resources. In the CDUA, UHIfA committed to mitigation measures "intended to reduce the duration, intensity or scale of impacts or to compensate for the impact by replacing or

providing substitute resources or environments." The measures specifically directed at reducing cultural and visual impacts included creating a Native Hawaiian Working Group to address issues concerning Native Hawaiians, setting aside area within the HO site solely for use by Native Hawaiians, removing unused facilities, and decommissioning the ATST within 50 years.

Other mitigating effects included the expected scientific, economic, and educational benefits of the ATST. BLNR determined that the ATST would result in "the advancement of scientific knowledge," as it would "significantly increase understanding of the Sun ... and help scientists predict major solar events having a profound impact on life on Earth." Additionally, BLNR noted that "[j]obs and revenue for the economy would be created on Maui," including job opportunities in the "clean high-tech industry." It also concluded that "[e]ducational opportunities would be created for students at the Maui Community College as well as for native Hawaiian astronomers" to "foster a better understanding of the relationships between native Hawaiian culture and science." [21]

Additionally, BLNR noted that the ATST was designed to be as small as possible while still being consistent with scientific needs. It also added permit conditions that would mitigate impacts on cultural resources, including:

17. Within 2 years of completion of the construction of the ATST facility, Kilakila may require the construction and consecration of a new ahu [22] in addition to the two currently present. Upon request by Kilakila, UHIfA will work with Kilakila, the Cultural Specialist and the Native Hawaiian Working Group to select an appropriate location for the new ahu which shall be built and consecrated in [a] similar manner to the prior ahu;

. . . .

20. In order to protect the traditional and customary rights exercised in the HO site, during construction of the ATST Project and after, UHIfA shall allow access to the two ahu for the reasonable exercise of traditional and customary practices of native Hawaiians to the extent feasible and safe, as determined by the Cultural Specialist and the ATST Project construction site supervisor.

Based on this analysis, BLNR concluded that "[t]he proposed land use, when considered together with all minimization and mitigation commitments discussed ... and with the additional conditions contained in this Decision, will not cause substantial adverse impact [sic] to existing natural resources within the surrounding area, community or region."

 In reviewing BLNR's findings under HAR § 13–5–30(c)(4), we first consider BLNR's reliance on the "incremental" nature of the ATST Project. We agree with Kilakila that BLNR does not have license to endlessly approve permits for construction in conservation districts, based purely on the rationale that every additional facility is purely incremental. It cannot be the case that the presence of one facility necessarily renders all additional facilities as an "incremental" addition.

---

21. Specifically, Maui College submitted a "mitigation proposal," which requested funding for:

(1) development and implementation of an innovative math and science curriculum and program based on Hawaiian cultural knowledge and worldview; (2) building up relevant coursework and dedicated programs at Maui College; (3) significantly increasing the number and retention of native Hawaiian students in Science, Technology, Engineering and Math ("STEM") courses and programs at Maui College; and (4) cultivating and developing an experienced, highly skilled native Hawaiian workforce for STEM related industries and careers.

The National Science Foundation adopted the proposal and "will make $ 20 million ($ 2 million per fiscal year for ten years) available to support this educational initiative to address the intersection between traditional native Hawaiian culture and science and to foster a better understanding of the relationships between native Hawaiian culture and science."

22. An "ahu" is defined as an altar or shrine. Pukui & Elbert, Hawaiian Dictionary 8 (2nd ed. 1986). In 2005, UHIfA contracted with Native Hawaiian stonemasons to erect a west-facing ahu within the HO site. In 2006, "in the spirit of makana aloha for the ATST Project," UHIfA contracted with the same stonemasons to erect an east-facing ahu in the HO site.

In spite of our concerns, we are not "left with a firm and definite conviction" that BLNR made a mistake in reaching its conclusion given the highly specific circumstances of this case. Brescia v. N. Shore Ohana, 115 Hawai'i 477, 491–92, 168 P.3d 929, 943–44 (2007) ("An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantive evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made.") (quoting Poe v. Hawai'i Labor Relations Bd., 105 Hawai'i 97, 100, 94 P.3d 652, 655 (2004)).

BLNR reviewed the ATST Project within the context of a single, highly developed 18.166–acre area within a much larger conservation district, and which involves a use (astromony) which is specifically permitted in the general subzone of the conservation district. The FEIS also determined that the level of impacts on natural resources would be substantially the same even in the absence of the ATST. In addition, UHIfA committed to mitigation measures directed at reducing the cultural and visual impacts on natural resources. See HAR § 13–5–42(a)(9) (1994) ("All representations relative to mitigation set forth in the accepted environmental assessment or impact statement for the proposed use are incorporated as conditions of the permit[.]"); see also Morimoto v. Bd. of Land & Nat. Res., 107 Hawai'i 296, 303, 113 P.3d 172, 179 (2005) (concluding that BLNR properly considered mitigation measures when evaluating HAR § 13–5–30(c)(4)). Taken cumulatively, BLNR "articulate[d] its factual analysis with reasonable clarity" why the ATST would not result in a substantial adverse impact on natural resources. Waiāhole, 94 Hawai'i at 164, 9 P.3d at 476.

■ Lastly, Kilkila argues that BLNR made its findings under HAR § 13–5–30(c) based on "unwritten criteria," referring to BLNR's mention of the ATST's scientific, economic, and educational benefits in its findings under HAR § 13–5–30(c)(4). However, there is no regulation suggesting that BLNR could not consider benefits related to HAR § 13–5–30(c) when approving a permit. HAR § 13–5–30(c) states, "In evaluating the merits of a proposed land use, the department or board shall apply the following criteria[,]" but the statute and agency regulations concerning conservation districts do not suggest that scientific, economic, and education benefits are not relevant. Rather, they suggest the opposite.

The purpose of HAR § 13–5–30(c) and the other conservation district regulations is "to regulate land-use in the conservation district for the purpose of conserving, protecting, and preserving the important natural and cultural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety, and welfare." HAR § 13–5–1 (1994). The statute governing the conservation districts, HRS § 183C–1 (Supp. 1996), similarly states:

> The legislature finds that lands within the state land use conservation district contain important natural resources essential to the preservation of the State's fragile natural ecosystems and the sustainability of the State's water supply. It is therefore, the intent of the legislature to conserve, protect, and preserve the important natural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety and welfare.

■ BLNR is therefore unequivocally tasked with protecting natural and cultural resources through "appropriate management and use to promote their long-term sustainability and the public health, safety, and welfare." HRS § 183C–1; HAR § 13–5–1. The consideration of relevant scientific, economic, and educational benefits of the ATST within the context of the HO does not conflict with this, as these benefits impact long-term sustainability and public welfare.[23] See Black's

23. We agree with Kilakila that BLNR should not have considered that "[j]obs and revenue for the economy would be created on Maui" under 13–5–30(c)(4) inasmuch as jobs unrelated to the preservation and advancement of natural or cultural resources are irrelevant. However, as BLNR properly considered the scientific and educational benefits in addition to the findings in the FEIS and numerous other mitigating measures, we conclude that this error was harmless. See Korean Buddhist Dae Won Sa Temple, 87 Hawai'i at 241–42, 953 P.2d at 1339–40 (holding

Law Dictionary 1828 (10th ed. 2014) (defining "public welfare" as "[a] society's well-being in matters of health, safety, order, morality, economics, and politics").

The cases cited by Kilakila are not applicable here, where an agency has evaluated considerations relevant to—rather than instead of—the criteria set forth in the applicable regulations. See Aluli v. Lewin, 73 Haw. 56, 58, 828 P.2d 802, 803 (1992) (agency had no rules governing the issuance of permit); Mahuiki v. Planning Comm'n, 65 Haw. 506, 519, 654 P.2d 874, 882 (1982) (court found no evidence in the record supporting agency finding); Ainoa v. Unemployment Compensation Appeals Div., 62 Haw. 286, 293, 614 P.2d 380, 385 (1980) (agency failed to comply with existing requirements); Aguiar v. Hawai'i Hous. Auth., 55 Haw. 478, 498, 522 P.2d 1255, 1268 (1974) (same).

Therefore, while BLNR could certainly not rely solely on the scientific, economic, or educational benefits of the ATST, BLNR did not improperly consider benefits relevant to the ATST's expected impact on existing natural resources under HAR § 13–5–30(c)(4). See Morimoto, 107 Hawai'i at 303, 113 P.3d at 179 (allowing BLNR to consider mitigation measures even though not explicitly mentioned in HAR § 13–5–30(c)).

Accordingly, we find that BLNR's conclusion that the ATST satisfied the criteria under HAR § 13–5–30(c)(4) was not clearly erroneous, though we emphasize that review of future BLNR decisions will be "dependent upon the facts and circumstances of the particular case." Save Diamond Head Waters, 121 Hawai'i at 25, 211 P.3d at 83 (quoting Del Monte Fresh Produce, 112 Hawai'i at 499, 146 P.3d at 1076).

### 2. BLNR did not err in interpreting HAR § 13–5–30(c)(5) to include the area within the HO

■ HAR § 13–5–30(c)(5) states: "The proposed land use, including buildings, structures, and facilities, shall be compatible with the locality and surrounding areas, appropriate to the physical conditions and capabilities of the specific parcel or parcels[.]" Kilakila argues that the ICA erred in affirming BLNR's interpretation of "locality and surrounding areas" in HAR § 13–5–30(c)(5) as the immediate vicinity of the proposed ATST site. Rather, Kilakila asserts that "surrounding areas" includes Haleakalā National Park, and that there is no evidence that the ATST is compatible with the Park.

In its consideration of HAR § 13–5–30(c)(5), BLNR focused on the permitted land use in the HO site:

> The HO site was specifically set aside for observatory site purposes under Executive Order No. 1987. Astronomical and observatory facilities have existed on the HO site since 1951. The ATST Project includes the construction of astronomical facilities which are compatible with the locality and surrounding areas, appropriate to the physical conditions and capabilities of the specific parcel.

Because it did not mention areas outside of the HO site, BLNR necessarily interpreted "locality and surrounding areas" as the areas within the HO site.

We defer to BLNR's interpretation unless it was plainly erroneous or inconsistent with the underlying legislative purpose. See Kaleikini v. Yoshioka, 128 Hawai'i 53, 67, 283 P.3d 60, 74 (2012) ("An agency's interpretation of its own rules is generally entitled to deference."); In re Wai'ola O Moloka'i, Inc., 103 Hawai'i 401, 425, 83 P.3d 664, 688 (2004) (stating that courts do not defer to agency interpretations that are "plainly erroneous or inconsistent with the underlying legislative purpose").

The ATST will be located in a small subsection of the HO site, which is a clearly defined, highly specialized area. The HO site's 18.166 acres were specifically set aside for observatory site purposes by Governor Quinn in 1961, and this site is the only site at Haleakalā used for these purposes. Since Governor Quinn's designation, the HO has been considerably developed by the construction of numerous observatories and other

---

that the Director of the Department of Land Utilization's improper consultation of evidence outside the record was harmless error because

"the outcome of the proceedings would not have been altered").

astronomical research facilities. The ATST will be the next facility built within the site's set boundaries and will fulfill the site's designated purposes. As such, it was not plainly erroneous to interpret "locality" as the location of the ATST and "surrounding areas" as the HO site, due to the site's unique characteristics and history.

Kilakila argues that BLNR recognized that Haleakalā National Park was part of the "surrounding area" based on a quote from the BLNR order approving the permit. In describing a site visit, BLNR states:

> The parties and Hearing Officer Jacobson visited the site of the proposed ATST and the surrounding area on July 15, 2011. They observed the views from the area, the proximity of the structures to each other, the ahu in the HO site and views from them, the view from Puʻu ʻUlaʻula, the view from Haleakalā National Park Visitor Center and the area around the Visitor Center, the view from the road driving up to the HO site, and the historic sites in the HO site.

This quote does not demonstrate any such recognition, as the second sentence appears to simply be listing locations without any reference to the first sentence's use of "surrounding area." Regardless, the fact that BLNR used the term "surrounding area" in describing a site visit does not bind BLNR to this exact definition when interpreting HAR § 13–5–30(c)(5).

Therefore, the ICA did not err in affirming BLNR's conclusions under HAR § 13–5–30(c)(5).

3. **BLNR did not err in concluding existing aspects of the land would be preserved under HAR § 13–5–30(c)(6)**

▆ HAR § 13–5–30(c)(6) states: "The existing physical and environmental aspects of the land, such as natural beauty and open space characteristics, will be preserved or improved upon, whichever is applicable[.]" Kilakila argues that HAR § 13–5–30(c)(6) is not satisfied because UH admitted that the ATST does not improve natural beauty or open space characteristics, and because "BLNR failed to point to any evidence that

ATST preserves natural beauty and open space[.]"

In its consideration of HAR § 13–5–30(c)(6), BLNR noted that "[t]he ATST will not enhance the natural beauty or open space characteristics of the HO site." However, because "[t]he HO site contains various astronomy facilities, including support buildings, roads and parking lots[,]" and "the proposed ATST is similar to existing facilities," BLNR concluded that "[t]he ATST will be consistent with and will preserve the existing physical and environmental aspects of the land." In other words, BLNR relied on similar reasoning as in HAR § 13–5–30(c)(4), which focused on the ATST within the context of the HO site. Because the ATST will be located within the HO site and among other pre-existing facilities, the ATST will maintain, or "preserve," the "existing physical and environmental aspects of the land[.]"

Additionally, BLNR considered numerous mitigation commitments in the CDUA, which were designed to mitigate impacts on biological resources. The measures included consulting a wildlife biologist, monitoring invertebrates, flora, and fauna, and following washing and inspection protocol to prevent the introduction of alien invasive species. BLNR also determined that "[l]ittle to no impacts are anticipated to the topography, geology, soils, water resources or air quality as a result of the ATST Project and as such no mitigation is required."

Therefore, similar to its analysis of HAR § 13–5–30(c)(4), BLNR articulated with "reasonable clarity" why the ATST would preserve the existing physical and environmental aspects of the land. See Waiāhole, 94 Hawaiʻi 97 at 164, 9 P.3d at 476. Because we are not "left with a firm and definite conviction that a mistake has been made," we do not find BLNR's findings regarding HAR § 13–5–30(c)(6) clearly erroneous, and we affirm the ICA on this point. Brescia, 115 Hawaiʻi at 492, 168 P.3d at 944.

C. **The ATST is not Inconsistent with the Purposes of Conservation Districts and General Subzones**

▆ Kilakila argues that the ICA erred in determining that the ATST is consistent

with the purposes of the conservation district because of its "unprecedented height, mass, and scale; industrial appearance; use of hazardous materials, location in 'Science City', location in an area that is already 40% developed, and substantial impacts[.]" The issue presents a mixed question of fact and law, and is therefore "reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case." Save Diamond Head Waters, 121 Hawaiʻi at 25, 211 P.3d at 83 (quoting Del Monte Fresh Produce, 112 Hawaiʻi at 499, 146 P.3d at 1076).

To grant a CDUP in a conservation district, HAR § 13–5–30(c)(1) requires that the proposed land use is "consistent with the purpose of the conservation district[.]" Additionally, HAR § 13–5–30(c)(2) requires that the proposed land use must be "consistent with the objectives of the subzone of the land on which the use will occur[.]" The ATST must therefore be consistent with the purposes of general subzones and conservation districts.

A general subzone seeks to "designate open space where specific conservation uses may not be defined, but where urban use would be premature." HAR § 13–5–14(a). HAR § 13–5–24 together with HAR § 13–5–25 provide guidance on appropriate land uses in general subzones. HAR § 13–5–24 lists "astronomy facilities under an approved management plan" as one of the allowable uses under a resource subzone. HAR § 13–5–25 states that "[i]n addition to the land uses identified [for general subzones], all identified land uses ... for the ... resource subzones also apply to the general subzone, unless otherwise noted." Together, these rules specifically permit the construction of astronomy facilities and do not specify a limit as to size, appearance, or other characteristics. As an astronomy facility, the ATST falls under an appropriate use and is not inconsistent with the purposes of a general subzone.

Additionally, as discussed above, the ATST complies with the broad purposes set out in the statute and agency rules regulating conservation districts. See HAR § 13–5–1 (directing BLNR to manage natural and

cultural resources "to promote their long-term sustainability and the public health, safety, and welfare"); HRS § 183C–1 (stating that the legislature created conservation districts "to conserve, protect, and preserve the important natural resources of the State through appropriate management and use to promote their long-term sustainability and the public health, safety and welfare").

In sum, BLNR did not erroneously conclude that the ATST was consistent with the purposes of both general subzones and conservation districts.

## IV. Conclusion

For the reasons stated above, BLNR properly granted CDUP MA–11–04 for construction of the ATST. The permit did not suffer from the procedural infirmities of prejudgment or improper ex parte communications, BLNR made valid findings under the applicable permit criteria, and the ATST is not inconsistent with the purposes of the conservation district. Therefore, the ICA's November 13, 2014 Judgment on Appeal is affirmed.

## CONCURRING OPINION BY McKENNA, J.

I have joined the majority opinion. I write to address a few additional points, but not to address all of the dissent's characterizations of my concurrence.

**1. The Board Of Land And Natural Resources' Approval Of Conservation District Use Permits Before Conducting Contest Case Hearings Departed From Previous Practice**

Approving conservation district use ("CDU") permits before contested case hearings, the process initially followed by the Board of Land and Natural Resources ("BLNR") for the Advanced Technology Solar Telescope ("ATST") before our remand in Kilakila I[1] and for the Thirty Meter Telescope ("TMT") on Mauna Kea before our remand in Mauna Kea Anaina Hou v. Bd. of Land & Nat. Res., 136 Hawaiʻi 376, 363 P.3d 224 (2015), was a major departure from

1. Kilakila ʻO Haleakala v. Bd. of Land & Nat. Res., 131 Hawaiʻi 193, 317 P.3d 27 (2013).

BLNR's prior CDU permitting procedure. For example, as outlined in Morimoto v. Bd. of Land & Nat. Res., 107 Hawai'i 296, 300, 113 P.3d 172, 176 (2005), BLNR issued a CDU permit allowing upgrades to Saddle Road after a contested case hearing that considered challenges based on impacts on the Palila and endangered and threatened species. As reflected in Dedman v. Bd. of Land & Nat. Res., 69 Haw. 255, 257–58, 740 P.2d 28, 30–31 (1987), the BLNR issued a CDU permit allowing development of geothermal energy in the Kilauea Middle East Rift Zone after conducting contested case hearings that considered free exercise of religion challenges. Finally, Stop H–3 Assoc. v. State Dep't of Transp., 68 Haw. 154, 157, 706 P.2d 446, 448–49 (1985), points out that the initial BLNR CDU permit for a realigned H–3 was invalidated by the circuit court because a contested case hearing on environmental challenges had not been held before its issuance.

BLNR's new procedure of approving CDU permits before conducting contested case hearings was based on its mistaken interpretation of what was allowed by the 2009 amendments to its administrative rules. Mauna Kea, 136 Hawai'i at 398, 363 P.3d at 246. Thus, in Kilakila I, this court held "that a contested case hearing should have been held, as required by law and properly requested by KOH on UH's application prior to BLNR's vote on the [CDU permit] application." 131 Hawai'i at 206, 317 P.3d at 40. Then in Mauna Kea, a majority of this court also held that approval of a CDU permit before a contested case hearing violated the due process rights of parties with standing to assert Native Hawaiian traditional and customary rights. Mauna Kea, 136 Hawai'i 376, 363 P.3d 224.

## 2. Issuance Of The Second CDUA Permit For The ATST Met Constitutional Due Process Requirements

The first permit in this case, issued before a contested case hearing, was effectively invalidated by our ruling in Kilakila I. A second permit issued in late 2012, after a contested case hearing and report by the second hearing officer, and a new vote by a reconstituted BLNR, which had several new members, including a new Chair. This second permit superseded the first permit improperly issued before a contested case hearing. Thus, although the process was less than ideal, the second permit minimally comported with Mauna Kea's procedural due process requirement.

## 3. "Pressure" On The First Hearing Officer

The dissent focuses on the pressure placed on the first hearing officer to hurry up and issue his report due to apparent concerns regarding possible loss of funding for the ATST. The pressure apparently started after about five months had elapsed after the first contested case hearing had finished. There is no suggestion of any attempt at direct contact with the hearing officer by staff from Senator Inouye or the Governor's offices. Rather, the hearing officer's administrative supervisors from the state executive branch asked the hearing officer when the report would issue, and later requested daily reports.

It is not unusual for adjudicative officers, including judges, to report to administrative supervisors regarding the status of decisions that remain outstanding. Requests for updates as to when a decision will be forthcoming are not improper, as long as the administrative supervisor does not comment at all on the substance of the decision. The first hearing officer was clear that the pressure never included any suggestion that he should reach a particular result. Although the hearing officer was apparently told at some point that these requests for updates had come from persons other than his administrative supervisors, there is no indication that there was any request to convey that information to the hearing officer. In other words, there is no indication that there was an actual attempt to effectuate ex parte communications with the first hearing officer, even if only on procedural matters.

Whether or not such pressure should have been placed on the first hearing officer, as noted in the majority opinion, any concern of impropriety in this regard was removed when the first hearing officer was replaced.

This was the relief requested by Kilakila, and it was granted.

Therefore, these allegations regarding pressure on the first hearing officer are not directly relevant to the legal issues in this case.

### 4. There Is No Actual Evidence Of Decision Makers Engaging In Improper Ex–parte Communications

With respect to the communications with the Chair of BLNR, the Chair is a member of the Governor's Cabinet, and represents the BLNR and the Department of Land and Natural Resources. The Chair is the obvious person to respond to the Governor and to the community regarding the procedural status of the work of the BLNR, even on adjudicative matters. Hawai'i Administrative Rules ("HAR") § 13–1–37 (effective 1982) recognizes as much, by allowing ex parte communications on procedural matters.

With respect to the assertions or questions whether Senator Inouye's chief of staff was acting as a representative of UH at the March 2012 meeting, I note that the January 2012 e-mail from the Senator's chief of staff to the UH representative offering to "carry the uh message" was <u>before</u> the first hearing officer issued his preliminary report in February. The urgent need for issuance of that report was the "message" to be conveyed. By the time the meeting took place in March, however, the first hearing officer had already issued his report the month before. Therefore, the reason to "carry the uh message" no longer existed.

Although the March meeting should have been avoided due to the questions it raises, it was not improper just because it was undisclosed. As the Chair was not meeting with a party and because the subject matter concerned procedural matters, it did not constitute an ex-parte communication prohibited by HRS § 91–9(g) and/or HAR § 13–1–77. I also note that the Attorney General of the State of Hawai'i was present at the meeting. The Attorney General is a member of the Hawai'i bar and Senator Inouye's chief of staff is also a lawyer. Lawyers are well aware of prohibitions on ex parte communications with adjudicators, except on procedural questions.

Finally, it is important to note that despite Kilakila's knowledge of communications and the meeting involving the Chair well before issuance of the second hearing officer's report and the BLNR's vote granting the second permit, it did not request that the Chair be disqualified, as it had with the first hearing officer.

Despite my analysis, I do not in any way condone meetings and discussions with administrative adjudicators. Hawai'i Revised Statutes § 171–4(b) (2011 & Supp. 2014) prohibits BLNR members from participating in or voting on any matters in which they have a direct or indirect interest, and BLNR rule HAR § 13–1–37 prohibits ex parte communications by parties with BLNR members concerning the substance of and during the pendency of potential or actual contested case matters. Due process considerations, however, prohibit administrative adjudicators from discussing the substance of contested case matters during the pendency of potential or actual contested case matters, whether with parties or with others. It is therefore preferable and indeed advisable that procedural questions be raised and responded to in writing, so that questions do not linger whether improper communications took place regarding the substance of contested matters. Thus, although BLNR members differ from judges, as administrative adjudicators, they must not allow ex parte communications on substantive matters during the pendency of potential or actual contested case matters and would be well advised to ensure that any communications regarding procedural matters are disclosed in writing to all parties.

### 5. The BLNR Performed Its Functions In A Manner That Fulfills The State's Affirmative Obligations Under The Hawai'i Constitution

In <u>Mauna Kea</u>, in addition to the due process holding, a majority of this court held that a state agency must perform its functions in a manner that fulfills the State's affirmative obligations under the Hawai'i constitution. 136 Hawai'i at 414, 363 P.3d at 262 (Pollack, J., concurring).

Applying this second holding, I believe the BLNR performed its functions in a manner that fulfills the State's affirmative obligations under the Hawaiʻi constitution. In this case, those duties included considering and applying the State's obligations under Article XI, section 1 and Article XII, section 7 of the Constitution of the State of Hawaiʻi, which provide as follows:

Article XI, section 1:

For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.

All public natural resources are held in trust by the State for the benefit of the people.

Article XII, section 7:

The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by ahupuaʻa tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

Although not necessarily couched in the language of these constitutional provisions, the findings and conclusions of the BLNR, as outlined in the majority opinion, illustrate that the BLNR carefully considered and applied the applicable constitutional considerations.

Therefore, as to the CDU permit for the ATST at Haleakalā, the requirements set out by the majority opinions in Mauna Kea were met.

For these and the reasons stated therein, I join the majority opinion.

1. The ATST has since been renamed as The Daniel K. Inouye Solar Telescope. Daniel K. Inouye

DISSENTING OPINION BY POLLACK, J., IN WHICH WILSON, J., JOINS AS TO PARTS IA AND II

When an administrative agency acting in a quasi-judicial capacity makes or receives (1) substantive ex parte communications, (2) procedural ex parte communications that have the potential to influence the agency adjudicator, or (3) ex parte contacts with interested persons or parties in the case, due process under the Hawaiʻi Constitution requires disclosure of the communications. Due process also prohibits the insertion of external political pressure into a quasi-judicial administrative proceeding. The state of the record in this case prevents this court from fulfilling its responsibility to independently review whether inappropriate ex parte communications affected the validity of the Advanced Technology Solar Telescope (ATST) [1] permit issued by the Board of Land Natural Resources (BLNR). Similarly, the record is inadequate for this court to conclude that external political pressure was not made an ingredient in the BLNR Chair's decisionmaking process. In order for this court to resolve these issues, this case should be temporarily remanded to BLNR for a detailed disclosure of certain ex parte communications that occurred in this case and an adversarial hearing regarding the matters disclosed, instead of relying, as the majority does, on a decidedly incomplete record.

The consequences of the majority's decision should not be understated. It means that during the decisional phase of contested case proceedings, the decisionmakers can meet in private with interested persons strongly supporting one side or a particular outcome in the case. These interested persons can be representatives of a United States Senator or the Governor, members of advocacy groups, or employees of companies that may gain an economic advantage by the decision. Neither the existence nor the substance of the meeting needs to be disclosed to any other party in the case if the meeting is characterized by the decisionmakers of the contested hearing as a meeting related to procedural matters. If by some fortuitous circumstance the exis-

Solar Telescope, http://dkist.nso.edu/ (last visited July 25, 2016).

tence of the meeting is discovered by another party in the case, then the decisionmakers need only state that the meeting was procedural in nature to obviate the need for further disclosure. Lacking any other information about the meeting, courts will be unable to independently review the "procedural" characterization offered by the agency. Consequently, as the majority has done in this case, the agency's characterization will be accepted without any objective analysis and despite indications pointing to a contrary conclusion. Because I believe that our law provides a higher degree of procedural fairness in contested case proceedings, I respectfully dissent.

## I. Ex Parte Contacts and Due Process

### A. Disclosure of Ex Parte Communications Is Warranted by Constitutional Due Process and the Hawai'i Administrative Procedure Act

#### 1. Due Process

A cornerstone of administrative law is the principle of record exclusivity, which requires quasi-judicial administrative decisionmaking to be based "solely on the evidence adduced at the hearing." Bernard Schwartz, Administrative Law § 7.13, at 367 (2d ed. 1984); HRS § 91–9(g); see generally Sandy Beach Def. Fund v. City Council of Honolulu, 70 Haw. 361, 391, 773 P.2d 250, 268 (1989) (Nakamura, J., dissenting). Record exclusivity is an integral component of constitutional due process, in that the right to a contested case hearing is rendered meaningless if an agency strays from the properly introduced evidence and considers in its lieu (or in addition to) information gathered through ex parte contacts. See Ohio Bell Tel. Co. v. Pub. Utils. Comm'n, 301 U.S. 292, 300, 57 S.Ct. 724, 81 L.Ed. 1093 (1937) (holding that the agency violated due process by relying on statistical information not introduced into evidence and by depriving the party of the opportunity for rebuttal); Schwartz, supra, § 7.13, at 367–68. Three purposes are served by the rule of record exclusivity: "First, it helps to ensure that the agency does not make decisions that have no adequate basis in fact; second, it gives opposing parties the opportunity to challenge the agency's reasoning process and

the correctness of the decision; and third, it affords reviewing courts the opportunity to evaluate the decision." City of Fairbanks v. Alaska Pub. Utils. Comm'n, 611 P.2d 493, 495 (Alaska 1980); accord Schwartz, supra, § 7.13, at 368.

Thus, when agency decisionmaking is influenced by facts extraneous to the record, such as those introduced through ex parte communications, elementary precepts of due process guaranteed by both the state and federal constitutions are offended. See Mauna Kea Power Co. v. Bd. of Land & Nat. Res., 76 Hawai'i 259, 263, 874 P.2d 1084, 1088 (1994) (intimating that due process would have been denied had the ex parte communications not been disclosed and the hearing reopened to allow the opposing party to respond to the contents of the ex parte communications); Guenther v. Comm'r, 939 F.2d 758, 760–61 (9th Cir. 1991) (reasoning that due process under the Fifth Amendment is violated when ex parte communications result in unfair prejudice to a party). As aptly explained by the D.C. Circuit, "[w]here agency action resembles judicial action, where it involves formal rulemaking, adjudication, or quasi-adjudication among 'conflicting private claims to a valuable privilege,' the insulation of the decisionmaker from ex parte contacts is justified by basic notions of due process to the parties involved." Sierra Club v. Costle, 657 F.2d 298, 400 (D.C. Cir. 1981) (footnote omitted). Injection of ex parte communications into the quasi-judicial decisionmaking process of an administrative agency is inconsistent "with fundamental notions of fairness implicit in due process and with the ideal of reasoned decisionmaking on the merits which undergirds all of our administrative law." Home Box Office, Inc. v. FCC, 567 F.2d 9, 56 (D.C. Cir. 1977).

It follows that when ex parte communications are introduced into an agency adjudication, due process may require their disclosure. Two distinct interests are served by disclosure: (1) "to prevent the appearance of impropriety from secret communications in a proceeding that is required to be decided on the record" and (2) to allow parties to "respond effectively and ensure that [their] position is fairly considered." Prof'l Air Traffic

Controllers Org. v. Fed. Labor Relations Auth. (PATCO v. FLRA II), 685 F.2d 547, 563–64 (D.C. Cir. 1982). In addition, disclosure of ex parte communications would permit appellate courts to independently and effectively determine whether such communications provide grounds for the invalidation of an agency's decision. Cf. id. at 564 n.32 (reasoning that "effective judicial review may be hampered if ex parte communications prevent adversarial decision of factual issues by the agency"). In determining whether an ex parte communication must be disclosed under due process principles, one must ask whether the communication would produce an appearance of impropriety or prevent parties from meaningfully responding to the contents of the communication; if so, then disclosure is mandatory. Id. at 563 ("When the[ ] interests of openness and opportunity for response are threatened by an ex parte communication, the communication must be disclosed."). "It matters not whether the communication comes from someone other than a formal party or if the communication is clothed in the guise of a procedural inquiry." Id. Only when an ex parte communication "does not threaten the interests of openness and effective response" would disclosure not be necessary. Id.

Substantive ex parte communications and ex parte communications involving parties or interested persons bear the highest potential of infringing upon the due process interests of openness and opportunity to respond. Substantive ex parte communications from anyone, even those exchanged with disinterested persons, possess a significant potential of giving rise to the appearance of impropriety. In such instances, the agency would appear to be considering outside, off-the-record information or that it is somehow beholden to or influenced by the predilections of the persons with whom the ex parte communications were exchanged.

When an adjudicating agency engages in undisclosed ex parte communications with a party, the agency has effectively authorized off-the-record communications, giving rise to the impression that the agency is predisposed towards the interests of that party. The same is true if ex parte communications are made to or received from an interested person, defined under federal law as "any individual or other person with an interest in the agency proceeding that is greater than the general interest the public as a whole may have." Portland Audubon Soc'y v. Endangered Species Comm'n, 984 F.2d 1534, 1544 (9th Cir. 1993) (quoting H.R. Rep. No. 94–880, pt. I, at 19–20 (1976), reprinted in 1976 U.S.C.C.A.N. 2183, 2201). An individual's interest "need not be monetary" in order to be considered as an "interested person," and "[t]he term includes, but is not limited to, parties, competitors, public officials, and nonprofit or public interest organizations and associations with a special interest in the matter regulated." Id. Excluded from this term are "member[s] of the public at large who make[ ] a casual or general expression of opinion about a pending proceeding." PATCO v. FLRA II, 685 F.2d at 562. In instances involving the exchange of ex parte communications between an adjudicating agency decisionmaker and an interested person, the decisionmaker would appear to be improperly considering materials or information not properly introduced in the record. Worse, the agency might be viewed as adjudicating in accordance with the preferences of interested persons instead of the applicable law.

There may in fact be situations in which ex parte communications from interested persons will have a more influential effect on an agency's substantive decisionmaking than ex parte communications from parties in a contested case. This court has recognized as much, when it previously reasoned that statements by the Governor regarding a pending contested case before an agency may constitute improper pressure, given the Governor's "obvious position of influence" over administrative agencies headed by individuals who may be a member of the Governor's cabinet. In re Water Use Permit Applications (Waiāhole I), 94 Hawai'i 97, 124, 9 P.3d 409, 436 (2000); see also Portland Audubon, 984 F.2d at 1545 ("No ex parte communication is more likely to influence an agency than one from the President or a member of his staff. No communication from any other person is more likely to deprive the parties and the public of their right to effective participation in a key governmental decision at a most

crucial time."). Just as public statements by the Governor have the potential to improperly pressure an agency acting in a quasi-judicial capacity in contravention of constitutional due process, so too the Governor's ex parte communications directly conveyed to that agency. See Waiāhole I, 94 Hawai'i at 124–25, 9 P.3d at 436–37 (intimating that the Governor's general statements about his views on the contested case before the agency, if directly communicated with the decisionmakers, could have been sufficient to demonstrate the requisite nexus between the pressure and the decisionmakers and could have been grounds for the invalidation of the agency decision on due process grounds).

To effectuate the guarantees of state constitutional due process, the need to disclose ex parte communications originating from interested persons may thus be more crucial than disclosing the same communications from a party. The contrary conclusion of the deputy attorney general for BLNR in this case—that there was no need to disclose the ex parte communications that Steven Jacobson, the first hearing officer, received from government officials because they did not originate from UHIfA's counsel—is incorrect.

Disclosure of ex parte communications between an agency adjudicator and parties or interested persons is critical because the adverse impacts of these communications to due process interests are present regardless of whether the content of the ex parte communications is procedural or substantive. If the content is substantive, the agency would have in front of it information outside of the record that, if not disclosed, the parties to the contested case would have no opportunity to address or rebut. If the content is proce-

dural, the fact that the agency has permitted that party or interested person to engage in undisclosed communications off the record—an allowance not enjoyed as a matter of right by all of the other parties to a contested case—raises a shadow of impropriety. More importantly, ex parte communications concerning a facially procedural subject matter could nonetheless subtly influence the substantive decisionmaking process of the adjudicating agency. See PATCO v. FLRA II, 685 F.2d at 563 (explaining that ex parte communications concerning requests for information on the procedural status of a proceeding "may in effect amount to an indirect or subtle effort to influence the substantive outcome of the proceedings."). In such cases, the due process right to respond would be inhibited by nondisclosure.

For example, Jacobson stated that, as a result of the communications initiated by the chiefs of staff of the Governor and Senator Inouye, he was required to "make daily reports to both the Health Department and the Board's Chair as to how soon [he] contemplated finishing, what else [he] thought [he] needed to do, why [he] thought [he] had to do it, etc." Consequently, Jacobson concluded that his "initial report and recommended decision ... were filed as a result of 'or else' pressure." Although Jacobson averred that he "was not asked to recommend a particular result," "the result Senator Inouye's office wanted from the Board was clear." Thus, even if it were assumed that the contacts initiated by the chiefs of staff of the Governor and Senator Inouye were versed facially as procedural inquiries, their effects made clear to Jacobson what sort of result Senator Inouye's office wanted BLNR to reach.[2] It

---

**2.** Also of note are the emails from Senator Inouye's chief of staff to the Governor's chief of staff, reiterating UHIfA's fears of losing funding and that it would "be bad if we lose" the project. If these concerns were then conveyed to Aila, Jacobson, or Jacobson's superiors at DOH, it is not improbable that the facially procedural inquiries had the potential to influence the decisionmaking process of Jacobson and BLNR. See PATCO II, 685 F.2d at 568 (reasoning that the call from the Secretary of Transportation to FLRA members, communicating a possibility of settlement regarding a case before the FLRA and

a desire for a speedy decision, "may be a subtle effort to influence an agency decision").

Accordingly, requiring disclosure of ex parte procedural inquiries made by parties or interested persons is crucial in order to allow all of the parties to address or object to their contents if they believe that the inquiries have a tendency to affect the substantive decisionmaking of the adjudicating agency. See id. (even if the FLRA members contacted by the Transportation Secretary "concluded in good faith that the communications were not improper, ... it would have been preferable for them to heed Congress' warning, to assume that close cases

follows that ex parte communications from parties and interested persons may affect the due process interests of fairness and opportunity to respond regardless of whether such communications have a substantive or procedural content; hence, due process requires disclosure of these communications. See PATCO v. FLRA II, 685 F.2d at 563.

This principle parallels Rule 2.9 of the Hawai'i Revised Code of Judicial Conduct (RCJC). Hawai'i state judges are generally not permitted to "initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers, concerning a pending[ ] or impending matter." RCJC Rule 2.9(a) (2008). Even when the "circumstances require . . . an ex parte communication for scheduling, administrative, or emergency purposes that does not address substantive matters," RCJC Rule 2.9(a)(1)—an exception to the general prohibition against ex parte communications—a judge is still required "promptly to notify all other parties of the substance of the ex parte communication and gives the parties an opportunity to respond," RCJC Rule 2.9(a)(1)(B); see also RCJC Rule 2.9(a)(2) (requiring disclosure of a judge's written consultation with a disinterested expert on the law and the opportunity for the parties to respond). Thus, even though the RCJC does not prohibit procedural ex parte communications, it still requires judges to disclose them. See RCJC Rule 2.9(a)(1)(B), (a)(2). Further, it is notable that RCJC Rule 2.9 does not limit its proscription against ex parte communications to parties or their agents. RCJC Rule 2.9. Except for specifically delineated exceptions, see RCJC Rule 2.9(a)(2)-(3), RCJC Rule 2.9 generally prohibits ex parte communications regardless of the source.

Patterning procedures governing ex parte communications in agency contested cases from those already applied by Hawai'i judges is consistent with the majority opinion in Mauna Kea Anaina Hou v. Board of Land and Natural Resources, which noted that "[a] contested case hearing is similar in many respects to a trial before a judge: the parties have the right to present evidence, testimony

is taken under oath, and witnesses are subject to cross-examination." 136 Hawai'i 376, 380, 363 P.3d 224, 228 (2015). As such, a contested hearing "provides a high level of procedural fairness and protections to ensure that decisions are made based on a factual record that is developed through a rigorous adversarial process." Id. Analogously, a hearing officer presiding over a contested case hearing should follow procedures akin to those that govern judges with regard to ex parte communications. Applying these procedures is an integral component of the "high level of procedural fairness and protections" provided for in a contested hearing, id. that are designed to ensure that decisions are based on the factual record before the agency and not influenced by off-the-record communications.

In addition to their procedural similarity to court hearings, agencies in contested cases are "often in the position of deciding issues that affect multiple stakeholders and implicate constitutional rights and duties," as recognized by a separate majority of this court in Mauna Kea. Id. at 413–14, 363 P.3d at 261–62 (Pollack, J., concurring). These issues commonly surpass, in importance and magnitude, those present in a typical court case. See, e.g., Mauna Kea, 136 Hawai'i 376, 363 P.3d 224 (involving a permit to build an astronomical observatory on the summit of Mauna Kea and implicating the constitutionally guaranteed right of Native Hawaiians to exercise traditional and customary practices); Waiāhole I, 94 Hawai'i 97, 9 P.3d 409 (contested case involving the collection of fresh water and dike-impounded ground water, water use permits, and water reservations affecting various classes of users); Pele Def. Fund v. Puna Geothermal Venture, 77 Hawai'i 64, 66, 881 P.2d 1210, 1212 (1994) (contested cases involving permit applications to construct geothermal exploratory and developmental wells and a power plant).

Given the importance of the issues and rights involved in agency contested cases, it is logical and fair to hold agency officials involved in quasi-judicial decisionmaking to the same or a similar standard that governs judges with regard to ex parte communica-

like these are improper, and to report them on the public record.").

tions. Not doing so would result in a situation where ex parte conduct that would otherwise be prohibited had the contested case been litigated in a court, to be permitted in the agency adjudication. This is an anomalous result, given that agency contested cases are similar to a trial before a judge, and, as such, the parties to an agency contested case should be afforded the same due process protections as those enjoyed by trial litigants in court.[3]

## 2. Hawai'i Administrative Procedure Act

Disclosure of substantive ex parte communications and procedural ex parte communications that bear the potential to influence the substantive decisionmaking of an adjudicating agency is also required by the Hawai'i Administrative Procedure Act (HAPA). In every contested case, HAPA provides that "[n]o matters outside the record shall be considered by the agency in making its decision," HRS § 91-9(g) (2012), and that "[n]o

official of an agency who renders a decision in a contested case shall consult any person on any issue of fact except upon notice and opportunity for all parties to participate, save to the extent required for the disposition of ex parte matters authorized by law," HRS § 91-13 (2012).[4] Relatedly, HRS § 91-9(c) directs agencies to afford opportunities to "all parties to present evidence and argument on all issues involved." HRS § 91-9(c). Further, HRS § 91-10(3) (2012) provides every party "the right to conduct such cross-examination as may be required for a full and true disclosure of the facts, and shall have the right to submit rebuttal evidence."

Substantive ex parte communications and procedural ex parte communications that may subtly affect the decisionmaking of an agency adjudicator are, by their nature, "outside the record," such that the quasi-judicial decisionmaker of an agency may not consider them in the decisional process without giving notice and the opportunity for all parties to

3. As in trial court cases, an agency in a contested case is required to provide an opportunity for a hearing, HRS § 91-9(a) (2012), to allow parties to present evidence and argument on all issues, HRS § 91-9(c), and to decide the issues based on the record, HRS § 91-9(e)-(g). The agency is also mandated to follow evidentiary principles similarly applied by trial court judges, including "the exclusion of irrelevant, immaterial, or unduly repetitious evidence." HRS § 91-10(1) (2012). Just like judges, agency adjudicators are required to "give effect to the rules of privilege recognized by law," HRS § 91-10(1) (2012), and they are authorized to "take notice of judicially recognizable facts," HRS § 91-10(4). In addition, similar to parties at a trial, parties to a contested case have the right to conduct cross-examination and to submit rebuttal evidence. HRS § 91-10(3).

Agency adjudicators are also required to apply the preponderance of the evidence burden of proof in contested cases, like trial judges in civil cases. HRS § 91-10(4). And like a trial order, an agency order in a contested case must be supported by "reliable, probative, and substantial evidence." HRS § 91-10(1). Finally, adjudicating agencies, like trial courts, are required to include "separate findings of fact and conclusions of law" in their decisions. HRS § 91-12 (2012); see Ka Pa'akai O Ka'Aina v. Land Use Comm'n, 94 Hawai'i 31, 47, 7 P.3d 1068, 1084 (2000) (noting that the agency was required to "make specific findings and conclusions" regarding certain factors "[i]n order to fulfill its duty to preserve and protect customary and traditional native Hawaiian rights to the extent feasible").

Given that agency adjudicators are already bound by rules and legal principles that parallel those governing trial court judges, it would be a minimal burden to require agency adjudicators to apply in contested cases a similar disclosure standard for ex parte communications as that followed by Hawai'i judges. See infra Part I.A.3.

4. The sole exception contemplated by HRS § 91-13 involves those instances where legal authority exists for a decisionmaker to decide an ex parte matter. See, e.g., HRS § 584-6 (a)(4) (Supp. 2013) (allowing parties entitled to file a paternity action to submit an ex parte motion requesting the family court to appoint a personal representative); Hawai'i Rules of Penal Procedure Rule 44(c) (2012) (allowing court-appointed counsel to request for expenses under seal through an ex parte motion); Hawai'i Family Court Rules Rule 41(e)(1) (2015) (allowing a party to set aside a dismissal for want of service or prosecution by ex parte motion); see also Hawai'i Circuit Court Rules Rule 7.2(f) (2014) (providing requirements for parties filing a motion entitled to be heard ex parte).

A contested case hearing is not an "ex parte matter[] authorized by law," HRS § 91-13, as this type of proceeding is adversarial in nature and involves notice to parties, introduction of evidence, the right of cross-examination, presentation of arguments, and decisionmaking based on the record. See HRS §§ 91-9 to 91-13; supra. No legal authority permits contested cases before agencies to be resolved on an ex parte basis.

participate; otherwise, HRS §§ 91–9(g) and 91–13 are necessarily offended. See Korean Buddhist Dae Won Sa Temple of Haw. v. Sullivan, 87 Hawai'i 217, 241, 953 P.2d 1315, 1339 (1998) (reasoning that the Director of the Honolulu Department of Land Utilization violated HRS § 91–13 by considering a book concerning Buddhism that was not made part of the record and by consulting an unidentified qualified individual regarding the Buddhist belief system). In the event that such ex parte communications are not timely disclosed to allow the parties to respond, the right of parties to present evidence and argument on all issues involved is contravened. HRS § 91–9(c); see Town v. Land Use Comm'n, 55 Haw. 538, 548–49, 524 P.2d 84, 91–92 (1974). By the same token, nondisclosure of these ex parte communications precludes parties from conducting cross-examination and from submitting rebuttal evidence concerning their contents. HRS § 91–10(3); see Town, 55 Haw. at 548–49, 524 P.2d at 91–92. Thus, by proscribing the consideration of off-the-record materials and by guaranteeing parties certain procedural rights during contested case hearings, it is inherent in HAPA that substantive ex parte communications and procedural ex parte communications that have the potential to affect the substantive decisionmaking of an agency adjudicator must be disclosed.

### 3. Summary of the Procedure on Disclosure of Ex Parte Communications

Undisclosed ex parte communications pose a substantial risk on the reality and appearance of fairness in agency adjudications, have the potential to inhibit fair and objective agency decisionmaking based on the evidentiary record, present a danger to effective and objective judicial review, and are inconsistent with the strictures of HAPA. Consequently, disclosure and placement in the record of ex parte communications are required if they (1) involve substantive matters, (2) are facially phrased as a procedural inquiry but bear the potential to subtly affect the substantive decisionmaking of an agency adjudicator, or (3) are made to or received from a party or an interested person, regardless of whether the subject is substantive or procedural.[5] See Mauna Kea Power Co., 76 Hawai'i at 262–63, 874 P.2d at 1087–88. Disclosure would allow the parties to challenge or respond to the contents of such ex parte communications, see id. and permit courts to effectively review the implications of the communications to the validity of the agency decision, I PATCO v. FLRA II, 685 F.2d at 564 n.32.

Further, in order for disclosure to effectively serve the values protected by due process and HAPA, the contents of the disclosure should be sufficiently detailed to allow the parties to adequately respond to the ex parte communications and to permit the courts to independently review the nature and substance of the communications. Mauna Kea Power Co., 76 Hawai'i at 261, 874 P.2d at 1086; PATCO v. FLRA II, 685 F.2d at 564 n.32 (observing that "effective judicial review may be hampered if ex parte communications prevent adversarial decision of factual issues by the agency"). Therefore, in all instances where an adjudicating agency decisionmaker must disclose ex parte communications, see supra, the disclosure should include (a) any written ex parte communication, (b) any writing memorializing the nature, character, or substance of an oral communication, and (c) any response to the ex parte communication.

This approach enhances the integrity of administrative adjudication, safeguards the parties' interests subject to an agency's adjudication, and insures against the appearance of impropriety. See Sandy Beach Def. Fund v. City Council of Honolulu, 70 Haw. 361, 377, 773 P.2d 250, 260 (1989) (reasoning that

---

**5.** It follows that ex parte communications to or from disinterested persons involving a request for information regarding the procedural status of a proceeding need not be disclosed because such communications possess only a slight effect on the due process interests of openness and opportunity to respond. See PATCO v. FLRA II, 685 F.2d at 563 (concluding that it is unnecessary to disclose an ex parte communication that "does not threaten the interests of openness and effective response"). However, in situations when it is too close to call whether the ex parte communication is substantive or procedural, it is best for the agency to err on the side of caution and disclose. See id. at 568.

"the probable value, if any, of additional or alternative procedural safeguards" should figure in the determination of the kind of procedures that must be afforded in a proceeding). Further, given that the rights and interests involved in many contested cases are profoundly important, this approach is necessary to adequately protect and implement those rights and interests. See id. (stating that the interests affected by a governmental act is a relevant consideration in deciding what procedural protections are warranted by due process).

If the approach described herein is not adopted, the same type of ex parte communications that occurred in this case would likely recur in future contested proceedings no matter how ardent the majority's entreaty that agencies should be more open under similar circumstances. The risk that off-the-record information would influence the decisionmaking process of an agency adjudicator would remain open, and the possibility that individuals would be deprived of important rights and interests would remain high. See id. (holding that "the risk of erroneous deprivation" of individual interests through the procedures used should be considered in deciding whether certain procedures are mandated by due process). Further, a rule that comes short of requiring disclosure of substantive ex parte communications and ex parte communications exchanged with parties or interested persons would preclude courts from meaningfully reviewing the validity of agency adjudications. See PATCO v. FLRA II, 685 F.2d at 564 n.32. Likewise, a conclusory disclosure as to the nature and content of ex parte communications would inhibit a reviewing court's duty to independently review the outcome of agency adjudications and would cause the court to summarily accept the agency's explanation as true and dispositive.

Finally, the additional burden that may accrue to an adjudicating agency of complying with the disclosure principles discussed in this opinion is very slight. Given that agencies are already required to effectuate the Hawai'i Constitution, see Mauna Kea, 136 Hawai'i at 413-15, 363 P.3d at 261-63 (Pollack, J., concurring), and the various statutory mandates of HAPA, see supra note 3, obligating agencies to adhere to procedures regarding ex parte communications that parallel those that apply to courts will not be unduly burdensome. See Sandy Beach Def. Fund, 70 Haw. at 377, 773 P.2d at 260 (noting that the burden on the government of certain procedural protections is relevant to whether such protections should be imposed).

And any additional burden that may befall agencies is overwhelmingly outweighed by the benefits of the disclosure procedures discussed. See id. (noting that the "probable value" of additional procedural protections should be balanced against the burden on the government in determining what process is due). Not only will these disclosure procedures guard against the appearance of impropriety that could result in the invalidation of an agency decision, see Mauna Kea, 136 Hawai'i at 399, 363 P.3d at 247 (vacating a permit that BLNR issued because the proceedings produced the appearance of impropriety), but they will also ensure that the proceedings are conducted in compliance with the values embodied by due process and HAPA.

Accordingly, substantive ex parte communications, procedural ex parte communications that bear the potential of influencing an agency adjudicator's decisionmaking process, and ex parte communications exchanged between adjudicating agencies and parties and interested persons must be disclosed consistent with due process.[6]

---

**6.** Nothing precludes agencies from comporting their practices with the procedures and principles consistent with due process as set forth in this opinion. Doing so would provide greater integrity to agency adjudications and would be consistent with the general position of this court on ex parte communications: the majority "caution[ing] public officials and other parties that contacts of the type involved here car-

ry significant risk of creating the appearance of impropriety, and ... of having an effect on the process," Majority at 402, 382 P.3d at 214, the concurrence not "condon[ing] meetings and discussions with administrative adjudicators," Concurrence at 410, 382 P.3d at 222, and this dissenting opinion explicitly holding that such contacts contravene HAPA and have the potential to violate constitutional due process.

## B. Ex Parte Communications Has the Potential to Render Voidable an Agency Decision

The introduction of ex parte communications into a quasi-judicial administrative decisionmaking does not automatically invalidate the agency's decision. If the ex parte communications are disclosed and the parties are given the opportunity to respond to the contents of the communications, this court has held that due process is not denied. In Mauna Kea Power, the parties' attorneys, after the contested case hearing had concluded, "made several written ex parte communications to members of the BLNR, sending them copies of news articles, reports, and a community petition against the project." 76 Hawai'i at 261, 874 P.2d at 1086. Subsequently, BLNR reopened the contested case hearing in order to address, among other things, the propriety of the ex parte communications that the parties' attorneys conveyed to members of BLNR after the hearing had closed. Id. In concluding that Mauna Kea Power was afforded due process, this court reasoned that the reopening of the contested case hearing, together with the disclosure of the ex parte communications, provided Mauna Kea Power with the opportunity to effectively respond to the contents of the ex parte communications. Id. at 263, 874 P.2d at 1088. Thus, the dispositive factors that this court considered in Mauna Kea Power as rectifying any prejudicial effect flowing from the ex parte communications were the disclosure of the ex parte communications and the opportunity for the opposing parties to respond to the contents of the ex parte communications through the reopening of the hearing. Id.

In Korean Buddhist, the Director of the Honolulu Department of Land Utilization considered a book concerning Buddhism that was not made part of the contested case record and consulted an unidentified qualified individual regarding the Buddhist belief system. 87 Hawai'i at 241, 953 P.2d at 1339. In reviewing the decision, this court reasoned that a violation of HAPA does not result in the invalidation of the agency's decision if the violation is "harmless" in that the violation did not prejudice the "substantial rights" of a party in the contested case. Id. Because the Director's consultation of evidence outside the record did not affect the Temple's substantial rights, this court concluded that the Director's decision must be affirmed despite the HAPA violation. Id. at 245, 953 P.2d at 1343.

Thus, under both constitutional due process and HAPA, only when the inappropriate ex parte communication at issue had prejudiced the complaining party would the invalidation of the agency decision be warranted. In light of this standard, the following email communications are relevant to the issue of whether the discussion at the March 21, 2012 meeting necessitates further disclosure from BLNR in order for this court to determine whether the discussion at the meeting constituted improper ex parte communications that could potentially invalidate the ATST permit on due process grounds:

- January 30, 2012 at 4:02 p.m. (from the UHIfA associate director to Senator Inouye's chief of staff): "I know you've talked with Aila [the then BLNR Chairperson], but as previously mentioned, Steve Jacobsen [sic] doesn't work for Aila he works for Fuddy [the Director of the Hawai'i Department of Health]. Would it be possible for you or someone to talk with Fuddy to see if it could be clarified that Steve's work priority is to complete the Finding of Facts, Conclusions of Law and Recommendation in the ATST Contested Case?" "By mid-March, the project will have burned through $4M and will bleed $.5M each month after that." "In order to keep from losing the project, we may have to start construction whether Jacobsen [sic] files or not."

- January 30, 2012 at 6:43 p.m. (Senator Inouye's chief of staff to Governor's chief of staff): "This will be bad if we lose it. Can we do this – if you all can't get a handle on this guy by mid-week, can you call a meeting with uh, me, and your depts.—dlnr, health and ag. We need a plan b—we need to review our options before we get notified that we are losing the moneis [sic]—I think it's been 14 weeks!"

- January 30, 2012 at 10:42 p.m. (from the Governor's chief of staff to Senator Inouye's chief of staff): "I will speak with [Fuddy]. I also spoke with [Aila] and asked to please help."

- January 31, 2012 at 9:25 a.m. (from the UHIfA associate director to Senator Inouye's chief of staff): "UH can't meet with DLNR until after the Board acts on the Hearing Officers [sic] recommendation or it could jeopardize the Contested Case. What do you think about Tony attending the meeting rather than UH? The NSF is not a party in the Contested Case."

- January 31, 2012 at 11:20 a.m. (from Senator Inouye's chief of staff to the UHIfA associate director): "I can carry the message and I can also carry the uh message."

- February 21, 2012 at 9:52 a.m. (Gary Gill to the Governor's chief of staff, the DOH Director, Aila, and Senator Inouye's chief of staff): giving advance notice to the recipients that "Steve Jacobson, hearings officer, will serve the Haleakala ATST contested case recommended decision today. This morning he is adding some photos to illustrate the location of historic sites and ahupuaa boundaries. He tells me that so long as the approximately 200 page document is in the mail by midnight it will be considered served today. He is confident it will be done. I have seen the document and discussed it briefly with him. He has been keeping me informed every day over the weekend of his progress." (This email was thereafter forwarded by Senator Inouye's chief of staff to the UHIfA associate director.)

- March 21, 2012 at 12:13 p.m. (from Tracy Kubota to the Governor's chief of staff): "[Senator Inouye's chief of staff] requested a meeting today at 3 p.m. to discuss the telescope, hearings officer and funding issue. AG will be coming in and Chair Aila is pending."

- March 21, 2012 at 12:37 p.m. (from Susan N. Richey to Tracy Kubota): "Chairman Aila will attend todays [sic] 3 p.m. meeting on the Maunakea Telescope"[7]

As it now stands, the record is inadequate for this court to make an informed ruling as to whether the March 21, 2012 meeting constituted improper ex parte communication that prejudiced Kilakila and, consequently, whether Kilakila's due process rights were violated to such an extent as to require the invalidation of the ATST permit. See Mauna Kea Power Co., 76 Hawai'i at 263, 874 P.2d at 1088 (reasoning that an agency decision need not be invalidated if the ex parte communications to parties were harmless). While BLNR disclosed that the "sole topic of discussion" at the March 21, 2012 meeting "was when the final decision in this contested case would be issued[ ]—in light of Minute Order No. 14, filed on March 19, 2012,"[8]— the email from Kubota to the Governor's chief of staff indicated that the purpose of the March 21, 2012 meeting was "to discuss the telescope, hearings officer and funding issue."[9] This is inconsistent with BLNR's post hoc disclosure that the sole topic of discussion was when the final decision of BLNR was going to issue. Given this inconsistency, there is at least a legitimate and substantial question as to whether the discussion that transpired at the March 21, 2012 meeting violated HAPA and the due process guarantees of both the State and federal constitutions. Re-

7. It was later clarified that the March 21, 2012 meeting would concern the ATST on Haleakala instead of the observatory project on Mauna Kea.

8. Minute Order No. 14 contained BLNR's disclosure of Jacobson's ex parte email to UHIfA's counsel. In that order, BLNR noted that Jacobson's ex parte contact called into question his impartiality and that, as a result, BLNR was considering alternatives to rectify the effects of the ex parte contact.

9. BLNR's original disclosure stated that the subject of the March 21, 2012 meeting "was when the recommended decision in this contested case would be issued by the hearing officer, Steven Jacobson." After Kilakila pointed out that this could not have been the case, as Jacobson already issued his recommended decision about a month before the meeting, BLNR amended its previous disclosure and stated that the meeting actually discussed when its final decision would issue.

latedly, because of BLNR's cursory and unsubstantiated description of what occurred in the March 21, 2012 meeting, Kilakila was deprived of a meaningful opportunity to respond to the contents of the March 21, 2012 ex parte communications. Cf. id.

The majority, however, reasons that the March 21, 2012 meeting between Aila, the Governor's office, the Attorney General's office, and Senator Inouye's office was not an impermissible ex parte communication because (1) none of the participants was a party or a party's employee, representative or agent and (2) even assuming that the Governor's office or Senator Inouye's office was acting as a representative or an agent for one of the parties, the subject matter of the meeting related solely to the procedural status of the contested case and was therefore allowed under HAR § 13–1–37(b)(2).

HAR § 13–1–37 contains a general prohibition on ex parte communications:

(a) No party or person petitioning to be a party in a contested case, nor the party's or such person's [sic] to a proceeding before the board nor their employees, representatives or agents shall make an unauthorized ex parte communication either oral or written concerning the contested case to the presiding officer or any member of the board who will be a participant in the decision-making process.

(b) The following classes of ex parte communications are permitted:

(1) Those which relate solely to matters which a board member is authorized by the board to dispose of on ex parte basis.

(2) Requests for information with respect to the procedural status of a proceeding.

(3) Those which all parties to the proceeding agree or which the board has formally ruled may be made on an ex parte basis.

HAR § 13–1–37 (2007).

As an initial matter, HAR § 13–1–37, which does not prohibit substantive ex parte communications from nonparties, is inconsistent with the demands of HAPA. As discussed, supra, HAPA proscribes an agency's consideration of substantive information outside of the record regardless of the source. See HRS §§ 91–9(g), 91–13. Thus, by not prohibiting substantive ex parte communications from nonparties and interested persons, HAR § 13–1–37 is at variance with HAPA.[10]

Even assuming that HAR § 13–1–37 is consistent with HAPA, contrary to the majority's conclusion, the state of the record in this case is such that it precludes this court from determining whether the Governor's office or Senator Inouye's office was acting as a representative or an agent of UHIfA. "A 'representative' is defined as an 'agent, deputy, substitute, or delegate usually being invested with the authority of the principal.'" Olelo: The Corp. for Cmty. Television v. Office of Info. Practices, 116 Hawai'i 337, 350, 173 P.3d 484, 497 (2007) (quoting Webster's Third New International Dictionary at 1926–27) (emphasis omitted). There is no indication in the record that the attendees at the March 20, 2012 meeting from the respective offices of the Governor and Senator Inouye were not serving as an agent, deputy, substitute, or delegate for one of the parties. See id.

Indeed, the record establishes that Senator Inouye's chief of staff, in her January 31, 2012 email to the UHIfA associate director, offered to "carry the [UH] message" for UHIfA since the UHIfA associate director could not attend a planned meeting. In what manner and the extent to which Senator

---

10. Substantive ex parte communications from nonparties are not expressly allowed by HAR § 13–1–37(b), but at the same time HAR § 13–1–37(a) does not explicitly disallow such communications. Thus, HAR § 13–1–37 is ambiguous at best. One can argue that the allowed classes of ex parte communications enumerated in HAR § 13–1–37(b) is exhaustive, but this would render HAR § 13–1–37(a)'s prohibition relating to a "party or person petitioning to be a party" and "their employees, representatives or agents" superflu-

ous, a result that should be avoided under settled principles of statutory construction. See Lopez v. Bd. of Trs., Emps.' Ret. Sys., 66 Haw. 127, 129, 657 P.2d 1040, 1042 (1983) (noting "that a statute ought upon the whole be so constructed that, if it can be prevented, no clause, sentence or word shall be superfluous, void, or insignificant" (quoting In re City & Cty. of Honolulu Corp. Counsel, 54 Haw. 356, 373, 507 P.2d 169, 178, 54 Haw. 412, 373 (1973))).

Inouye's chief of staff carried the UH "message" during the March 21, 2012 meeting are unclear, and, therefore, whether Senator Inouye's chief of staff acted as an agent or representative for UHIfA cannot be determined.[11] The Governor's chief of staff previously talked to the Director of the Department of Health and asked Aila for "help." As to what kind of "help" the Governor's chief of staff requested, and on whose behalf, is unclear. Hence, there is a material question as to what roles the chiefs of staff of the Governor and Senator Inouye assumed at the March 21, 2012 meeting. In short, without a deeper exploration into what the topics of conversation were between the participants at the March 21, 2012 meeting, without knowing what role the chiefs of staff of the Governor and Senator Inouye assumed during that meeting, and without knowing what was actually said between the participants at the meeting, this court cannot determine whether the chiefs of staff of the Governor and Senator Inouye were acting as representatives or agents for one of the parties. Deprived of such information, this court is left to speculate on the roles that the chiefs of staff of the Governor and Senator Inouye played during the March 21, 2012 meeting. Thus, the conclusion reached by the majority—that neither the Governor's office nor Senator Inouye's office was UHIfA's agent or representative—is premature and not supported by the record.[12]

The majority further concludes that the ex parte communication during the March 21, 2012 meeting was permissible because the topic of the discussion was the expected issuance date of BLNR's final decision following the contested case hearing. For this conclusion, the majority relies solely on the conclusory statement made by BLNR in the minute

order it issued granting in part and denying in part Kilakila's motion for reconsideration. It cannot be the case that a post-hoc, conclusory statement regarding the subject matter of an ex parte communication is in itself sufficient to establish that the communication is permissible. If after-the-fact, unsubstantiated explanations are sufficient to demonstrate the procedural nature of an ex parte communication, BLNR and any other agency can engage in substantive ex parte communications and then, when those communications are brought to light, provide a post-hoc explanation that the subject of the communication was procedural. An appellate court, as the majority does in this case, would then just summarily accept the agency's explanation as true and dispositive without engaging in an independent and objective inquiry on a complete record into whether the communication in fact constituted a request for a procedural status of a contested case.

The minute order upon which the majority relies states that "[d]uring the meeting, the sole topic of discussion was when the final decision in this contested case would be issued." No further elaboration or supporting document substantiates this conclusory statement. The majority takes BLNR at its word and accepts as dispositive BLNR's after-the-fact and unsubstantiated explanation as to the subject matter of the March 21, 2012 meeting. This post-hoc disclosure is insufficient for purposes of due process because it precludes parties from effectively responding to the contents of the ex parte communications and prevents a reviewing court from independently assessing the propriety of such communications. See Mauna Kea Power Co., 76 Hawai'i at 262–63, 874 P.2d at 1087–

11. One can assume, as the concurrence does, that the message that Senator Inouye's chief of staff offered to carry was the urgent need for issuance of the first hearing officer's preliminary report. Because that preliminary report was already issued before the March 21, 2012 meeting, it can be contended that there remained no message for Senator Inouye's chief of staff to carry on behalf of UHIfA. However, there is nothing in the record that indicates what exactly the UHIfA message was that Senator Inouye's chief of staff offered to "carry" or whether there was continuing cooperation between the UHIfA associate di-

rector and the senator's chief of staff, and this court should not engage in speculation.

12. Under the disclosure procedures discussed in this opinion, see supra Part I.A., ex parte communications from the chiefs of staff of the Governor or Senator Inouye to BLNR adjudicators must be disclosed because the chiefs of staff are "interested persons." Thus, under these disclosure procedures, it would not matter whether the chiefs of staff of the Governor or Senator Inouye acted as an agent or a representative of UHIfA.

88; PATCO v. FLRA II, 685 F.2d at 564 n.32.

BLNR's disclosure is also inconsistent with the email from Kubota to the Governor's chief of staff; this email was explicit that the topic of the March 21, 2012 meeting included the telescope, funding, and the hearing officer, none of which can be considered procedural. Thus, there is a substantial question as to the substance and subject of the discussions that occurred at the March 21, 2012 meeting.

Even assuming that the "discussion" at the March 21, 2012 meeting solely involved when the Board would issue its final decision, the "discussion" would still not qualify as a request "for information with respect to the procedural status of a proceeding," which is an allowable ex parte communication under HAR § 13-1-37. This is because a "discussion" about when BLNR would issue its final decision was specifically stated by BLNR to be "in light of Minute Order No. 14, filed on March 19, 2012." This order outlined the alternatives that BLNR was considering to remedy the effects of Jacobson's ex parte communications to UHIfA's counsel. Given that BLNR was still considering how to address Jacobson's ex parte communications, the "discussion" during the March 21, 2012 meeting necessarily implies that it may have involved discussions as to whether and when Jacobson would be removed, the appointment process for a new hearing officer, whether there would be a complete rehearing, and whether new findings of fact and conclusions of law would be issued. These topics go far beyond what is contemplated as "[r]equests for information with respect to the procedur-

al status of a proceeding" because they touch upon substantive issues concerning procedural due process and the agency's interpretation of its administrative rules.[13] HAR § 13-1-37.

In addition, if the March 21, 2012 meeting was a request for a procedural status on the contested case involved in this case, it has been recognized that procedural ex parte communications "may in effect amount to an indirect or subtle effort to influence the substantive outcome of the proceedings." PATCO v. FLRA II, 685 F.2d at 563 (quoting S. Rep. No. 94-354, at 37 (1975); Government in the Sunshine Act—S.5 (Public Law 94-409) Sourcebook: Legislative History, Texts, and other Documents 232 (Jt. Comm. Print 1976)). In such instances, "[t]he judgment will have to be made whether a particular communication could affect the agency's decision on the merits." Id. Said another way, an ex parte communication whose subject matter is procedural on its face may in fact influence the substance of the administrative proceedings. Hence, a reviewing court should not be hasty in proclaiming that an ex parte communication is procedural in nature simply because the agency says so, for there are instances in which a procedural communication could influence the substance of the proceedings. Elec. Power Supply Ass'n v. FERC, 391 F.3d 1255, 1259 (D.C. Cir. 2004); see, e.g., PATCO v. FLRA II, 685 F.2d at 568. The relevant inquiry "is not the label given the communication, but rather whether there is a possibility that the communication could affect the agency's decision in a contested on-the-record proceeding." Elec. Power Supply Ass'n, 391 F.3d at 1259.[14] It follows

13. Given that Jacobson's fate and the consequences of his ex parte communications were pending issues when the meeting occurred, an innocuous request for a procedural status of this case could have been quickly addressed. For instance, Aila could have appropriately responded, "I am not sure when a final decision will be issued, given what has recently come into the attention to the Board" or something similar. If so, then the meeting should have been very brief.

14. The majority seems to conclude that procedural ex parte communications exchanged between an adjudicating agency and a party or an interested person need not be disclosed and that, if an agency chooses to disclose them upon the

request of a party in a contested case, appellate review of the propriety and extent of disclosure is governed by the abuse of discretion standard. Majority at 397, 382 P.3d at 209, 214-15. As noted, however, due process requires the adjudicating agency decisionmakers to disclose substantive ex parte communications, procedural ex parte communications that can influence the decisionmaking process of an agency adjudicator, and ex parte communications to or from parties or interested persons. Additionally, the manner and extent of the disclosure must enable the parties to respond to the content of the communications and allow the court to independently review the agency's compliance with due process principles, see supra.

that a court must take a more careful and critical look at the nature and character of the communication that transpired, together with the surrounding circumstances and the purpose of the participants in the ex parte communication, in order to ensure that the ex parte communication in fact concerned procedural issues and did not affect the manner in which the administrative proceeding was decided. See id.

## II. Political Pressure and Due Process

Apart from ex parte communications, a distinct due process basis for the invalidation of an agency's decision is external political pressure. In re Water Use Permit Applications (Waiāhole I), 94 Hawai'i 97, 123, 9 P.3d 409, 435 (2000). In assessing whether external political pressure runs afoul of due process, the focus is "on the nexus between the pressure and the actual decision maker"; that is, "the relation between the communications and the adjudicator's decisionmaking process." Id. at 123–24, 9 P.3d at 435–36 (quoting ATX, Inc. v. U.S. Dept. of Transp., 41 F.3d 1522, 1527 (1994)). The majority concludes that no improper political pressure was effectuated in this case because, while there was direct contact between Aila and the respective chiefs of staff of the Governor and Senator Inouye at the March 21, 2012 meeting, there is no indication "that they discussed anything other than the timing of BLNR's final decision following the contested case hearing." Majority at 401–02, 382 P.3d at 213–14. However, the record does not enable this court to determine the exact role played by the chiefs of staff of the Governor and Senator Inouye at the March 21, 2012 meeting, what was said by the participants during that meeting, or the potential effect on Aila of what the chiefs of staff said. In short, because it cannot be gleaned from the record whether Aila was politically influenced by the participants in the March 21, 2012 meeting, there is insufficient information that would allow this court to conclude that due process was not affronted by external political pressure.

The concurrence underscores the status of Aila as a member of the Governor's Cabinet and posits that Aila should be free to respond to the Governor and the community regarding the procedural status of BLNR proceedings. Concurrence at 409–10, 382 P.3d at 221–22. Although this is accurate, even procedural inquiries by the Governor's office about pending contested case proceedings before BLNR carries the potential to subtly influence the substantive decisionmaking of the recipient of the inquiry. Prof'l Air Traffic Controllers Org. v. Fed. Labor Relations Auth. (PATCO v. FLRA II), 685 F.2d 547, 563 (D.C. Cir. 1982). Further, while the Governor, as the head of the executive branch, should have some leeway in overseeing the business of the various state administrative agencies, there is no gubernatorial "prerogative to influence quasi-judicial administrative agency proceedings through behind-the-scenes lobbying." Portland Audubon Soc. v. Endangered Species Comm'n, 984 F.2d 1534, 1546 (9th Cir. 1993). As the Supreme Court has pronounced, "there may be duties of a quasi-judicial character imposed on executive officers and members of executive tribunals whose decisions after hearing affect interests of individuals, the discharge of which the President can not in a particular case properly influence or control." Myers v. United States, 272 U.S. 52, 135, 47 S.Ct. 21, 71 L.Ed.

Thus, the sufficiency of the disclosure of an ex parte communication is not a matter of agency discretion; because the adequacy of the disclosure of ex parte communications has the potential to violate constitutional due process, it is a question of law that this court should review de novo. See Save Sunset Beach Coal. v. City & Cty. of Honolulu, 102 Hawai'i 465, 474, 78 P.3d 1, 10 (2003) ("We review questions of constitutional law de novo, under a right/wrong standard.").

Even if I were to agree that an abuse of discretion standard governs this court's review of the manner and extent of an agency's disclosure of procedural ex parte communications, as discussed, the majority's characterization of the subject of the March 21, 2012 meeting as procedural is based solely on BLNR's post hoc disclosure and not on the court's independent analysis of what exactly was exchanged during the meeting, the role that the participants played, and all of the relevant circumstances surrounding the meeting. Because the permissibility of the communications at the March 21, 2012 meeting is unclear, it is premature both to conclude that the meeting exclusively involved a request for a procedural status and to review the nature and extent of BLNR's disclosure as an exercise of its discretion.

160 (1926). The same limitation circumscribes the manner in which the Governor must manage state agencies. This court reaffirmed this legal principle in Waiāhole I: "We do not take lightly the governor's legitimate supervisory interest and role with respect to [administrative agencies]. At the same time, we cannot emphasize strongly enough that all adjudicative proceedings conducted by [administrative agencies] must conform to the same exacting standards of fairness, impartiality, and independence of judgment applicable in any court of law." Waiāhole I, 94 Hawai'i at 124, 9 P.3d at 436.

The concurrence notes that Kilakila did not request that Aila be disqualified in light of the March 21, 2012 meeting. However, disqualification is a remedy for bias and impartiality, and ex parte communications to an administrative decisionmaker, without more, do not provide sufficient grounds for disqualification. See Sussel v. City & Cty. of Honolulu Civil Serv. Comm'n, 71 Haw. 101, 107, 784 P.2d 867, 870 (1989) ("[N]o one would argue seriously that the disqualification of [decision-makers] on grounds of actual bias ... prevents unfairness in all cases. So 'our system of [justice] has always endeavored to prevent even the probability of unfairness.'" (first quoting State v. Brown, 70 Haw. 459, 467, 776 P.2d 1182, 1187 (1989), and then quoting In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955))). Thus, the remedy for improper ex parte communications is distinct from that demanded in cases involving a biased or impartial decisionmaker. The mere existence of improper ex parte communications does not automatically result in disqualification of an adjudicating agency decisionmaker; "due process requires disqualification where 'circumstances fairly give rise to an appearance of impropriety and reasonably cast suspicion on [the adjudicator's] impartiality.'" Liberty Dialysis–Haw., LLC v. Rainbow Dialysis, LLC, 130 Hawai'i 95, 110–11, 306 P.3d 140, 155–56 (2013) (quoting State v. Ross, 89 Hawai'i 371, 377, 974 P.2d 11, 17 (1998)). Indeed, if a party to an administrative proceeding could disqualify a decisionmaker for receiving improper ex parte communications, there is nothing to inhibit parties from employing such communications as a tool to "eliminate unfavorable

decisionmakers." 32 Charles Alan Wright & Charles H. Koch, Jr., Federal Practice & Procedure Judicial Review § 8260 (1st ed. 2006).

In addition, Kilakila could not have requested that Aila be disqualified because BLNR never disclosed sufficient information in response to Kilakila's multiple requests regarding ex parte communications involving Aila. Without any additional information as to what was said during the March 21, 2012 meeting, what roles the attendees played, and the possible effect on Aila of what was discussed, Kilakila was never in a position to reasonably assess whether there were adequate grounds to seek Aila's disqualification. Further, Kilakila's motion for reconsideration of BLNR's repeated refusals to disclose information that could support a disqualification request was denied the same day that the ATST permit was issued, effectively preventing any attempt at disqualifying Aila or other Board members.

## III. The Proper Remedy is a Temporary Remand for Record Supplementation

It has been said that an incomplete record is no more than a "fictional account of the actual decisionmaking process." Home Box Office, Inc. v. FCC, 567 F.2d 9, 54 (D.C. Cir. 1977). Because the record in this case prevents this court from reviewing the propriety of the ex parte communications that transpired during the March 21, 2012 meeting, from determining whether Kilakila was deprived of due process, and from concluding whether to invalidate the ATST permit, this case should be temporarily remanded to BLNR for record supplementation. See Portland Audubon Soc. v. Endangered Species Comm., 984 F.2d 1534, 1548–50 (9th Cir. 1993); Pub. Power Council v. Johnson, 674 F.2d 791, 794 (9th Cir. 1982); Prof'l Air Traffic Controllers Org. v. Fed. Labor Relations Auth. (PATCO v. FLRA I), 672 F.2d 109, 113 (D.C. Cir. 1982). Just as in Portland Audubon, the proper remedy is to order a temporary "remand for a 'vigorous and thorough' adversarial, evidentiary hearing," with the aid of a specially appointed hearing officer, to determine what was said by the participants in the March 21, 2012 meeting, what

roles each participant played and whether any of the participants acted as a representative of any of the parties, what influence, if any, the discussion may have had on Aila and his decisionmaking process, and whether any of the participants in the meeting exerted political pressure on Aila. See Home Box Office, Inc., 567 F.2d at 58–59 (quoting PATCO v. FLRA I, 672 F.2d at 113). The parties would be allowed to participate in the evidentiary hearing. Id. At the conclusion of the hearing, the hearing officer should prepare written findings of facts and conclusions of law to supplement the record in this case. Id.[15]

## IV. Conclusion

Due process, as guaranteed by the Hawaiʻi Constitution, places upon BLNR the affirmative duty to disclose all substantive ex parte communications, procedural ex parte communications that can influence the decisionmaking process of an agency adjudicator, and all ex parte communications received from or made to parties or interested persons. Complementary to this duty is BLNR's constitutional obligation to provide a meaningful opportunity to the parties to respond to the content of such communications. BLNR's deficient disclosure in this case precludes this court from independently determining whether the March 21, 2012 meeting constituted improper ex parte communications that may invalidate the ATST permit on due process grounds. The majority simply accepts BLNR's post hoc characterization that the March 21, 2012 meeting concerned a procedural matter despite considerable indicia pointing to the contrary.

The record in this case also prevents this court from assessing in an informed manner whether the March 21, 2012 meeting improperly influenced Aila's decisionmaking process, in violation of elementary notions of due process. Thus, the state of the record significantly impairs this court's ability to accurately resolve the issues presented in this case without resorting to speculation. Because the

majority decides the important due process issues raised in this case on an incomplete record, I respectfully dissent.

I join in Parts IA and II of this dissenting opinion. Michael D. Wilson

## DISSENTING OPINION BY WILSON, J.

The strength of the law resides in its fair application. Fair application of the law justifies faith in judicial decision-making. The decision in this case as to whether a $ 298 million dollar telescope providing unique benefits to scientific knowledge should be built in a location sacred to the Hawaiian community is one of great consequence deserving a fair decision—a decision arising from a process of fairness that the parties and our community can trust. The conservation district use permit (CDUP) sought by the University of Hawaiʻi Institute for Astronomy (UHIfA) is subject to decision-making based on evidence presented at a contested case hearing—an adjudicative proceeding. A hallmark of due process to which all parties are entitled in this case is an impartial decision-maker who receives evidence subject to public view—an impartial decision-maker equally accessible to all parties, whose decision is based on the evidence and law, with no regard to which party may be the most powerful politically or economically.

The decision-makers of the Advanced Technology Solar Telescope (ATST) contested case proceedings were not equally accessible to all the parties involved in the contested case; instead, the decision-makers engaged in undisclosed communications with government officials who sought issuance of the permit: the offices of the Governor and the senior United States senator for the State of Hawaiʻi. Under the weight of the political pressure being applied, the hearing officer initially selected by the Board of Land and Natural Resources (Board) rendered an incomplete report—a report recommending that the conservation district use permit for

---

**15.** I do not reach the prejudgment issue at this time because of the incomplete state of the record and because information that will be gleaned from additional proceedings on temporary remand to BLNR may also be relevant in determin-

ing the prejudgment issue. Further, given that remand to BLNR for additional proceedings is necessary, I do not reach the merits of BLNR's decision to grant the permit pursuant to HAR § 13–5–30.

construction of the telescope on Haleakalā be granted. Due to the ex parte political pressure he received, the hearing officer publicly disavowed his initial report. He was discharged by the Board because he attempted to engage in ex parte communication with UHIfA to determine whether those government officials were acting on behalf of UHIfA when they applied ex parte pressure upon him. The day after the hearing officer's public disclosure of the ex parte pressure placed upon him by government officials, the Chairman of the Board participated in an undisclosed ex parte meeting with the same government officials whose pressure upon the hearing officer caused him to declare his initial report untrustworthy. When Kilakila 'O Haleakalā (Kilakila) learned of the undisclosed meeting, it sought to obtain the communications that occurred. The Board refused to produce any documentation in its possession showing the extent of undisclosed ex parte communications that occurred with the decision-makers while they deliberated. Having rejected Kilakila's request for discovery, the Board granted the CDUP notwithstanding the conclusion of the Final Environmental Impact Statement that construction and operation of the ATST telescope would cause major, adverse, and long-term direct impacts on traditional cultural resources.

Disclosure by the Board is required in this case. Kilakila contends that the Board engaged in prejudgment of the ATST project, that ex parte communications undermined the integrity of the contested case hearing and also contributed to an appearance of impropriety, and that the decision-makers were subjected to political pressure. Each of these issues independently warrant vacatur of the permit and remand for discovery. Considering the seriousness of the collective issues, remand to the Board to grant the requested discovery would ensure the next contested case hearing is fair both in appearance and actual decision-making. The absence of a reasonably clear factual analysis explaining the Board's departure from the conclusion of the Final Environmental Impact Statement also constitutes a basis for remand with instructions to provide such a rationale.

## I. Facts

### A. UHIfA Applies for a Conservation District Use Permit to Develop the ATST Project on Haleakalā

Haleakalā is a resource of seminal importance to Hawai'i. Its significance to science is such that it was chosen from 72 potential sites as the best location to meet a worldwide need for a telescope capable of taking high-resolution images of the sun to study its solar magnetic fields and its relation to solar energy, sunspots, and flares. The ATST would consist of a 142.7-foot tall telescope observatory structure, a support and operations building, a utility building, a parking lot, and a wastewater treatment plant. In addition to its scientific importance, the observatory project represents significant economic development.

The summit of Haleakalā is also of great cultural significance to Hawai'i. The summit was traditionally used by Native Hawaiians as a place for religious ceremonies, for prayer to the gods, to connect to ancestors, and to bury the dead. Native Hawaiians continue to engage in some of these practices at the summit. Cultural assessments performed for the ATST project determined that the Haleakalā summit is one of the most sacred sites on Maui, and the Haleakalā Crater is known as "where the gods live."

The ATST cannot be built if it will cause a substantial adverse cultural impact. Hawai'i Administrative Rules (HAR) § 13-5-30(c)(4) (2011). This is because the summit of Haleakalā is within the conservation district.[1] As

---

1. To evaluate a proposed land use in the conservation district, the Board must apply the following criteria:
 (1) The proposed land use is consistent with the purpose of the conservation district;
 (2) The proposed land use is consistent with the objectives of the subzone of the land on which the use will occur;
 (3) The proposed land use complies with provisions and guidelines contained in chapter 205A, HRS, entitled "Coastal Zone Management", where applicable;
 (4) The proposed land use will not cause substantial adverse impact to existing natural resources within the surrounding area, community, or region;

such, the site of the ATST is recognized by our state legislature as containing important natural resources—including cultural resources—"essential to the preservation of the State's fragile ecosystems." Hawai'i Revised Statutes (HRS) § 183C–1 (2011); see also Hawai'i Administrative Rules (HAR) § 13–5–2 (1994) (defining natural resources as including "cultural, historic, recreational, geologic, and archaeological sites"). Accordingly, to construct the ATST, UHIfA must obtain from the Board of Land and Natural Resources a CDUP establishing that the ATST does not have a substantial adverse impact on natural resources, including cultural resources. HAR § 13–5–30(b)(2),(c)(4) (1994); HAR § 13–5–2 (1994).

UHIfA began the application process for a CDUP for the ATST by filing a conservation district use application (CDUA) with the Department of Land and Natural Resources (DLNR) on March 1, 2010. In support of its CDUA, UHIfA attached to its CDUA the final environmental impact statement (FEIS) for the project that concluded the ATST would have a major adverse effect on cultural resources. Based on the finding of the FEIS and other concerns, Kilakila opposed granting a CDUP for the ATST, maintaining there was no evidence upon which the Board could refute the findings of the FEIS and conclude the ATST would not have a substantial adverse impact on cultural resources.

## B. Kilakila Successfully Asserts its Right to a Contested Case Hearing

Kilakila began its challenge less than three months after UHIfA filed its CDUA with the DLNR. On May 24, 2010, Kilakila submitted to the DLNR a petition for a contested case hearing. Kilakila 'O Haleakalā v. Bd. of Land & Nat. Resources, 131 Hawai'i 193, 196, 317 P.3d 27, 30 (2013) (hereinafter Kilakila I).

This petition was wrongfully rejected by a DLNR staff member and Kilakila re-filed its petition for a contested case hearing. Id. However, the Board took no action on Kilakila's request for a contested case hearing. Id. Rather than institute a contested case hearing on the CDUA, the Board held a public hearing in August 2010, during which Kilakila presented evidence in opposition. Id. At its regularly scheduled board meeting on December 1, 2010, the Board granted a permit to UHIfA, CDUP MA–3542, to build the ATST. Id. Immediately following the vote, Kilakila again requested a contested case hearing, followed by a written petition the next day. Id. Kilakila thereafter argued in its appeal to the circuit court that the Board's vote to grant the CDUP was effectively a denial of Kilakila's request for a contested case hearing.[2] Id. at 197, 317 P.3d at 31. The circuit court dismissed Kilakila's complaint. Id. at 198, 317 P.3d at 32.

Kilakila appealed the circuit court's dismissal of its complaint to the ICA, and the ICA affirmed the circuit court's dismissal. Id. On December 13, 2013, this court vacated the decisions of the ICA and circuit court concluding that the circuit court had jurisdiction to hear Kilakila's appeal and that Kilakila's right to a contested case hearing had been violated. Id. at 206, 317 P.3d at 40.

Meanwhile, prior to the issuance of the ICA's decision, the Board reconsidered its denial of a contested case hearing and granted Kilakila's request. The Board did not address, however, Kilakila's request that the Board void the already granted permit, CDUP MA–3542, prior to commencing the contested case hearing.

This permit, which was formally issued on December 1, 2010, was granted subject to eighteen conditions. In a December 20, 2010

---

(5) The proposed land use, including buildings, structures, and facilities, shall be compatible with the locality and surrounding areas, appropriate to the physical conditions and capabilities of the specific parcel or parcels;
(6) The existing physical and environmental aspects of the land, such as natural beauty and open space characteristics, will be preserved or improved upon, whichever is applicable;

(7) Subdivision of land will not be utilized to increase the intensity of land uses in the conservation district; and
(8) The proposed land use will not be materially detrimental to the public health, safety, and welfare.

HAR § 13–5–30(c)(1)-(8) (1994).

2. The Honorable Rhonda A. Nishimura presided.

letter to UHIfA, a DLNR staff member set forth the conditions upon which the Board had based its grant of CDUP MA-3542. The letter stated that the Board conditioned the permit upon sixteen conditions.

Pursuant to Condition No. 4 of the conditions for CDUP MA-3542, which required UHIfA to inform the DLNR in writing when construction activity is initiated, UHIfA informed the Board on April 10, 2012—during the second hearing officer's deliberations of the contested case—of its intent to begin construction.[3] After learning of the planned construction, Kilakila filed objections with the Board[4] and also filed a motion for a preliminary injunction with the circuit court to stay UHIfA's construction activities. Subsequently, UHIfA informed Kilakila and the Board that it chose not to commence construction on Haleakalā "at this time" as UHIfA sought to avoid the expense of a preliminary injunction hearing.

## C. During Deliberations, the First Hearing Officer Encounters Ex Parte Pressure from Government Officials Aligned with the University of Hawai'i Institute for Astronomy

Though it was authorized to conduct the contested case hearing on the CDUA, the Board elected to delegate its authority to a hearing officer who was to conduct the hearing and make a recommendation to the Board. The hearing officer appointed by the Chairman of the Board of Land and Natural Resources was Steven Jacobson (Jacobson). In July and August of 2011, Jacobson conducted four days of contested case hearings, during which he heard 7 witnesses and received more than 5,000 pages of evidence.

After the conclusion of the contested case hearing on August 26, 2011, and during Jacobson's deliberations process, Jacobson experienced pressure from the offices of the Governor and the senior United States senator for the State of Hawai'i.

On January 30, 2012, UHIfA Associate Director for External Relations (UHIfA associate director) Mike Maberry received assistance from both the Governor's office and the senior senator's office to contact the decision-makers during the deliberation phase of the contested case proceedings. The UHIfA associate director acknowledged in his January 30, 2012 email to the senior senator's chief of staff that previous ex parte communication between the Chairman and the senator's chief of staff occurred: "I know you've talked with [the Board Chairman] but as previously mentioned, Steve Jacobson doesn't work for [the Board Chairman], he works for [the director of the Department of Health (DOH)]." The UHIfA associate director asked the senator's chief of staff if it "[w]ould [ ] be possible for you or someone" to speak with Jacobson's superior, the DOH director, to clarify that Jacobson's priority was the ATST project. In the same email, the UHIfA associate director expressed to the senator's chief of staff UHIfA's fears of losing funding if the permit was not timely granted: "By mid-March, the project will have burned through $4M and will bleed $.5M each month after that." To assist the UHIfA associate director, the senator's chief of staff enlisted the Governor's chief of staff to speak to the DOH director on UHIfA's behalf.[5] This communication is reflected in a January 30, 2012 email from the senator's chief of staff to the Governor's chief of staff. In re-

---

**3.** UHIfA summarized its construction activities as:

> (1) site work to remove Reber Circle, which is one of the obligations of the Programmatic Agreement and the CDUP, and to address other previously disturbed sites, and (2) site work associated with utility corridors on the Haleakalā Observatories site that will connect to the existing Pan–STARRS and Mees facilities.

**4.** Kilakila objected to any construction pursuant to CDUP MA-3542. Kilakila moved to "(a) void the approval of the construction plans, (b) bar all construction and land alteration pursuant to

CDUP MA-3542 until and unless the contested hearing concludes and the BLNR issues a conservation district use permit for the ATST project; and (c) disqualify all members of the BLNR that have prejudged the University's conservation district use application for the ATST."

**5.** The senator's chief of staff also conveyed UHIfA's fears of losing funding to the Governor's chief of staff, stating in her January 30, 2012 email, "uh and my feds [sic] are getting really really nervous about losing money for the atst [sic]." She reiterated this fear in her following email, sent later that day, to the Governor's chief of staff, stating "[t]his will be bad if we lose it."

sponse to the request of the senator's chief of staff, the Governor's chief of staff demonstrated his commitment to UHIfA's cause by speaking with the DOH director and the Board Chairman: "I will speak with [the DOH director]. I also spoke with [the Board Chairman] and asked to please help."

The senator's and Governor's chiefs of staff further acted to support UHIfA by deciding to organize a meeting between UHIfA, the senator's chief of staff, DLNR, and DOH. When UHIfA learned of the meeting that the office of the senior senator and the office of the Governor were organizing to discuss the ATST project with the DLNR, the UHIfA associate director explained in a January 31, 2012 email: "UH can't meet with DLNR until after the Board acts on the Hearing Officers [sic] recommendation or it could jeopardize the Contested Case." The senator's chief of staff offered to "carry the uh message" for UHIfA, as stated in her January 31, 2012 email to the UHIfA associate director. The senator's chief of staff thus specifically offered a means for UHIfA to bypass the prohibition on ex parte communication with DLNR via the senior senator's office, and by extension the Governor's office, to do what UHIfA believed it could not do: make contact with Jacobson and the Board Chairman.

The impact of the pressure on Jacobson was substantial. Less than two months after the January 2012 emails had been sent, Jacobson publicly revealed the effects of the ex parte communications and political influences on his deliberations.[6] He explained that while there was no explicit statement from the senior senator or Governor instructing him to rule in favor of granting the conservation district use permit, the desired result was obvious: "I was not asked to recommend a particular result, although the result [United States] Senator [Daniel K.] Inouye's office wanted from the Board was clear." He noted that the pressure he experienced was "generated by a staffer in [United States] Senator Inouye's office and applied through the Governor's office." The pressure required Jacob-

son to make daily reports to DOH and the Board Chairman "as to how soon I contemplated finishing, what else I thought I needed to do, [and] why I thought I had to do it." Jacobson experienced what he characterized as "or else" pressure during his deliberations to file an initial report and recommended decision. He states, "considerable ex parte pressure was placed upon me to simply spit out a recommended decision quickly[.]" He further notes that this initial report did not "include[ ] any suggested conditions to granting of the CDUA." The undisclosed communications he received thus culminated in his decision to issue a report and recommendation granting the permit that was, in his view, invalid. Jacobson disavowed the report, specifically requesting that his "initial report and recommendations [be] ignored."

The political pressure upon Jacobson and the extent of the ex parte communications exchanged during Jacobson's deliberations process are also apparent from the February 21, 2012 email sent by the deputy director of environmental health of DOH (DOH deputy director). The DOH deputy director emailed the Governor's chief of staff and cc'd the DOH director, the Board Chairman, and the senator's chief of staff informing them that Jacobson "will serve the Haleakala ATST contested case recommended decision today." The DOH deputy director's email demonstrates that Jacobson had provided him updates throughout his deliberations process:

> This morning he is adding some photos to illustrate the location of historic sites and ahupuaa boundaries. He tells me that so long as the approximately 200 page document is in the mall by midnight it will be considered served today. He is confident it will be done. I have seen the document and discussed it briefly with him. He has been keeping me informed every day over the weekend of his progress.

The senator's chief of staff then forwarded this email to the UHIfA associate director with the message "Hopefully . . ." Kilakila's counsel declared months later, upon learning of these February 2012 emails, that

**6.** As discussed infra, Jacobson filed a document titled "Hearing Officer's Response to Minute Order No.14" on March 20, 2012 in response to the Board's review of his ex parte communication with UHIfA's counsel.

"[u]ntil the day that the hearing officer's report was actually released, I was never given a 'heads up' that the report was about to be released that day. I never received emails that the hearing officer would submit his recommendation on ... February 21, 2012." The February 2012 emails thus compound the appearance of extensive ex parte communications and political pressure surrounding the deliberations process for the ATST project.

## D. The Deputy Attorney General Concludes that Disclosure of Ex Parte Communications with the Deliberating Hearing Officer Is Not Required

Throughout the deliberations process, Jacobson repeatedly sought counsel from the deputy attorney general because it appeared to him that the deputy attorney general for the Board "was overlooking important issues relating to fairness." The deputy attorney general for the Board opined that pressure on Jacobson from government officials was permissible because UHIfA's counsel was not involved in generating the pressure on him; the deputy attorney general also informed Jacobson that "no disclosures were required."

Left essentially on his own to contend with his ethical dilemma, Jacobson contacted UHIfA's counsel on March 15, 2012 to inquire "whether any [of UHIfA's counsel] had anything to do with what the Senator's and Governor's offices were doing." Lacking knowledge of cooperation between UHIfA, the Governor's office, and the senator's office in the ATST case, Jacobson sought to discover whether an alliance existed.[7] Jacobson explained that the pressure would not cause him to commit an ethical transgression: "I am not about to sacrifice my integrity or breach my ethical responsibilities to make a Senator or Governor happy."

The next day, March 16, 2012, counsel for UHIfA informed the Board of Jacobson's email. The Board responded on March 19, 2012 with "Minute Order No. 14–Order Re:

Ex Parte Communication." In Minute Order No. 14, the Board found that "the communication from the Hearing[ ] Officer to UHIfA was an unpermitted ex parte communication" and that the communication "calls into question the Hearing Officer's impartiality with regards to his [February 2012 initial report] and the [March 2012 final report]." Due to Jacobson's unpermitted ex parte communication, the Board explained in its order that it was considering the following actions:

1. Striking the [February 2012] Report and [March 2012] Final and Amended Report from the record;

2. Discharging the Hearing Officer, Steven Jacobson, as the hearing officer in this case; and

3. Retaining a new hearing officer to review the record of the proceedings in this case and to issue a new hearing officer's report and proposed findings of fact, conclusions of law, and decision and order. The new hearing officer would be authorized to conduct additional fact finding as necessary.

The Board also informed the parties they could file comments or objections and that a hearing on the matter would be held on March 23, 2012.

On March 20, 2012, Jacobson responded to the Board's order in his "Hearing Officer's Response to Minute Order No. 14." As discussed supra, Jacobson publicly disclosed the ex parte communications and political pressures that affected his recommendations on the ATST project's CDUA. Jacobson further disclosed that the deputy attorney general for the Board expressed the opinion that no disclosures of the ex parte communications or pressures were required.

## E. The Board Chairman, the Governor's Chief of Staff, and the Senator's Chief of Staff Engage in an Ex Parte Meeting

The day after Jacobson's March 20, 2012 public disclosure, the Board Chairman, who

---

7. Jacobson explains that he made the decision to contact UHIfA based on his analysis of HAR § 13–1–39 (2009) and the Hawai'i Revised Code of Judicial Conduct. Jacobson, at the time of his discharge as hearing officer, had 38 years of legal experience, having graduated from Harvard Law School in 1973. Jacobson never received a response to his query as to whether UHIFA aligned with the Senator's and Governor's office to place pressure upon him.

was also the presiding decision-maker of the contested case hearing, met with representatives of the same government officials who had applied the inordinate pressure upon the hearing officer that resulted in his public disclosure. Specifically, the Chairman met with the chief of staff for the Governor, the chief of staff for the senior United States senator, and the Attorney General for the State of Hawai'i. A March 21, 2012 email [8] from the Governor's staff scheduling the March 21, 2012 meeting explains that the purpose of the meeting was "to discuss the telescope, hearing[ ] officer and funding issue"—which were significant substantive matters pertaining to the CDUA. [9]

As with all other ex parte communications between the Board Chairman, the Governor's office, and the senior senator's office, Kilakila was not informed of the March 21, 2012 meeting (hereinafter "ex parte meeting") and did not learn of its existence until approximately five weeks later. It is noteworthy that the ex parte meeting was held while deliberation of the CDUP was underway and the remedy for the hearing officer's ex parte communication with UHIfA was under consideration by the Board.

## F. Kilakila Responds to the Ex Parte Communications and the Board's Silencing of the Record and Discharge of Jacobson

Jacobson's March 20, 2012 declaration, discussed supra, was the first time Kilakila discovered that during the deliberation phase of the contested case hearing, undisclosed ex parte political pressure was being imposed upon the hearing officer by representatives of the Governor's office and Hawaii's senior senator's office.

In response to the hearing officer's March 20, 2012 public disclosure, on March 22, 2012,

Kilakila filed its "Response of Kilakila 'O Haleakalā to Minute Order No. 14" (Response) seeking to discover "ex parte communications with the hearing[ ] officer ... so that their impact on this case going forward can be minimized." However, without knowledge of the March 21, 2012 ex parte meeting at the time of this filing, Kilakila was deprived of the opportunity to request information regarding the ex parte meeting.

Kilakila noted in its Response that it could not adequately judge the proper remedy for violation of its constitutional right to a fair hearing absent disclosure. Kilakila explained that "[g]iven that neither Kilakila 'O Haleakalā nor this Board has a complete understanding of what happened here, Kilakila 'O Haleakalā cannot expect to know what the full remedy would be at least until full disclosure is made." Kilakila expressed its concern that without full disclosure "the specter of external political pressure being exerted on this proceeding remains." To discover "what happened here," Kilakila specifically requested "any communications tending to show that external political pressure was applied to affect the outcome of this proceeding." [10] Kilakila's request was for disclosure of ex parte communications by or to the hearing officer and UHIfA.

Kilakila identified in its Response particular issues that arose due to the ex parte communications with and political pressure upon the hearing officer. Kilakila maintained that its "basic constitutional right to a fair hearing" was in question; Kilakila wanted "[a]ll the facts ... disclosed," particularly "when these ex parte communications began, whether they were initiated by the University[,] or what they were precisely"; it sought full disclosure of any improper external political pressure; it wanted the Board to "consider how to prevent any such improper

---

8. Kilakila was provided emails regarding the March 21, 2012 meeting pursuant to its government records request filed with the Office of the Governor on March 30, 2012. The Governor's office disclosed the emails on April 27, 2012.

9. The funding issue in particular was of paramount importance to UHIfA. On January 30, 2012, the UHIfA associate director, informed the senior senator's chief of staff that due to funding

concerns, "to keep from losing the project, we may have to start construction." In an email dated January 31, 2012, the UHIfA associate director described the financial situation as "dire."

10. At the time of Kilakila's March 22, 2012 filing, the January 2012 and February 2012 emails discussed supra had not yet been disclosed to Kilakila.

communications, if they occurred, from continuing with the next hearing officer"; it sought to remove the deputy attorney general who advised the hearing officer that the communications need not be disclosed to Kilakila; and, tellingly, Kilakila expected to assert its interest in presenting additional live witnesses:

> Kilakila 'O Haleakalā should have the right to present live witnesses as it deems necessary for the hearing officer to judge their credibility. The new hearing officer must also be required to make a site visit. Kilakila 'O Haleakalā is entitled to a fair process.[11]

Kilakila also noted in its Response that a remedy greater than replacement of the hearing officer might be necessary once discovery was received: "If this threat persists, simply replacing the Hearing Officer will not cure that problem."

At the March 23, 2012 hearing, which was scheduled to address Jacobson's ex parte communication with UHIfA's counsel and potential discharge, Kilakila was not permitted to make a record of the issues it sought to raise at the hearing.[12] Despite the objection of Kilakila, the Board refused to permit a secretary to take notes. The hearing was Kilakila's first opportunity to make a record regarding the ex parte communications with the deliberating hearing officer; the Board denied that opportunity. The Board provided no explanation for its silencing of the record.

Kilakila was compelled to subsequently file a written objection to the Board's silencing of the record. In its written objection, filed March 27, 2012, Kilakila attempted to memorialize what occurred by providing a list of issues that were raised at the hearing.[13] Kilakila further noted the Board's silencing of the record would shield the actions of the Board from appellate review. "The record in this case will not be complete if the reviewing court is denied an opportunity to review substantive proceedings." As predicted, this court is without a record of the representations made by counsel for UHIfA, Kilakila, the Attorney General's office, or Board members at the March 23, 2012 hearing.

Six days after the March 23, 2012 hearing in which the record was silenced, the Board discharged Jacobson. In its March 29, 2012 Minute Order No. 15, "Order Discharging the Hearing Officer and Appointing a New Hearing Officer," the Board explained that although Jacobson denied that the ex parte communication affected his decision, the single communication to UHIfA was reason to question his impartiality:

> The communication from the Hearing Officer to UHIfA was an unpermitted ex parte communication in violation of Hawaii Administrative Rules (HAR) § 13-1-37.

> Despite the assertions by the Hearing Officer that the pressure that was put on him to issue a decision did not influence the outcome of his decision, the Board finds that the totality of the circumstances gives

---

11. These particular requests were recognized by the Board. The Board authorized the new hearing officer to "hold additional evidentiary hearings, as deemed necessary by the hearing officer, to receive testimony from those witnesses that provided oral testimony during the prior evidentiary hearings." But, the Board limited the additional testimony to "the scope of each witnesses' prior testimony." The Board also authorized the hearing officer to schedule a site visit.

12. In preventing any record of the proceedings to be made, the Board acted in direct contravention of its rules. HAR § 13-1-32(d) (2009) ("The presiding officer shall provide that a verbatim record of the evidence presented at any hearing is taken unless waived by all the parties." (Emphases added)).

13. Kilakila stated that the following issues were raised at the hearing:

- Kilakila 'O Haleakalā began by objecting to the absence of a court reporter and the Board's secretary.
- Kilakila 'O Haleakalā renewed its objection to the BLNR's counsel Linda Chow's further participation in this matter.
- Kilakila 'O Haleakala asked that all rulings made by the Hearing Officer that were integral to his reports also be stricken [sic]. The University conceded that the December 29, 2011 Supplemental Order and Notice Re Judicial Notice should be struck from the record.
- Kilakila 'O Haleakala asked that a site visit to Haleakala be part of the fact-finding that the hearing officer is required to do and the University did not object to this request.
- Kilakila 'O Haleakala asked the Board to install safeguards to protect the integrity of this process, including selecting a new hearing office who can be independent.

rise to a question regarding the impartiality of the Hearing Officer in arriving at his recommended decision.

Further, to "avoid even the appearance of impropriety," the Board ordered Jacobson discharged and his filings, including the February 2012 initial report and March 2012 final report, "stricken from the record and . . . not be referred to in any future filings or arguments in this case." Notwithstanding its authority to conduct the hearing, the Board ordered a new hearing officer to be appointed.

### G. The Board Refuses to Disclose Any Ex Parte Communications Within Its Possession

As stated, Kilakila immediately took steps to obtain information critical to determining the extent of the undisclosed ex parte communications after receipt of Jacobson's March 20, 2012 disclosure and again, after the silencing of the record at the March 23, 2012 hearing.

In the Board's March 29, 2012 order, in which it discharged Jacobson, the Board did not address Kilakila's requests for disclosure from Jacobson and UHIfA nor did the Board provide information as to why the Board refused to create a record of the silenced hearing. The order also failed to address Kilakila's request that the Board lay out a process to limit potential political pressure on the second hearing officer.

However, the March 29, 2012 order does contain the Board's pivotal determination that parties in a contested case hearing may urge a non-party to engage in undisclosed ex parte communications with the Board with respect to "procedural" matters. The Board concluded:

Even assuming the communications from the non-parties were initiated at the urging of a party in this case, such communica-

tions would be considered permitted ex parte communications under Hawaii Administrative Rules (HAR) section 13–1–37(b)(2) which permits requests for information with respect to the procedural status of a proceeding.

Thus, the Board determined the parties were free to "urge" others to communicate with deliberating decision-makers, apparently without the Board or the party having to disclose the nature of the "procedural" communication or its existence.

After the Board's March 29, 2012 order, Kilakila centered its next request for disclosure directly on evidence of ex parte communications with the Board. Kilakila filed its first motion for disclosure of communications to and from Board members regarding the ATST project on March 30, 2012. In its motion, Kilakila requested

each member of the BLNR disclose any and all communication (written, electronic and oral) that mentioned or related to the University's proposed Advanced Technology Solar Telescope with anyone—except for (a) communications between board members; (b) communications between any board member and the Board's counsel; (c) any board meeting when the ATST was a subject matter on the agenda.

Kilakila specifically explained that the request "includes any and all communication with Senator Inouye or his staff, the Governor or his staff, . . . that mentioned or related to the University's proposed Advanced Technology Solar Telescope." In support of its motion for disclosure, Kilakila provided evidence that the senior senator had previously exerted pressure on officials involved in the ATST project.[14] On the same day that it filed its motion for disclosure, Kilakila filed a government records request with the Governor's office for "[a]ll emails, memoranda and correspondence that mention or relate to the

---

14. The former superintendent of Haleakalā National Park testified in the contested case hearing,

> While serving as superintendent, I was well aware of Senator Inouye's displeasure with my statements/comments against the construction of the ATST. His staff assistant, James Chang placed heavy pressure on me to mute objections that [t]he National Park

> Service had regarding the impacts of the ATST. For example, in a meeting with Mr. Chang, he strongly encouraged me to go along with the construction of the ATST project. When I stated it was my job to guard against such extreme impacts to this majestic national park, he indicated that he would go to the Secretary of the Interior to override my objections.

Advanced Technology Solar Telescope (ATST) created after December 1, 2010 that were received or generated by anyone in the Governor's Office." The Governor responded and the documents were received by Kilakila on April 27, 2012. The documents contained the emails discussed supra regarding the March 21, 2012 ex parte meeting. On May 10, 2012, Kilakila—having learned for the first time of the occurrence of the ex parte meeting—supplemented its April 9, 2012 motion for disclosure seeking, inter alia, communications pertaining to the meeting.

The Board replied to Kilakila's March 30, 2012 motion for disclosure in its June 4, 2012 Minute Order No. 23. In its order, the Board denied the request for other communications but granted Kilakila's motion "with regard to the meeting held on March 21, 2012," determining that the matter was "suitable for disposition without the need for oral argument." [15] The Board stated that the sole topic of discussion was when Jacobson would release his report:

a. A meeting occurred on March 21, 2012, at which [the] Chairperson [ ] was in attendance. No party to the contested case was present during the meeting.

b. During the meeting the sole topic of discussion was when the recommended decision in this contested case would be issued by the hearing officer, Steven Jacobson.

c. There was no discussion of any substantive issues involved in this contested case hearing.

The Board also determined

Inasmuch as no party was present during the meeting, there was no ex parte communication with the hearing officer or any member of the Board. Even if a party were present, the discussion referred to above comes within the purview of Hawaii Administrative Rule (HAR) § 13–1–37 as a permitted communication related to requests for information with respect to the procedural status of a proceeding. No further action is required regarding this communication.

On the one hand, the Board indicated that no party was present at the meeting. On the other hand, even if a party were present, the Board concluded that the discussion that occurred at the March 21, 2012 ex parte meeting was "permitted communication related to requests for information with respect to the procedural status of a proceeding" (hereinafter "procedural explanation"). No documentation was produced to substantiate that the meeting discussed only when the recommended decision in the contested case would be issued by the hearing officer. In addition to its procedural explanation, the Board further explained that "[w]hen carrying out their duties as Board members, the members of the Board interact with numerous people in various situations." As to Kilakila's motion for disclosure for ex parte communications other than the ex parte meeting, the Board determined the motion "does not provide a time frame or context for the requested disclosures" and the motion "is based, at most, upon mere speculation." According to the Board, Kilakila did not demonstrate that the Board "acted in any manner other than as an impartial adjudicator in this case." Additionally, the Board concluded that "any prejudice that may have occurred as a result of communications with the former hearing officer has been remedied by the Board's discharge and replacement of the hearing officer."

Approximately a week after the Board issued its June 4, 2012 Minute Order No. 23, Kilakila informed the Board of the impossibility of its procedural explanation for the meeting. In its June 8, 2012 "Motion of Kilakila 'O Haleakalā to Reconsider Minute Order No. 23," Kilakila explained that the Board's justification for the meeting could not be true because the hearing officer's report was already issued by the time of the ex parte meeting:

In granting the motion of Kilakila 'O Haleakalā for disclosure of all communications to and from members of the BLNR, in part, this Board disclosed that the "sole topic of discussion" at the March 21, 2012 meeting was "when the recommended decision in the contested case would be issued

15. The Board concluded in each of its orders denying Kilakila's requests for disclosure that

"this matter [is] suitable for disposition without the need for oral argument."

by the hearing officer, Steven Jacobson." With all due respect, this statement cannot be true.

Steven Jacobson had already produced his first decision on February 23, 2012—a month before this meeting. His recommendation had received media coverage. His second and final decision was produced on March 12, 2012, over a week before this meeting took place—a meeting that had only been hastily called on March 21, 2012 itself according to the documents produced by the Governor's office. In fact, on March 19, 2012, this Board announced through Minute Order 14 that it was considering "[s]triking the Report and Final Amended Report from the record." Thus, it strains credulity to assert that the discussion was "when the recommended decision in this contested case would be issued by the hearing officer, Steven Jacobson." He had already done so. Everyone already knew that fact by the time that the meeting had been called.

Having informed the Board that its explanation of the purpose of the ex parte meeting was not accurate, Kilakila reasserted in its June 8, 2012 motion its request for the Board to disclose its ex parte communications relating to the ATST. Kilakila requested the Board to

respond definitively as to whether or not there were any communications (oral, written or electronic) between any member of the Board and anyone else that mentioned or related to the University's proposed Advanced Technology Solar Telescope with anyone (except for (a) communications between board members; (b) communications between any board member and the Board's counsel; (c) any board meeting when the ATST was a subject matter on the agenda) from the time that Kilakila 'O

Haleakalā requested a contested case hearing.

The Board refused to disclose the extent of the ex parte communications that occurred during the ex parte meeting. The Board also offered no explanation of how it composed its original inaccurate account of the ex parte meeting. Instead, on July 13, 2012, the Board issued a one-page order providing another "procedural" explanation of the ex parte meeting. The Board amended Minute Order No. 23 to state that the purpose of the ex parte meeting was to discuss when the Board would issue its final decision: [16]

During the meeting, the sole topic of discussion was <u>when the final decision in this contested case would be issued, in light of Minute Order No. 14, filed on March 19, 2012.</u>

The Board's amended explanation was contradicted by the March 21, 2012 email disclosed by the Governor's office wherein the purpose of the meeting was stated to be discussion of "the telescope, hearing[ ] officer and funding issue"—all issues of current import.

Kilakila filed its final motion on September 27, 2012 requesting disclosure from the Board, entitled "Second Motion of Kilakila 'O Haleakalā to Reconsider Minute Order No. 23." Kilakila filed this motion based on new evidence it had received from UHIfA, which produced records pursuant to an order by the circuit court referencing the Hawai'i Uniform Information Practices Act, HRS chapter 92F.[17] The disclosed documents consist of the January 2012 and February 2012 emails, discussed _supra_, between the senator's chief of staff, the Governor's chief of staff, the UHIfA associate director, and the DOH deputy director.

Based on the disclosed emails, Kilakila raised additional questions in its September

---

16. The Board's explanation raises more questions than it answers inasmuch as on the date of the undisclosed Chairman meeting, March 21, 2012, the final report of the hearing officer had not been stricken, the hearing officer had not been discharged, and a Board decision had yet to be made regarding its announcement that it was considering striking Jacobson's initial and final reports. Yet, per the second explanation for the meeting, "the sole topic of discussion was when

the final decision in this contested case would be issued."

17. Kilakila received this new evidence after obtaining summary judgment on its motion for compelling disclosure of the records in circuit court on September 7, 2012. On September 25, 2012, UHIfA produced the documents.

27 motion for disclosure that further suggest substantial ex parte communications occurred.[18] For example, Kilakila inquires as to the means through which UHIfA could have knowledge of when the hearing officer would file his initial and final recommendations. The questions posed by Kilakila also sought an explanation for the Board's decision to engage in communications with government officials favoring the permit without disclosing the communications to Kilakila.

Kilakila's September 27 motion for disclosure also noted the emails received from UHIfA revealed that the Board's justification for denying Kilakila's request for disclosure was misleading. Kilakila noted that while the Board previously disclosed only the ex parte meeting of March 21, 2012 in response to Kilakila's March 30 request for disclosure of ex parte communications, the emails subsequently obtained from UHIfA contained evidence of "more ex parte communication than ha[d] previously been reported." [19]

The Board denied Kilakila's September 27 motion for disclosure in its November 9, 2012 order, ending Kilakila's unsuccessful seven-month effort to obtain access to the Board's records of its ex parte communications. The Board based its denial of the motion on the conclusion that Kilakila failed to show that any unpermitted ex parte communications occurred:

Kilakila's Motion fails to show that any unpermitted ex parte communications occurred between the former hearing officer or any of the Board members and one of the parties in this case that would be a basis to reconsider this Board's prior Order[.]

That same day—November 9, 2012—the Board accepted the recommendation of the second hearing officer and granted the second conservation district use permit in favor of UHIfA, titled CDUP MA–11–04, for construction of the ATST on Haleakalā.

## H. The Board Grants UHIfA the Conservation District Use Permit for the ATST Project

The Board's November 9, 2012 Findings of Fact, Conclusions of Law, and Decision and Order, granted CDUP MA–11–04 (hereinafter "2012 permit") with conditions that are substantially similar to the conditions required by the initial permit, CDUP MA–3542, granted on December 1, 2010 (hereinafter "2010 permit"). The December 20, 2010 letter informing UHIfA that the Board granted the first permit contained 18 conditions addressing construction activities, mitigation, and statutory requirements. The first 16 conditions listed in the Board's 2010 permit are virtually the same [20] as the first 16

**18.** Kilakila, in its memorandum in support of the September 27, 2012 "Second Motion of Kilakila 'O Haleakalā to Reconsider Minute Order No. 23," stated:

> E. Inexplicable Conduct
> • How did the applicant come to learn that the hearing officer would submit his recommendation on January 27, 2012 when this information was never provided to Kilakila 'O Haleakalā?
> • How did the applicant receive information that the hearing officer would submit his recommendation on February 21, 2012 when this information was never provided to Kilakila 'O Haleakalā?
> • Why did . . . the deputy director of environmental health[,] a political appointee[,] have an opportunity to see the hearing officer's report and discuss it with the hearing officer before the report was provided to the parties? . . . . Why is [the deputy director of environmental health] even involved and why were his comments fed directly to the applicant?
> • The hearing officer also previously claimed that "the Board's counsel opined

that no disclosures" of the ex parte communications to Kilakila 'O Haleakalā was required.

**19.** On January 30, 2012, the UHIfA associate director emailed the senator's chief of staff and referred to her prior conversation with the Chairman: "I know you've talked with Aila." The Governor's chief of staff also stated that he "spoke with Bill [Aila] and asked to please help." The senator's chief of staff and the Governor's chief of staff began planning a meeting with DLNR on January 30, 2012. The senator's chief of staff asked the Governor's chief of staff to "call a meeting with uh, me, and your depts [sic]—dlnr, health and ag" if they could not get in contact with Jacobson.

**20.** The December 20, 2010 letter and the Board's November 9, 2012 Decision and Order differ slightly in their reference to UHIfA. The letter refers to UHIfA as "the applicant," while the Decision and Order specifically references "the UHIfA."

conditions listed in the subsequently granted 2012 permit. The 2012 permit contains two additional conditions that are not listed in the prior 2010 permit. Thus the two permits are the same, except for two conditions contained in the latter permit: access to the previously constructed ahu and allowance of a new ahu.

## I. ICA Appeal

Following the Board's decision granting the CDUP for development of the ATST telescope, Kilakila unsuccessfully appealed to the Circuit Court of the First Circuit (circuit court) seeking a stay and reversal of the Board's order granting the 2012 permit. Having lost its appeal in the circuit court, Kilakila appealed to the Intermediate Court of Appeals (ICA). In a memorandum opinion, the ICA affirmed the circuit court's August 20, 2013 Final Judgment and its "Order Affirming the Board of Land and Natural Resources' Findings of Fact, Conclusions of Law, Decision and Order in DLNR File No. MA–11–04." The ICA explained that although Jacobson engaged in improper ex parte communication, because Jacobson's report was stricken and the Board appointed a new hearing officer, Kilakila was not prejudiced. The ICA held that because Kilakila "does not contend [the second hearing officer] was subject to any ex parte communication or political pressure," "any impropriety was cured when the Board discharged Jacobson and appointed [the second hearing officer]." The ICA thus adopted the Board's position that any prejudice to Kilakila was remedied by the appointment of the second hearing officer. The ICA's opinion does not explain how appointment of a new hearing officer remedied any prejudice arising from undisclosed ex parte communication with the Chairman during the deliberation period of the first contested case hearing.

## II. Discussion

The location of Haleakalā's summit within the conservation district affords it certain protections. HAR § 13–5–1 (1994). As the stewards of the conservation district, the members of the Board of Land and Natural Resources are charged with the duty to implement the protections enumerated by the Hawai'i State Legislature. HRS § 183C–3 (2011). The signature legal procedure administered by the Board to assure that the protections of the conservation district are effectuated is the contested case hearing. HAR § 13–5–34(d) (1994). After a contested case hearing, it is the Board that determines whether a conservation district use permit is granted.

Kilakila asserts that the Board prejudged the 2012 permit, that ex parte communication "undermined the integrity of the contested case hearing" and raised an appearance of impropriety, and that external political pressure was directly placed on the adjudicating decision-makers. Each of these issues presents a distinct legal issue as to whether the proceedings comported with due process.

Kilakila also contends the Board did not provide a reasonably clear explanation for its departure from the conclusion of the FEIS that the ATST would cause major adverse impacts to important cultural resources.

### A.

### 1. The Board's Grant of a Conservation District Use Permit Prior to the Contested Case Hearing Constitutes Actual Prejudgment or the Appearance of Prejudgment

Kilakila raises the question, "[d]id the BLNR prejudge the issue by granting the CDUP before the contested case was held and then authorizing some construction activities to proceed pursuant to that permit prior to completion of the post hoc contested case hearing?" This court recently examined a similar issue in Mauna Kea Anaina Hou v. Board of Land & Natural Resources, 136 Hawai'i 376, 363 P.3d 224 (2015). In Mauna Kea, the Board voted to grant a CDUP to the applicants prior to, and despite repeated calls for, a contested case hearing. Id. at 381–82, 363 P.3d at 229–30. The Board subsequently granted a contested case hearing, assigned it to a hearing officer, and issued findings of fact, conclusions of law, and a decision and order granting the conservation district use permit for construction of the Thirty Meter Telescope (TMT) on Mauna Kea. Id. at 384–87, 363 P.3d at 232–35. This

court held that, under the facts of Mauna Kea, the appearance of prejudgment rendered the contested case hearing an inauthentic exercise of the contested case process. Accordingly, the conservation district use permit was vacated and the case remanded for a new contested case hearing. Id. at 399, 363 P.3d at 247.

The series of events in this case that culminated in the contested case hearing likewise suggest the reality or appearance of prejudgment. Although Kilakila repeatedly requested a contested case hearing through both written and oral requests, the Board took no action on Kilakila's requests for a contested case hearing. Kilakila I, 131 Hawai'i at 196, 317 P.3d at 30. Instead, the Board held public hearings—rather than a contested case hearing—in November 2010, and voted to grant the application at the final public hearing. Id. Thus, as in Mauna Kea, the Board issued the 2010 permit to UHIfA without a contested case hearing. Id. Also, as it did in Mauna Kea, the Board in the instant case granted the request for a contested case hearing after the permit had been issued. Id. at 198, 317 P.3d at 32. Accordingly, the Board's actions in this case—granting the 2010 permit and subsequently holding a contested case hearing—are substantially similar to the agency actions that caused the appearance of prejudgment in Mauna Kea.

In Mauna Kea, this court held that the approval of the CDUP prior to the contested case hearing demonstrated that the Board appeared to have prejudged the permit and thus violated due process. Mauna Kea, 136 Hawai'i at 396–9, 363 P.3d at 244–7. "[S]imply stated, sequence matters." Id. at 393, 363 P.3d at 241. The sequence of events in which a permit is granted prior to a contested case hearing—"whether events were separated by two minutes or two months—plainly gives rise to the appearance of prejudgment[.]" Id.

Prejudgment and the appearance of prejudgment is a form of bias that is "constitutionally unacceptable" and prohibited as a violation of due process. Id. at 389, 363 P.3d at 237. There are few situations that "more severely threaten trust in the judicial process than the perception that a litigant never had a chance due to some identifiable potential bias." Id. at 390, 363 P.3d at 238. Where "there exists any reasonable doubt about the adjudicator's impartiality at the outset of a case, provision of the most elaborate procedural safeguards will not avail to create [an] appearance of justice." Sussel v. Honolulu Civil Service Comm'n, 71 Haw. 101, 108, 784 P.2d 867, 870 (1989) (citation omitted).

This case presents greater evidence of an appearance of prejudgment than the record in Mauna Kea. The Board, in deciding whether to grant a permit for the TMT project, included a condition in its approval of the permit that anticipated the permit would be revoked during a subsequent contested case hearing: "[i]f a contested case proceeding is initiated, no construction shall occur until a final decision is rendered by the Board in favor of the applicant or the proceeding is otherwise dismissed." Mauna Kea, 136 Hawai'i at 385, 363 P.3d at 233. The Board's grant of the permit for the ATST project contained no such condition. Rather, the 2010 permit for the ATST project remained in effect even though the Board later granted the contested case hearing.[21] As this court explained in Kilakila I, "[b]ecause the permit remains in effect despite BLNR's failure to hold a contested case hearing before voting to grant the permit, UH can still build on Haleakalā[.]"[22] Kilakila I, 131 Hawai'i at 199, 317 P.3d at 33 (emphasis added). Thus, unlike the revoked CDUP in Mauna Kea, the ATST CDUP remained in effect during the contested case hearing that followed the Board's initial approval of the permit. See Mauna Kea, 136 Hawai'i at 398, 363 P.3d at 246.

---

21. In Mauna Kea, the court clarified "it does not matter whether or not the permit was stayed. BLNR should not have issued the permit prior to holding a contested case hearing." Mauna Kea, 136 Hawai'i at 393, 363 P.3d at 241.

22. UHIfA informed the Board of its construction plans pursuant to the conditions of its December 20, 2010 letter. After Kilakila filed a motion for a preliminary injunction to stay UHIfA's construction activities, UHIfA responded to the motion in a letter to Kilakila's counsel and the Board's counsel, stating that it decided not to commence construction.

The appearance of prejudgment in a contested case hearing violates due process. To reach that conclusion in <u>Mauna Kea</u> the court analyzed whether the appellants "were given an opportunity to be heard at a meaningful time and in a meaningful manner." <u>Mauna Kea</u>, 136 Hawai'i at 390, 363 P.3d at 238. The procedures of a contested case hearing "are designed to ensure that the record is fully developed and subjected to adversarial testing." <u>Id.</u> at 391, 363 P.3d at 239. But, "that purpose is frustrated if . . . the decisionmaker rules on the merits before the factual record is even developed." <u>Id.</u> The Board's approval of the 2010 permit before the contested case hearing indicates that the hearing officer for the contested case hearing knew "BLNR's position on the permit before the first witness [was] sworn in." <u>Id.</u> The Board members are also susceptible to the appearance of prejudgment as they are aware of their earlier vote when they act on the hearing officer's recommendation. Such a process "does not satisfy the appearance of justice, since it suggests that <u>the taking of evidence is an afterthought and that proceedings were merely 'mov[ing] in predestined grooves.'</u>" <u>Id.</u> (emphasis added) (citation omitted).

The similarity between the conditions of the 2010 permit initially granted without a contested case hearing and the conditions of the 2012 permit granted after the contested case hearing also creates the appearance of prejudgment. The majority noted in <u>Mauna Kea</u> that "the high level of detail" that the Board provided in its findings, conclusions, decision and order was not sufficient to mitigate an appearance of prejudgment. <u>Id.</u> at 398, 363 P.3d at 246. The 2011 permit and the 2013 decision for the TMT project that the Board issued were "virtually indistinguishable documents." <u>Id.</u> This similarity indicated that "none of the testimonies, arguments, or evidence submitted to BLNR" during the contested case proceedings "were seriously considered." <u>Id.</u>

In this case, as in <u>Mauna Kea</u>, the two sets of conditions upon which the Board granted the permits are "virtually indistinguishable." <u>Id.</u> Sixteen of the conditions are exactly the same with language mirroring each other. The post-contested case hearing 2012 permit does contain two additional conditions that solely affect the use of the area by Native Hawaiian practitioners. These two additional conditions were the only conditions added after months of deliberation, hundreds of pages of briefing, and four days of contested case hearings. Thus, the Board's 2012 permit contains all but two of the same conditions contained in the previous decision of the Board granting the 2010 permit <u>without a hearing</u>. The similarity suggests "less than full consideration was given to the voluminous legal and factual arguments and materials presented in the contested case hearing." <u>Mauna Kea</u>, 136 Hawai'i at 393, 363 P.3d at 241.

The concurrence contends that the first permit was "invalid" and that the second permit "superseded" the first permit. **Concurrence at 409, 382 P.3d at 221.** This is not reflected in the record. <u>Kilakila I</u> remanded to the circuit court to stay or reverse the permit, but the permit was not invalidated prior to the commencement of the contested case hearing. <u>Kilakila I</u>, 131 Hawai'i at 206, 317 P.3d at 40. Rather, the first and second permits were both issued <u>prior to</u> this court's 2013 decision in <u>Kilakila I</u>. The Board failed to invalidate the first permit, the 2010 permit, <u>prior to the contested case hearing</u> despite requests from Kilakila beginning on February 11, 2011.

Additionally, the stipulation by the parties rendering the first permit void did not occur until January 30, 2014, and was not approved by the circuit court until February 7, 2014. The parties and the Board stipulated that the initial conservation district use permit, the 2010 permit that was granted by the Board in December 2010, was void.[23] Although generally the invalidation of the first permit

---

23. The stipulation was not included in the record for this case, but it is in the record for a related case currently on appeal, <u>Kilakila 'O Haleakalā v. Univ. of Hawai'i</u>, 134 Hawai'i 86, 332 P.3d 688 (App. 2014), <u>cert. granted</u>, No. SCWC–13–0000182, 2014 WL 4545916 (Sept. 12, 2014). I take judicial notice of the stipulation pursuant to Hawai'i Rules of Evidence Rule 201(b), which provides that a judicially noticed fact "must be one not subject to reasonable dispute" and must be "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."

might ensure that Kilakila's due process rights were adequately protected in the contested case hearing on the second permit application, this is not the case here. The first permit was not rendered void until more than one year after the second permit—the 2012 permit at issue in this case—was granted by the Board on November 9, 2012. Thus, the first permit was valid throughout the course of the contested case hearing. Any suggestion that, prior to the Board's second approval of the permit, a stipulation rendering the 2010 permit void between Kilakila, UHIfA, and the Board removed the possible appearance of prejudgment is not persuasive. And the proposition that our Kilakila I decision invalidated the first permit before the Board's decision granting the second permit of November 9, 2012 is not possible given that the Kilakila I decision was not filed until 2013.

The concurrence also appears to suggest that the Board did not engage in prejudgment in granting the second permit. **Concurrence at 409, 382 P.3d at 221.** The concurrence states that the second permit was issued "after a contested case hearing and report by the second hearing officer, and a new vote by a reconstituted BLNR, which had several new members, including a new Chair." **Concurrence at 409, 382 P.3d at 221.** Although a new hearing officer issued a new report, the new hearing officer did not hold new hearings.[24] The facts addressed in the original hearings were considered and incorporated into the Board's Findings of

Facts, Conclusions of Law, Decision and Order. In addition, the 2012 permit was voted on by substantially the same board members as had reviewed the 2010 permit.[25] To consider the composition of the Board is to acknowledge that like the Board in Mauna Kea,[26] the composition of the Board is substantially the same. However, unlike in Mauna Kea, one of the new members to the Board—the Chair—engaged in ex parte communication.

This court indicated in Mauna Kea that because the Board granted the permit before holding the contested case hearing, "[a]ppellants were denied the most basic element of procedural due process—an opportunity to be heard at a meaningful time and in a meaningful manner." Mauna Kea, 136 Hawai'i at 391, 363 P.3d at 239. As stated in Mauna Kea, the justice system must "be fair and must also appear to be fair." Id. at 389, 363 P.3d at 237. The assignment of the conservation district use application to a hearing officer to conduct a contested case hearing does not cure any appearance of prejudgment arising from the issuance of the permit prior to the contested case hearing. Id. at 393, 363 P.3d at 241.

Due to the Board's grant of the 2010 permit prior to commencing the contested case hearing and the Board's subsequent refusal to void the 2010 permit upon the commencement of the contested case proceedings, the 2010 permit was valid and operative throughout the deliberations process of both hearing officers and the Board. The existence of a valid permit during the contested case hearing for the second permit renders the instant

24. The Board authorized the new hearing officer "to hold additional evidentiary hearings, as deemed necessary by the hearing officer, to receive testimony from those witnesses that provided oral testimony during the prior evidentiary hearings," but limited the testimony to "the scope of each witnesses' prior testimony." Although the new hearing officer could have held additional evidentiary hearings, the record does not reflect that such hearings were held. The new hearing officer did conduct a site visit to the Haleakala High Altitude Observatories site on May 25, 2012. Oral argument by the parties was held before the Board on September 14, 2012.

25. In 2012, the Board's Findings of Fact, Conclusions of Law, Decision and Order was signed by Chairman William Aila, Sam M. Gon III, Jerry Edlao, Robert Pacheco, and David Goode. The Findings of Fact, Conclusions of Law, Deci-

sion and Order provided to the court was not signed by John Morgan. On December 1, 2010, the first permit was orally approved with amendments by all board members except for Member Gon. The Board members present on December 1, 2010 were Chairperson Laura Thielen, Sam M. Gon III, Jerry Edlao, Ron Agor, John Morgan, and David Goode. Thus, the 2012 composition of the Board only differed from the 2010 composition by two members, one of whom was the Chair.

26. I take judicial notice of the Board's composition in 2011 and 2013 during the proceedings in Mauna Kea pursuant to HRE Rule 201(b). From 2011 to 2013, the Board's composition differed by only one Board member. Compare this composition with that of the Board between 2010 and 2012, discussed supra, which varied by only two Board members.

record more replete with evidence of prejudgment than that in Mauna Kea. Moreover, unlike Mauna Kea, this case raises issues of ex parte communication and political pressure that may constitute further due process violations of the contested case hearing process. And, unlike Mauna Kea, discovery was improperly denied the permit opponent who sought to understand the extent of ex parte communications with the Board by those who favored the permit. Thus, the due process infirmity in Mauna Kea that necessitated a new hearing is surpassed by the infirmity apparent in the instant record. No less a remedy is due Kilakila. The conservation district use permit should be vacated and a new hearing ordered.

## 2. Undisclosed Ex Parte Communications Raise the Significant Concern that Kilakila's Due Process Right to a Fair Tribunal Was Violated

The Board and UHIfA argue that no ex parte communications occurred in this case; [27] and if such communications did occur, those communications were permissible. Kilakila asserts that the contested case hearing was tainted by ex parte communication and the Board's refusal to disclose the extent of the ex parte communication. Kilakila raises two distinct issues as to the "taint" of the ex parte communication between government officials and the Board: first, ex parte communications undermine the integrity of the contested case hearing, and second, such

communications suggest an appearance of impropriety.

### a. The Decision-makers Engaged in Ex Parte Communications in Violation of HAR § 13-1-37

The Board and UHIfA claim that no impermissible ex parte communications occurred between the Board, Jacobson, the Governor's office, or the senior senator's office. The Board states that "[n]either the Governor, or his staff, nor Senator Inouye, or his staff, were parties to the administrative hearing." In response to Kilakila's argument that the senator's chief of staff was UHIfA's "agent," the Board stated "Kilakila ignores Senator Inouye's role as a politician representing the State of Hawai'i and the responsibility of the late senator to support his constituents." UHIfA likewise stated, "[t]here is nothing improper about the Senator's office following up on a priority project identified by the science community and a decade in the making." According to the Board, the communications were permissible ex parte communications because the communications "were limited to when the decision would be forthcoming and the communications were not related to a particular result[.]" The arguments of the Board and UHIfA that no impermissible ex parte communications occurred lack merit.

### i. The alignment of the government officials with a party.

The Hawai'i Administrative Rules prohibit communications between Board members

---

**27.** UHIfA asserted in its Answering Brief to the ICA when discussing the ex parte meeting: "As no party was present, there was no ex parte communication." This novel position taken by counsel for UHIfA was shared by the Board. Per its counsel—the Attorney General's office for the State of Hawai'i—the Board likewise claimed in its Answering Brief that "[n]one of the communications identified or alleged by Kilakila are ex parte communications under HAR 13-1-37." The Board offered the proposition that the alleged communications with Jacobson did not constitute ex parte communications because: 1) "the communication did not come from a party" and 2) "the communication concerned the procedural status of the hearing, an exception to the ex parte prohibition." With this analysis, the Attorney General for the State of Hawai'i rejected settled jurisprudence defining communications between deliberating agency officials acting in a

quasi-judicial capacity and nonparties interested in the outcome of the case as "ex parte" communication. Whether procedural or not, it is beyond cavil that any communication by an interested person with a judicial decision-maker about the matter under consideration without counsel for the parties present is ex parte communication. See, e.g., Portland Audubon Soc. v. Endangered Species Committee 984 F.2d 1534, 1544 (9th Cir. 1993) (noting that an interested person need not "be a party to, or intervenor in, the agency proceeding" to be covered by the ban on ex parte communication); Prof'l Air Traffic Controllers Org. v. Fed. Labor Relations Auth., 685 F.2d 547, 570 (D.C. Cir. 1982) (discussing ex parte contact and concluding that "[i]t is simply unacceptable behavior for any person directly to attempt to influence the decision of a judicial officer in a pending case outside of the formal, public proceedings").

and "representatives or agents" of a party. HAR § 13–1–37 provides

No party or person petitioning to be a party in a contested case, nor the party's or such person's to a proceeding before the board nor their employees, <u>representatives or agents</u> shall make an unauthorized ex parte communication either oral or written concerning the contested case to the presiding officer or any member of the board who will be a participant in the decision-making process.

HAR § 13–1–37(a) (2009) (emphasis added). The term "representatives" of a party is undefined in the Hawai'i Administrative Rules, Title 13, chapter 1, which "governs practice and procedure before the board of land and natural resources." HAR § 13–1–1 (2009). This court has previously defined "representative" as "agent, deputy, <u>substitute</u>, or delegate usually being invested with the authority of the principal." 'Olelo v. Office of Info. Practices, 116 Hawai'i 337, 350, 173 P.3d 484, 497 (2007) (citing Webster's Third New International Dictionary to analyze the language of HRS § 92F–3 (1993)). Accordingly, an entity or individual is a representative of a party "when it substitutes for the [party]." Id.

At a minimum, the evidence indicates that the senior senator's and the Governor's staff acted with UHIfA to serve as UHIfA's substitutes with the Chairman during the hearing process. The senator's chief of staff specifically <u>offered to help UHIfA by "carry[ing] the uh message" for UHIfA</u> to DLNR in her January 31, 2012 email to the UHIfA associate director.

The record of this cooperation between UHIfA, the senior senator's staff, and the Governor's staff offers insight into the March 21, 2012 ex parte meeting. Although UHIfA and Kilakila were not at the meeting, the senator's chief of staff and the Governor's chief of staff attended. The purpose of the meeting expressed in the March 21, 2012 email disclosed by the Governor's office, "to discuss the telescope, hearing[ ] officer and funding issue," is consistent with UHIfA's prior concerns regarding the ATST project.

Specifically, the UHIfA associate director had explained in his January 30, 2012 email to the senator's chief of staff that "[b]y mid-March, the project will have burned through $ 4M and will bleed $ .5M each month after that." The project's funding was a key concern for UHIfA and, given the senior senator's and Governor's previous attempts to protect UHIfA's interests, the decision to call and participate in the March 21, 2012 ex parte meeting appears to be another example of the Governor and senior senator acting on behalf of UHIfA to engage in undisclosed ex parte communications with the contested case adjudicative officers. At the time of the March 21, 2012 email requesting the meeting, the senator's chief of staff intended to discuss the loss of funding—as she sought to do in January 2012 when she offered to "carry the . . . message" for UHIfA regarding the loss of funding if the permit were denied.

Accordingly, the record indicates that the offices of the senior senator and the Governor acted as substitutes for UHIfA. Thus, without the possible clarification of further discovery, an appearance arises that the ex parte communications by the senator's chief of staff and the Governor's chief of staff with the deliberating decision makers were as representatives of UHIfA.

### ii. The nature of the communications was not procedural.

Although communications between a representative of UHIfA and the Board occurred, the communications, if disclosed, may be permissible if the nature of the communications was procedural. HAR § 13–1–37(b)(2) provides an exception to ex parte communication where the communication is for: "[r]equests for information with respect to the procedural status of a proceeding."

The Board describes the months of undisclosed ex parte communications with those who contacted the hearing officer and the Chairman of the Board of Land and Natural Resources as solely "procedural."[28] The refutations in the record of the proposition that the undisclosed ex parte communications

---

**28.** The Board described the communications as procedural in its March 29, 2012 Minute Order

No. 15, titled "Order Discharging the Hearing Officer and Appointing a New Hearing Officer."

were merely procedural have been recounted. The Board offers no explanation how this record supports its argument that the ex parte communications with Jacobson were merely procedural and gave no rise to the appearance of impropriety. Instead, the Board simply declared there to be no appearance of impropriety—while refusing Kilakila's requests for documents pertaining to the communications. Without the benefit of additional discovery, the instant record renders unlikely the proposition that the ethical concern that Jacobson experienced as a result of the undisclosed ex parte communications was based upon mere procedural inquiries. In addition, although Jacobson's discharge may have cured the effect of the ex parte communications with him, it does not address the impropriety of ex parte communications with Board members.

The Board also applies its procedural explanation to justify the ex parte communications at the undisclosed meeting with the Chairman. The Board's two justifications of the meeting as procedural are unpersuasive. The first justification gave a procedural status explanation for the communications at the meeting that was not possible. The group assembled at the ex parte meeting could not have discussed "when the recommended decision in this contested case would be issued by the hearing officer, Steven Jacobson," because Jacobson had issued his report more than a week before the March 21, 2012 ex parte meeting. The second justification—that only the release of the final report of the Board was discussed—is unpersuasive for two primary reasons: the senator's chief of staff's email regarding the agenda of the

meeting and the timing of the meeting itself. The email from the senator's chief of staff, which stated that the purpose of the March 21, 2012 ex parte meeting was "to discuss the telescope, hearing[ ] officer and funding issue," provides a more likely description of the topics discussed at the March 21, 2012 meeting given the timing of the meeting. The meeting occurred one day after Jacobson's public disclosure of the ex parte communications and pressure imposed on him, and two days prior to the March 23, 2012 hearing in which the Board and the parties addressed Jacobson's ex parte communication with UH-IfA's counsel. In the face of the issues immediately before the Board, it thus seems unlikely that the senator's chief of staff would call what appears to be an emergency meeting to only discuss when the Board's final decision would be filed. Indeed, the March 21, 2012 email sent by the Governor's office to the Attorney General's office one hour and forty minutes before the meeting confirmed the meeting was called to discuss the Haleakalā telescope;[29] no mention was made that it was about procedural matters.[30] The Board's procedural explanation further erodes in light of the evidence of the meeting and conversations involving the Chairman of the Board that occurred in January 2012—nearly two months before Jacobson exposed the ex parte political pressure placed upon him. As noted supra, the emails describe cooperation between UHIfA, the Governor's office, and the senior senator's office intent on gaining approval of the permit in a timely manner that would preserve funding for the telescope.

29. The March 21, 2012 email from staff at the Governor's office to the Attorney General's office stated, "Now that I spoke with [the Governor's chief of staff], I think [the meeting will discuss] Haleakala, not Big Island."

30. The concurrence suggests that, as attorneys, the Attorney General and the senator's chief of staff are to be accorded a presumption that all ex parte matters discussed were proper. However, there is no authority for such a presumption. To the contrary, based on the March 21, 2012 email referencing the ex parte meeting, the Attorney General and the senator's chief of staff intended to engage in ex parte communication with an adjudicative official about substantive matters before the official. The email plainly stated that

the meeting was to discuss "the telescope, hearing[ ] officer and funding issue"—all substantive issues pertaining to the merits of the case. As attorneys, the Attorney General and the senator's chief of staff are mandated not to "seek to influence a ... decision maker" nor "communicate as to the merits of the cause with a judge or an official before whom the proceeding is pending." Hawai'i Rules of Professional Conduct Rule 3.5(a), (d); see also HAR § 13-1-37 (providing no party or their representatives "shall make an unauthorized ex parte communication either oral or written concerning the contested case to the presiding officer or any member of the board who will be a participant in the decision-making process").

The Board's refusal to produce documents in its possession describing the ex parte meeting further detracts from acceptance of its procedural explanation.[31] Whether documents in the Board's possession substantiate that the meeting was purely of a procedural nature remains unknown due to the Board's refusal to produce documentary evidence of its ex parte communications.

Notwithstanding the Board's denial of Kilakila's request for documentary evidence of ex parte communications with the Board Chairman in the possession of the Board of Land and Natural Resources,[32] the instant record of ex parte communications is not susceptible to a convincing characterization as "procedural." Ex parte communications regarding procedural matters by their very nature may affect the merits of a case. For example, the United States Circuit Court for the D.C. Circuit noted that an ex parte communication from the United States Secretary of Transportation to a member of the Federal Labor Relations Authority (FLRA) acting in a judicial capacity may have been impermissible notwithstanding that the communication was of a procedural nature. Prof'l Air Traffic Controllers Org. v. Fed. Labor Relations Auth., 685 F.2d 547, 568 (D.C. Cir. 1982) (hereinafter PATCO II)(discussing ex parte contact without deciding impropriety because the communications "did not taint the proceedings or prejudice [the plaintiff]"). The Secretary of Transportation stated that he was not calling about the "substance" of the case, but expressed the desire of the Department of Transportation for an "expeditious handling of the case." Id. at 595 (Rob-

inson, C.J., concurring). The court noted that the "procedural inquiry may be a subtle effort to influence an agency decision" and that it "would have been preferable" for the FLRA member to have reported the contact on the public record. Id. at 568. The concurring opinion expressed greater concern, stating, "I find these calls exceedingly troubling; equally disturbing is the lingering uncertainty as to how much influence they exerted on the voting to expedite the case." Id. at 596–97 (Robinson, C.J., concurring).

Even assuming the scope of the ex parte meeting only concerned the timing of the Board's issuance of its final decision on the permit application, that communication was relevant to the merits of this case. Given that a primary focus of the ex parte communications sought by Kilakila was the possible loss of funding for the ATST project, any discussions of the decision's release dates were relevant to the substantive issue of loss of funding if the permit was not timely granted. The importance of the ATST project's funding is repeatedly mentioned throughout the January 2012 emails between the UHIfA associate director and the senator's chief of staff.[33] The funding concern was also ongoing throughout the initial hearing officer's deliberation process. Indeed, one of the specific purposes of the March 21, 2012 ex parte meeting identified in the March 21, 2012 email from the Governor's staff to the Governor's chief of staff was to discuss the "funding issue."

Because the ATST's funding would potentially be lost if the decision was not made

---

31. The Board's staff emailed staff from the Governor's office on March 21, 2012 stating "Chairman Aila will attend todays [sic] 3 p.m. meeting on the Maunakea [sic] Telescope." Given the scheduling of the meeting it is evident that the Board's staff incorrectly stated the meeting was "on the Maunakea Telescope," rather than the ATST project. At the time of the ex parte meeting, the conservation district use application for the Thirty Meter Telescope on Mauna Kea was under review by a hearing officer appointed by the Board Chairman. Mauna Kea, 136 Hawai'i at 385–87, 363 P.3d at 233–35 (explaining a hearing officer was appointed in August 2011, and following a contested case hearing, the hearing officer issued his findings of fact, conclusions of law, and decision and order on November 30, 2012).

32. For example, the March 21, 2012 email sent by the Chairman's office to the Governor's office confirming the Chairman's attendance at the March 21, 2012 meeting was withheld by the Board.

33. On January 30–31, 2012, the UHIfA associate director explained via email that the situation was so "dire" that "to keep from losing the project, we may have to start construction." The senator's chief of staff then explained the issue to the Governor's chief of staff, stating in her emails dated January 30, 2012 that the Governor's involvement was necessary because "uh and my feds [sic] are getting really really nervous about losing money for the atst [sic]" and "[t]his will be bad if we lose it."

quickly, any discussion as to the timing of the report inexorably raises the appearance of a substantive discussion. The pressing issue was not only that a decision must be made quickly, but that it must also be made in favor of UHIfA. Thus, the ex parte communications cannot be relegated to mere inquiries of the procedural status unconnected to an attempt to encourage a decision in UHIfA's favor. Had the Governor or senior senator been solely interested in merely learning from Jacobson or the Board the timing of when the final decision would be issued—rather than pressuring the adjudicatory decision-makers to grant the permit in time to preserve funding—they could have done so in a manner free of ex parte communication that protected the integrity of the proceedings by including Kilakila. As the concurrence in PATCO II explained,

> Agencies, like courts, promulgate rules of practice to assist outsiders in communicating in proper fashion with decisionmakers. These channels are quite adequate to accommodate any information that legitimately could be sought from or provided to those who will judge the case. For a high government officer to bypass established procedures and approach, directly and privately, members of an independent decisionmaking body about a case in which he has an official interest and on which they will be called to rule suggests, at the minimum, a deplorable indifference toward safeguarding the purity of the formal adjudicatory process.

685 F.2d at 597 (emphasis added). The concurrence in PATCO II further observed that one call to an agency—even if the conversation involved a discussion of timing—could be felt as political pressure and "regardless of its actual effect, such a call could be perceived by the public as political pressure." Id. Notwithstanding any evidence of as-yet-undiscovered ex parte communications concerning the conservation district use permit, the evidence of undisclosed ex parte communica-

tions with the Board uncovered by Kilakila far eclipses the phone call in PATCO II. At least one, perhaps two, face-to-face meetings and at least two conversations, one involving the Governor's office and one the senior senator's office, occurred with the Chairman during the Board's deliberation on whether to grant the permit.

In the March 21, 2012 ex parte meeting with both the Governor's office and the senior senator's office, it would have been difficult for the subject matter of the meeting to have been restricted solely to when the Board's final decision would be filed, as that date depended on numerous other substantive issues that would have to be addressed by the Board in order to provide a likely date for the Board's final decision. These include: whether the hearing officer would be removed; if so, what would happen with his report and recommendation; the process and timing of the appointment of a new hearing officer, including if the officer would again be an employee from another state agency; whether a new contested case hearing would be held; whether additional evidence would be considered; and whether new findings would be required. All of these substantive matters would require consideration by the Board in order to provide an anticipated date of its final decision.

The chorus of issues discussed at the March 21, 2012 ex parte meeting, or even the single "procedural" timing issue, viewed in the context of the matters under deliberation, were substantive. Accordingly, the communications between the senior senator's office, Governor's office, Jacobson, and the Board Chairman were impermissible ex parte communications.

#### b. The Undisclosed Ex Parte Communications Are Not Condoned

An ex parte communication with deliberating judicial officers [34] may lead to injustice

34. Although not defined in Title 13 of the Hawai'i Administrative Rules, which sets forth the rules for DLNR, other agency boards have defined "unauthorized ex parte communications" as:

private communications or arguments with members of the commission, or its hearings officer as to the merits of a proceeding with a view towards influencing the outcome of the petition or proceeding.

during adjudicative proceedings. To allow those interested in the outcome of a proceeding to communicate with the adjudicative officer privately, without the opposing party present, is to invite distrust and the possibility of decisions made on grounds unknown to the opposing party and the public. "At worst, an ex parte communication is an invitation to improper influence if not outright corruption." Moran v. Guerreiro, 97 Hawai'i 354, 373, 37 P.3d 603, 622 (App. 2001)(quoting J. Shaman, et al, Judicial Conduct and Ethics, at 159–60 (3d Ed. 2000).

The Hawai'i Revised Code of Judicial Conduct (HRCJC) provides helpful insight into the duty of adjudicative officers to abstain from undisclosed ex parte communication. See Sussel, 71 Haw. at 108–09, 784 P.2d at 870–71 (considering the code of judicial conduct in the context of administrative agencies that adjudicate). The HRCJC provides persuasive authority because in a contested case hearing, the presiding officer, who is the hearing officer or the Board, is authorized to perform judicial functions. Mauna Kea, 136 Hawai'i at 380, 363 P.3d at 228 ("A contested case hearing is similar in many respects to a trial before a judge: the parties have the right to present evidence, testimony is taken under oath, and witnesses are subject to cross-examination."). For example, the presiding officer of a contested case hearing has the power to "administer oaths, compel attendance of witnesses and the production of documentary evidence, ... issue subpoenas, [and] rule on offers of proof ... [and] on objections or motions." HAR § 13–1–32(c) (2009). In this sense, the two hearing officers and the members of the Board in this case performed judicial functions.

The HRCJC provides guidance in defining the parameters of ex parte communication with an adjudicative officer.[35] Specifically, a judge "shall not initiate, permit, or consider ex parte communications." HRCJC Rule 2.9(a). A judge may engage in non-substantive ex parte communication "for scheduling, administrative, or emergency purposes," but a judge must nonetheless "make[ ] provisions promptly to notify all other parties of the substance of the ex parte communication and give[ ] the parties an opportunity to respond." HRCJC Rule 2.9(a)(1)(B). Prohibition of all non-substantive ex parte communications and the requirement of immediate disclosure of all ex parte communications are important safeguards of the impartiality required of "administrative agencies which adjudicate as well as courts." Mauna Kea, 136 Hawai'i at 396, 363 P.3d at 244 (citation omitted). "[I]f we were to condone direct attempts to influence decisionmakers through ex parte contacts," then there "would be no way to protect the sanctity of the adjudicatory process." Portland Audubon Soc'y v. Or. Lands Coal., 984 F.2d 1534, 1543 (9th Cir. 1993) (citation omitted). Permitting undisclosed ex parte communications with adjudicating officials legitimizes private communication through which interested parties can impose fear of reprisal upon an adjudicative officer for a decision that, though not in favor of the powerful, is nonetheless following the rule of law.

The legal shield from undisclosed ex parte communication is a necessary protection for the parties in a contested case as well. This shield guarantees the most fundamental right due every citizen who becomes a party in the judicial system of Hawai'i: the right to a fair tribunal. A basic requirement of due process in both agency adjudication and court proceedings is a "fair trial in a fair tribunal." In re Water Use Permit Applications, 94 Ha-

---

HAR § 15–15–03 (2013) (providing Land Use Commission rules); see also HAR § 12–42–8(g)(19) (1981) (providing Hawai'i Public Employment Relations Board rules). The federal government has set forth a similar definition of ex parte communication. The federal Administrative Procedure Act defines ex parte communication broadly as including all communication not on the public record except for requests for status reports:
> "[E]x parte communication" means an oral or written communication not on the public record with respect to which reasonable prior notice to all parties is not given, but it shall not include requests for status reports on any matter or proceeding covered by this subchapter.

5 U.S.C. § 551(14) (2011).

**35.** Jacobson properly referred to the HRCJC to define his ethical duty; his review caused him to conclude "the Board's counsel was overlooking important issues relating to fairness."

wai'i 97, 120, 9 P.3d 409, 432 (2000) (hereinafter Waiāhole) (citation omitted); see also Orangetown v. Ruckelshaus, 740 F.2d 185, 188 (2nd Cir. 1984) ("[T]he insulation of the decisionmaker from ex parte contacts is justified by basic notions of due process to the parties involved."). Recently, in Mauna Kea, we noted the axiom that fundamentals of just procedure require impartiality of "administrative agencies which adjudicate as well as courts[,]" and concluded that there is "no reason why an administrative adjudicator should be allowed to sit with impunity in a case where the circumstances fairly give rise to an appearance of impropriety and reasonably cast suspicion on his impartiality." Mauna Kea, 136 Hawai'i at 396, 363 P.3d at 244 (citing Brown, 70 Haw. at 467 n. 3, 776 P.2d at 1188 n. 3). The circumstances of the Chairman in this case stands as an example of the jeopardy to due process posed by departure from the fundamental requirement that deliberating adjudicatory officials not engage in undisclosed ex parte communications about the matter before them. If disclosed, the ex parte meeting of March 21, 2012 and the ex parte conversations with the Governor's chief of staff and the senior senator's chief of staff in January 2012 would have offered far less reason for concern regarding the adjudicators' impartiality and the appearance of impropriety. And were the communications done in a manner cognizant of accepted practice allowing all sides to be present for communications with adjudicating officials, no specter of partiality and impropriety would attach to the decision of the Board to grant the CDUP for the ATST project. If, as suggested by the concurrence, the role of the Chairman is to be the ex parte point of contact for parties, their representatives, the Governor, other elected officials, and other interested entities who wish to discuss— without disclosure—contested case issues deemed to be procedural, future contested case decisions will continue to be haunted by misgivings about both the appearance and reality of fair decision-making.[36] Concurrence at 409–10, 382 P.3d at 221–22.

The Board's employment of undisclosed "procedural" ex parte communication with politically influential interests during contested hearings appears to be an accepted policy. The Board's counsel informed Mr. Jacobson over the two months that he consulted with her that the undisclosed ex parte political pressure he experienced was permissible. She opined that as long as the pressure was not placed on Mr. Jacobson by a party, "no disclosures were required." The Board reiterated this conclusion in its Minute Order No. 23 explaining that the March 21, 2012 Chairman's meeting did not involve ex parte communication: "Inasmuch as no party was present during the meeting, there was no ex parte communication with the hearing officer or any member of the Board." The Board further legitimized the Chairman's ex parte communication by stating, "[w]hen carrying out their duties as Board members, the members of the Board interact with numerous people in various situations."

In Scott v. N.D. Workers Comp. Bureau, 587 N.W.2d 153 (N.D. 1998), the Supreme Court of North Dakota considered the practice of the Worker's Compensation Bureau to allow an interested nonparty—specifically the Bureau's outside counsel—to confer ex parte with the Bureau's decision-making official without disclosure to the claimant seeking worker's compensation. The Bureau's outside counsel consulted with the Bureau's Director of Claims and Rehabilitation, advised the Director of Claims and Rehabilitation that the administrative law judge's decision should be rejected, and drafted several versions of findings, conclusions, and orders for the Director of Claims and Rehabilitation to review. The Court reversed the agency's denial of the claim following a determination

---

36. Commonly, in state and federal jurisdictions, it is the attorney general or an agency lawyer acting as the trained legal representative of the adjudicating agency who protects the integrity of the proceedings by communicating on behalf of the adjudicators with those who seek private access to adjudicatory officials during a contested case proceeding. See HRS § 28-4 (2009) (providing the attorney general shall "give advice and counsel to the heads of departments, district judges, and other public officers, in all matters connected with their public duties, and otherwise aid and assist them in every way requisite to enable them to perform their duties faithfully"). The importance of the attorney general assuming this role to protect the Chairman and the integrity of the contested case proceeding is apparent in this case.

that the agency's practice was to allow its outside counsel to engage in undisclosed ex parte consultation with the agency decision-maker. Id. at 157–58. As the court explained, "[w]hen a governmental agency systematically disregards the requirements of law, reversal may be required to prophylactically ensure the government acts consistently and predictably in accordance with the law." Id. at 158 (citation omitted). In fashioning an appropriate remedy, the court noted the importance of reversal of the agency decision where there was no disclosure by the Board of the extent of its ex parte communications:

> [Disqualification of the hearing officer] is an effective remedy if the agency head or hearing officer advises the parties of the improper communication prior to ruling on the case.... However, when the improper ex parte communications come to light only after the final agency decision has been issued, the "cat is out of the bag" and another remedy must be sought.

Id. at 157. The court concluded, "there has been a clear showing of institutional noncompliance which constitutes a systemic disregard of the law, and the Bureau's conduct has been prejudicial to the integrity of the system, thereby warranting reversal." Id. at 158 (internal quotation marks omitted).

Similarly, the policy of the Board and Attorney General regarding the Board's use of undisclosed ex parte communications with politically influential interests during the contested case hearings requires that the Board's decision be vacated. Any less remedy would insufficiently address prejudice "to the integrity of the system" caused by institutionalized disregard of the law. To determine otherwise would perpetuate a culture of agency decision-making that promotes confidential ex parte communication with judicial officers while they deliberate. Indeed, the policy endorsed here would permit deliberating judicial officials to receive—without disclosure—ex parte communications from influential nonparties interested in the outcome of the proceedings. Such a policy allowing undisclosed ex parte communications between influential special interests and deliberating judicial decision-makers jeopardizes the due process rights of citizens—particularly politically powerless citizens.

### c. The Degree of Prejudice Arising from Ex Parte Communications Between Government Officials and the Board Warrants Vacatur and Further Discovery

Although ex parte communication is not condoned, the sole fact that ex parte communication occurred does not require vacatur of an agency's decision. But, ex parte communication can rise to the level of prejudicial error, thus requiring vacatur of an agency's decision. See Found. Int'l, Inc. v. E.T. Ige Constr., Inc., 102 Hawai'i 487, 503, 78 P.3d 23, 39 (2003) (considering whether ex parte communication would appear "to a reasonable onlooker ... [to be] prejudicial, providing the State with an advantage or depriving Foundation of the opportunity to argue its case"); Town v. Land Use Comm'n, 55 Haw. 538, 549, 524 P.2d 84, 91–2 (1974) (holding prejudicial error was committed where appellant "was not given the opportunity to present argument or rebuttal evidence of his own to counter the ex parte arguments presented by petitioner"). To consider the due process ramifications of the Board's ex parte communications and its policy of endorsing such communications, the factors considered by the United States Court of Appeals for the District of Columbia in PATCO II are instructive. The court considered the following factors:

> the gravity of the ex parte communications; whether the contacts may have influenced the agency's ultimate decision; whether the party making the improper contacts benefited from the agency's ultimate decision; whether the contents of the communications were unknown to opposing parties, who therefore had no opportunity to respond; and whether vacation of the agency's decision and remand for new proceedings would serve a useful purpose.

PATCO II, 685 F.2d at 564; see also Duffy v. Berwick, 82 A.3d 148, 156 (Me. 2013); Idaho Historic Pres. Council v. City Council of Boise, 134 Idaho 651, 8 P.3d 646, 652 (2000). The court explained that these factors are considered to determine whether "the agen-

cy's decisionmaking process was irrevocably tainted so as to make the ultimate judgment of the agency unfair, either to an innocent party or to the public interest that the agency was obliged to protect." PATCO II, 685 F.2d at 564. But, because "the principal concerns of the court are the integrity of the process and the fairness of the result," these factors should not be mechanically applied. Id. at 565. Rather, a determination whether ex parte communications void an agency decision "must of necessity be an exercise of equitable discretion." Id. Sussel is instructive as to the discretion applied in reviewing the PATCO II factors in this case. The Sussel court explained that there is "no reason why an administrative adjudicator should be allowed to sit with impunity in a case where the circumstances fairly give rise to an appearance of impropriety and reasonably cast suspicion on his impartiality" and determined that a "showing of actual bias" was not necessary to disqualify an administrative adjudicator. Sussel, 71 Haw. at 110, 784 P.2d at 871. Thus, in considering the PATCO II factors, the court should consider whether the facts demonstrate "an appearance of impropriety," rather than whether a showing of "actual bias" exists.

The first factor in considering the impact of the ex parte communications is the gravity of the communications. Though the Board's written orders condone the ex parte communications that occurred between the Board Chairman, senior senator's office, and the Governor's office by defining them as discussions relating to procedural matters, documentary evidence of undisclosed ex parte communications with the Chairman produced by Kilakila evince communications of a substantive nature supporting the need to grant the permit in a timely manner to avoid loss of funding for the ATST project. The refusal of the Board to produce any documentary evidence of its ex parte communications during its deliberations makes unknown whether there are additional ex parte communications with the Board or with the second hearing officer. Nonetheless, as noted supra, based on the instant record, the gravity of the known undisclosed ex parte communications is significant.

As to the second factor, "whether the contacts may have influenced the agency's ultimate decision," the timing of the ex parte communications suggests that the communications may have affected the Board's decision. PATCO II, 685 F.2d at 565. Ex parte communications occurring in the "crucial period between the close of oral argument … and the adoption of the [order]" particularly calls into question the extent to which the adjudicating official considered the ex parte communications in making its decision. Home Box Office, Inc. v. Fed. Comm. Comm'n, 567 F.2d 9, 53 (D.C. Cir. 1977). Here, the impermissible ex parte communications occurred during the deliberations period of the first hearing officer and prior to the Board's grant of the 2012 permit. The record as it stands shows that pressure from undisclosed ex parte communications was so severe it compelled Jacobson to issue a public disavowal of his initial report and recommendation. Clearly, undisclosed ex parte communications also occurred with the Chairman during the deliberation period that followed the contested case hearing. However, in light of the incomplete record, the extent of the effect of additional ex parte communications on the Board cannot be ascertained.

PATCO II's third factor is whether the party making the improper contacts benefited from the agency's ultimate decision. PATCO II, 685 F.2d at 565. Here, the senior senator's and Governor's staff contacted the Chairman on UHIfA's behalf from January to March 2012. The Board subsequently granted the 2012 permit in favor of UHIfA in November 2012.

In considering the fourth factor, whether the contents of the ex parte communications were known to the opposing party, and whether the opposing party had an opportunity to respond to the ex parte communications, significant questions of prejudice arise. PATCO II, 685 F.2d at 565. The ability of an opposing party to respond to arguments is a necessary component to a fair hearing. The ICA has explained that undisclosed communications from parties and non-parties "deprive[s] the absent party of the right to respond and be heard." Moran, 97 Hawai'i at 373, 37 P.3d at 622 (quoting J. Shaman, et al.,

Judicial Conduct and Ethics at 159–60 (3d Ed. 2000)). Further, undisclosed meetings or communication are inconsistent "'with the ideal of reasoned decisionmaking on the merits which undergirds all of our administrative law.'" Home Box Office, 567 F.2d at 56. Jacobson's disclosure and Kilakila's requests for disclosure have produced evidence that the Board adopted a policy wherein Kilakila was not informed of ex parte meetings and communications between decision-makers and government officials appearing to act in concert with UHIfA to achieve timely approval of the conservation district use application for construction of the ATST.

Here, the Board's denial of Kilakila's discovery requests precluded Kilakila from responding to any undisclosed statements made to the Chairman by the staff of the Governor or senior senator on UHIfA's behalf. The Board did so both by refusing to produce the documents and by rendering a decision without releasing any documentation of the undisclosed communications. In so doing, not only did the Board shield itself from scrutiny by Kilakila of its undisclosed ex parte communications, the Board prevented appellate review of its actions depicted in any withheld documents. As a result, this court cannot know the extent of the ex parte communications' effect on the Board's decision.

PATCO II's fifth factor is whether vacatur and remand would serve a useful purpose. PATCO II, 685 F.2d at 565. Courts faced with a similar lack of a record have required evidentiary hearings to be held and additional discovery to be provided. For example, prior to its decision in PATCO II, the D.C. Circuit was faced with an incomplete record indicating that ex parte communications occurred. Prof'l Air Traffic Controllers Org. v. Fed. Labor Rels. Auth., 672 F.2d 109 (D.C. Cir. 1982) (hereinafter PATCO I). The court's review of the record left it "with a number of important but unanswered questions" and it was "not satisfied that the factual picture [the parties] assemble is yet complete." Id. at 112–13. Of additional concern to the court was that the parties detrimentally affected by the ex parte communication had not had "any opportunity to explore the effect that the newly discovered events may

have had on [the Federal Labor Relations Authority's] decision." Id. at 113. The court thus ordered an evidentiary hearing "to determine the nature, extent, source, and effect of any and all ex parte contacts and other approaches that may have been made to any member or members of the [Federal Labor Relations Authority] while the appeal ... was pending before them[.]" Id. at 110. The court explained the evidentiary hearing was necessary due to the grave significance of impermissible ex parte communication on a proceeding:

> This shadow on the integrity of the administrative process cannot be summarily dismissed. Consequently, we are today initiating procedures to ensure a thorough probe.
>
> . . . .
>
> We regard the portents of improper communications with an administrative decisionmaker as grave; particularly in an adjudicatory proceeding in which the stakes were so high and on which national attention was focused with much concern, the suggestion of behind-the-scenes machinations is intolerable.

Id. at 111–113. As evidenced by the initial appeal in this case establishing Kilakila's right to a contested case hearing, placement of the ATST on Haleakalā is a protracted issue in which stakes are high. Because the Board did not consider undisclosed ex parte communications by non-parties on "procedural" matters improper, such communications may have been ongoing following the appointment of the second hearing officer and during the deliberation period of the Board. The behind-the-scenes communications subsequent to the contested case hearing but before the decision warrant vacatur of the CDUP and completion of the discovery begun by Kilakila to determine the extent and nature of the communications.

### 3. The Appearance of Impropriety Created by the Ex Parte Communications with the Chairman and the Board's Refusal to Disclose the Ex Parte Communications Require Vacatur and Further Discovery

The potential prejudice to the proceedings caused by the Chairman's ex parte communi-

cations and the Board's subsequent refusal to grant Kilakila's requests for disclosure constitute an appearance of impropriety sufficient to require that the Board's decision to grant the 2012 permit be vacated with instructions to the Board to grant Kilkila's discovery request for ex parte communications. Few situations " 'more severely threaten trust in the judicial process than the perception that a litigant never had a chance' due to 'some identifiable potential bias.' " Mauna Kea, 136 Hawai'i at 390, 363 P.3d at 238 (citation omitted). Thus, "justice can perform its high function in the best way only if it satisfies the appearance of justice." Id. at 389, 363 P.3d at 237 (citation omitted). In other words, "justice must not only be done but must manifestly be seen to be done[.]" Sifagaloa v. Bd. of Trs. Of Emps. Ret. Sys., 74 Haw. 181, 190, 840 P.2d 367, 371 (1992). In the case of administrative agencies that perform adjudicative duties, such as the Board in this case, agencies must likewise demonstrate an appearance of justice and refrain from an appearance of impropriety. See Sussel, 71 Haw. at 109, 784 P.2d at 871 (explaining there is "no reason why an administrative adjudicator should be allowed to sit with impunity in a case where the circumstances fairly give rise to an appearance of impropriety and reasonably cast suspicion on his impartiality").

Appearance of impropriety means "conduct that reasonable minds, with knowledge of all the relevant circumstances, would perceive as materially impairing the judge's independence, integrity, impartiality, temperament, or fitness to fulfill the duties of judicial office." HRCJC Terminology. The determination of whether an appearance of impropriety exists is "an objective one, based not on the beliefs of the petitioner or [adjudicator], but on the assessment of a reasonable impartial onlooker apprised of all the facts." Waiāhole, 94 Hawai'i at 122, 9 P.3d at 434 (citation omitted)(alteration in original). In other words, "[t]he test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired[.]" Office of Disciplinary Counsel v. Au, 107 Hawai'i 327, 338, 113 P.3d 203, 214 (2005) (citation omitted).

The action taken by the Board in response to Jacobson's single ex parte contact with a representative of a party is an instructive insight as to the need to permit discovery and remand this case to the Board to allow Kilakila to address the appearance of impropriety. The single ex parte email communication between Jacobson and counsel for UHIfA created an appearance of impropriety sufficient to warrant Jacobson's discharge and invalidation of his decision. The ex parte communication by Jacobson to UHIfA was not related to the substance of the conservation district use permit; its purpose was to discover whether ex parte communication with the hearing officer had been initiated by UHIfA. In contrast, the number of ex parte communications with the Chairman far outnumber the single communication between UHIfA and Jacobson. The known ex parte communications with the Chairman involved one, and possibly two, meetings with the Governor's office and the senator's offices, at least two personal conversations with the Governor's office and the senator's office, and at least one email; all communications were with government officials who supported UHIfA's application. The impropriety of hearing officer Jacobson contacting a party one time to discuss whether it encouraged public officials to engage in ex parte communication created an appearance of partiality so significant as to warrant dismissal of the hearing officer and the striking of his decision. The multiple undisclosed ex parte communications with the Chairman in addition to the one involving hearing officer Jacobsen warrant a remand to the Board to permit discovery of evidence of ex parte communications and determine the safeguards necessary to ensure the propriety of the next contested case hearing.

The degree to which the undisclosed ex parte communications give rise to an appearance of impropriety is also reflected in the decision of the Board to deny the requests for disclosure of documentary evidence of ex parte communications. The D.C. Circuit in PATCO II emphasized the importance of

disclosing ex parte communications to prevent the appearance of impropriety:

> The disclosure of ex parte communications serves two distinct interests. <u>Disclosure is important in its own right to prevent the appearance of impropriety from secret communications in a proceeding that is required to be decided on the record.</u> Disclosure is also important as an instrument of fair decisionmaking; only if a party knows the arguments presented to a decisionmaker can the party respond effectively and ensure that its position is fairly considered. When these interests of openness and opportunity for response are threatened by an ex parte communication, the communication must be disclosed. <u>It matters not whether the communication comes from someone other than a formal party or if the communication is clothed in the guise of a procedural inquiry.</u>

PATCO II, 685 F.2d at 563 (emphases added). In this case, the Board refused to provide any disclosure of documentary evidence; and in its only attempt to address undisclosed ex parte communication the Board gave an inaccurate initial explanation of its March 21, 2012 meeting followed by one that was not persuasive.[37] The Board's denial of discovery and its characterization of the purpose of the March 21, 2012 meeting could lead a reasonable onlooker to determine that the Board's "ability to carry out [its adjudicative] responsibilities with integrity, impartiality and competence [was] impaired." Au, 107 Hawai'i at 338, 113 P.3d at 214 (citation omitted).

In addition to the Board's initial inaccurate justification for the ex parte meeting, the Board's reasoning in denying Kilakila's requests for disclosure[38] could lead a reasonable person to question the impartiality of the Board in this case. Three reasons underlie the Board's refusal:[39] (1) Kilakila failed to establish that the Board's actions were improper; (2) Kilakila's request was overly broad; and (3) even if the Board's actions were improper, they were cleansed by the appointment of a new hearing officer. Each of these reasons lacks merit.

First, the Board contended Kilakila failed to provide sufficient evidence of ex parte communications to constitute an appearance of impropriety by the Board. A court can require "significant evidence of wrongdoing before allowing [a plaintiff] to conduct extra-record discovery," but it "cannot require them to come forward with conclusive evidence of political improprieties at a point when they are seeking to discover the extent of those improprieties." Sokaogon Chippewa Community v. Babbitt, 961 F.Supp. 1276, 1281 (W.D. Wis. 1997). The Board rejected Kilakila's motion for disclosure despite Kilakila's specific demonstration of undisclosed ex parte communications: the declaration from the hearing officer that he had experienced political pressure; emails disclosing the March 21, 2012 ex parte meeting involving the Governor's chief of staff, the senator's chief of staff, the Board Chairman, and the Attorney General; and emails between the senator's chief of staff and the UHIfA associate director, as well as between the senator's chief of staff and the Governor's chief of staff. Despite this panoply of evidence of ex parte communications, the Board continuously refused to disclose any documentation of its ex parte communications, including an email from the Chairman's office, obtained by Kilakila from the Governor's office, in which the Chairman's office confirms he will attend the ex parte meeting on March 21, 2012. Rather than recognizing the growing appearance of impropriety, the Board refused Kilakila's requests by characterizing the evidence it received from Kilakila as mere evidence of permissible ex parte communications.

---

**37.** The Board initially stated the purpose of the ex parte meeting was to determine when the recommended decision would be issued by the first hearing officer. However, the Board subsequently amended its explanation when it became aware that this asserted purpose was not possible as the first hearing officer's decision was already issued.

**38.** Kilakila requested disclosure in its motions dated April 9, June 12, and September 27, 2012. Kilakila also requested disclosure in its March 22, 2012 response to Minute Order No. 14.

**39.** The Board's rebuff of Kilakila's requests for disclosure is contained in three orders issued by the Board: its June 4, 2012 order, its July 13, 2012 order, and its November 9, 2012 order.

Second, contrary to the Board's position that Kilakila's request for disclosure was overly broad,[40] Kilakila's motion for disclosure did provide a time frame and context for the requested disclosure. Kilakila provided a time frame by limiting its request to communications related to the ATST project. This limitation inherently sets a time frame from UHIfA's CDUA submission in 2010 to the filing of Kilakila's first motion for disclosure. Kilakila also provided a context for the disclosure. In support of its requests for disclosure, Kilakila provided memoranda and documentation recounting specific examples of undisclosed ex parte communications that included the Chairman of the Board and influential government officials acting with UHIfA. The Board's denial of Kilakila's request as overly broad and speculative stands in contrast to the Governor's ready release of documents in response to Kilakila's request for "[a]ll emails, memoranda and correspondence that mention or relate to the Advanced Technology Solar Telescope (ATST) created after December 1, 2010 that were received or generated by anyone in the Governor's office." In other words, the Governor's release of records encompassed documents involving the same time frame as documents requested from the Board, yet which the Board characterized as overbroad.

Third, in denying Kilakila's request for production of documents from the Board, the Board reasoned that no disclosure is necessary because it "remedied" the situation by replacing the first hearing officer with a second hearing officer:

> [A]ny prejudice that may have occurred as a result of communications with the former hearing officer has been remedied by the Board's discharge and replacement of the hearing officer.

However, there is no accompanying guidance in the Board's order as to how the replacement of Jacobson would remedy improper ex parte communications with the Board. Further, in making the decision to replace Jacobson, the Board held a hearing on March 23, 2012 but refused to create a record of the hearing. In preventing any record of the proceedings to be made, the Board acted in direct contravention of its rules. HAR § 13–1–32(d) (2009) ("The presiding officer shall provide that a verbatim record of the evidence presented at any hearing is taken unless waived by all the parties." (Emphases added)).

Under the circumstances of this case wherein evidence of ex parte communications between the Board and government officials favoring the ATST conservation district use permit was produced and a reasonable request for disclosure was made, the Board's denial of disclosure of its undisclosed ex parte communications cannot redound to its benefit. As noted by the California Supreme Court "because the [agency] has refused to make copies of the reports of [the] hearing part of the record, ... whether their contents are as innocuous as the [agency] portrays them to be is impossible to determine." Dep't of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd., 40 Cal.4th 1, 50 Cal.Rptr.3d 585, 145 P.3d 462, 472 (2006); see also Home Box Office, 567 F.2d at 54 ("[W]here, as here, an agency justifies its actions by reference only to information in the public file while failing to disclose the substance of other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly[.]"). This lack of disclosure, in part, led the California Supreme Court to reverse the agency's order. Dep't of Alcoholic Beverage Control, 50 Cal. Rptr.3d 585, 145 P.3d at 472. Here, although the Board had an opportunity to demonstrate through disclosure the extent of the communications with the decision-makers, it refused to do so. The evidence of proven ex parte communications and the Board's unwillingness to allow access to documents demonstrating the extent of undisclosed ex parte communications compels the conclusion that the decision-making process suffers an appearance of impropriety.

Remand for further discovery is thus necessary to determine whether additional docu-

---

**40.** The Board asserted Kilakila's motions do not "provide a time frame or context for the requested disclosures and the motion may encompass communications that occurred long before this matter was the subject of a contested case."

mentation of ex parte communication exists and to craft a commensurate remedy if necessary for a subsequent hearing. The concurrence raises the issue that Kilakila was aware of the ex parte meeting and of the communications between the Chairman and the governmental interests, yet did not request that the Chairman be disqualified. **Concurrence at 410, 382 P.3d at 222.** As Kilakila stated in its response to Minute Order No. 14 regarding the ex parte communications with Jacobson, "[g]iven that neither Kilakila ʻO Haleakala nor this Board has a complete understanding of what happened here, Kilakila ʻO Haleakala cannot expect to know what the full remedy would be at least until full disclosure is made." Kilakila never received full disclosure from the Board despite repeated requests to the Board. Further discovery was necessary to apprise Kilakila of the extent of undisclosed ex parte communications with the Board from the Governor's office, the Senator's office, or the UHIfA. Only after a full understanding of the extent of ex parte communication would Kilakila be equipped to request an appropriate remedy, including disqualification of the Chairman or a request for an additional hearing to counter any information provided to the Board ex parte.

### 4. The Effect of Political Pressure on the Contested Hearing Process

Kilakila also contends that the contested case hearing for the ATST project was tainted by political pressure on the decision-makers. The pressure upon Jacobson is evident from the consequences of such pressure—namely, Jacobson was forced to release an incomplete report that he subsequently disavowed. The degree of pressure on the Board is as yet undetermined in view of the lack of discovery. However, it is known that the Chairman participated in at least one, perhaps two, undisclosed meetings with government officials in person and engaged in at least two additional undisclosed ex parte communications—one with the Governor's office and one with the senior senator's office—that concerned their interest in the ATST project.

"Where an agency performs its judicial function, external political pressure can violate the parties' right to procedural due process, thereby invalidating the agency's decision." Waiāhole, 94 Hawaiʻi at 123, 9 P.3d at 435. The due process right at stake when outside political influence is exerted upon a decision-maker is the right to an impartial decision. See Sussel, 71 Haw. at 103, 784 P.2d at 868 (An "impartial tribunal is an essential component of due process in a quasi-judicial proceeding[.]"); Mauna Kea, 136 Hawaiʻi at 389, 363 P.3d at 237 (explaining "a biased decisionmaker [is] constitutionally unacceptable" (citation omitted)). This due process right to an impartial decision-maker free of outside political influence has been described as "the sine qua non of American judicial justice." Waiāhole, 94 Hawaiʻi at 124, 9 P.3d at 436 (quoting Pillsbury Co. v. Fed. Trade Comm'n, 354 F.2d 952, 964 (5th Cir. 1966)). Where a sufficient nexus exists between the conduct of the government official and the decisionmaker, an appearance of impropriety exists that would warrant reversal. Id. at 126, 9 P.3d at 438.

### a. A nexus may exist between the political pressure exerted by the senior senator and the Governor on the Board decision-makers.

Whether political influence is sufficient to invalidate an agency's decision requires an examination of "the nexus between the pressure and the actual decision maker." Waiāhole, 94 Hawaiʻi at 124, 9 P.3d at 436 (quoting ATX, Inc. v. U.S. Dept. of Transp., 41 F.3d 1522, 1527 (D.C. Cir. 1994)). In Waiāhole, this court considered "[t]he relation between the communications and the adjudicator's decisionmaking process." Id. (citation omitted). For example, "congressional actions not targeted directly at the decision makers—such as contemporaneous hearings—do not invalidate an agency decision." ATX, 41 F.3d at 1528; see also Waiāhole, 94 Hawaiʻi at 124–25, 9 P.3d at 436–37 (holding requisite nexus did not exist where governor's statements regarding his view of the case "arose in public forums apart from the instant proceeding and reached the Commission indirectly"). The court applied this analysis in Waiāhole to determine whether public comments by the Governor regarding his opinions on the mer-

its of the case constituted political pressure sufficient to violate due process. Our court declined to invalidate the decision of the agency on the basis of the Governor's comments because the comments were publicly expressed and not directed personally to the agency decisionmakers. Waiāhole, 94 Hawai'i at 124–25, 9 P.3d at 436–37. Similarly, in ATX, the pressure was insufficient to invalidate the adjudication because the alleged political pressure, exerted through the introduction of two bills and multiple letters, did not have a direct nexus with the decisionmaker. ATX, 41 F.3d at 1528. The introduction of the bills was analogous to contemporaneous hearings not targeting a decisionmaker. Id. The court held that the letters did not have a nexus with the decision-maker because the decision-making process was "insulated ... from congressional interference." Id.; see also Peter Kiewit Sons' Co. v. U.S. Army Corps of Engineers, 714 F.2d 163, 170 (D.C. Cir. 1983) (holding no political interference where a United States senator communicated with Department of Defense officials but not with the ultimate decision-maker).

In contrast, where the nexus between the political pressure and the decision-maker has been direct, courts have invalidated agency decisions. For example, political pressure placed directly upon commissioners of the Federal Trade Commission during public hearings before a United States Senate subcommittee caused the United States Court of Appeals for the Fifth Circuit to find a violation of procedural due process rights in the pending agency hearing before a hearing officer appointed by the Federal Trade Commission. Pillsbury Co., 354 F.2d at 964. The subcommittee "focuse[d] directly and substantially upon the mental decisional processes" of the Federal Trade Commission "in a case which [was] pending before it," and therefore directly intervened in the agency's adjudicative function. Id.

Here, the offices of the senior senator and the Governor directly contacted the Chairman without disclosure. The officials chose to express their requests privately rather than publicly, as in Waiāhole and ATX. Thus, the pressure from the Governor and the senior senator was applied directly to the Chairman through private, face-to-face meetings as well as additional ex parte communications.

Although the majority acknowledges that the Chairman was in direct ex parte contact with the Governor's chief of staff and the senator's chief of staff at the ex parte meeting, the majority concludes that improper political influences did not taint the Board's decision. Specifically, the majority states that "the communications here do not show evidence of 'direct contact' with BLNR over the 'merits of the dispute.' " **Majority at 400, 382 P.3d at 212.** The majority reaches this conclusion by determining that "there is no evidence that [at the ex parte meeting] they discussed anything other than the timing of BLNR's final decision following the contested case hearing." **Majority at 400, 382 P.3d at 212.** To the contrary, the record contains substantial evidence that the merits of the dispute were to be discussed at the March 21, 2012 ex parte meeting; specifically, an email sent less than three hours before the ex parte meeting confirms the topics identified for discussion were "the telescope, hearings officer and funding issue"—each of which are matters of substance. The sole basis for the majority's conclusion that the merits were not discussed at the undisclosed meeting is the Board's second explanation for the meeting, issued in its Minute Order No. 26 more than three months later, that the sole topic of discussion was the release of the Board's final decision. While this order is interpreted by the majority to mean that "the telescope, hearings officer and funding issue" were not discussed with the Chairman, the order is also subject to a contrary interpretation as an acknowledgement by the Board that the matters identified in the March 21, 2012 email were discussed, but only in the context of the procedural nature of the timing of the final decision by the Board. Under this view, discussion of core substantive issues pertaining to the telescope, hearing officer, and funding are transformed from substantive to procedural matters once the Board defines the discussions as procedural.

Prior communications with UHIfA offer additional evidence that the meeting was to discuss the merits of the case, i.e. the need to grant the permit in a timely manner to pre-

vent loss of funding. The two direct communications between the Chair, the Governor's office, and the senator's office in January 2012 were due to the need for a timely decision on the permit in order to protect funding for the telescope. Thus, all documentary evidence in the record—the March 21, 2012 email and the January 2012 emails—are consistent with discussion of the merits. A contrary interpretation that no substantive matters were discussed arises only from the declaration of the Board. Had the Board not repeatedly refused Kilakila's requests for disclosure, the Chairman's notes of what was discussed at the ex parte meeting—as well as any emails regarding the meeting—could have supported its exercise of discretion to meet privately and engage in undisclosed ex parte communications. As the United States Court of Appeals for the D.C. Circuit stated, "where, as here, an agency justifies its actions by reference only to information in the public file while failing to disclose the substance of other relevant information that has been presented to it, a reviewing court cannot presume that the agency has acted properly[.]" Home Box Office, 567 F.2d at 54. This court cannot presume that political influence did not taint the Board's decision without full disclosure by the Board.

b. **The status of the senior senator and the Governor exacerbates the political pressure imposed on the decision-maker.**

To understand the significance of the nexus between the political pressure and the decision-maker, this court has considered as an additional factor the status of the individual or entity exerting pressure on the decision-maker.

The status of the entity or individual may heighten the pressure exerted on the decision-maker and may increase the pressure to "the level of interference that courts have deemed violative of due process." Waiāhole, 94 Hawai'i at 124, 9 P.3d at 436; see also In re Larsen, 532 Pa. 326, 616 A.2d 529, 562 (Pa. 1992) (noting "[t]he appearance of impropriety raised by the improper ex parte communications" was "exacerbated" when the individual exerting pressure stood in a "position of

authority" over the decisionmaker). To evaluate the degree of political influence, this court has considered whether the "interference [was] by an office having superior status or some control over the salary or tenure of the decisionmaker." Waiāhole, 94 Hawai'i at 125, 9 P.3d at 437. Factors reflective of the power of the authority engaging in ex parte communication with the decision-maker were considered in Jarrot v. Scrivener, 225 F.Supp. 827 (D.D.C. 1964). In Jarrot, the court explained that the government officials exerting pressure on the members of the District of Columbia Board of Zoning Adjustment "possess[ed] vast power to bestow or not to bestow benefits of various kinds upon subordinate employees" and the board members "could not fail to be aware that they would incur administrative displeasure if they decided the appeal unfavorably." Id. at 834.

Both the senior senator and the Governor possessed significant status. The senior United States senator was a major political figure in Hawai'i. In 2012, when his staff was in contact with the Board Chairman, the senior senator was the chair of the Senate Appropriations Committee and the president pro tempore of the United States Senate, making him third in line to the presidency. Christopher M. Davis, The President Pro Tempore of the Senate: History and Authority of the Officer, Congressional Research Service 9, 21 (Sept. 16, 2015). The senior senator was also the "second-longest serving Senator in the history of the [United States Senate] chamber," representing Hawai'i in Congress "from the moment [Hawai'i] joined the [United States]." Press Release, The White House, Statement by the President on the Passing of Senator Daniel Inouye (Dec. 17, 2012).

The Governor is the highest-ranking state official. He nominates and appoints all members of the Board of Land and Natural Resources. Haw. Const. art. V, §§ 1, 6; HRS § 171–4(a) (2011). Thus, the Governor "occupies an obvious position of influence." Waiāhole, 94 Hawai'i at 124, 9 P.3d at 436. Because the Governor appoints the Board members, "[w]e do not take lightly the governor's legitimate supervisory interest and role with respect to the [Board]." Id.; see also

458

Haw. Const. art. V, § 6; HRS § 171–4(a) (2011). Accordingly, the Governor holds a substantial influence over the Chairman and the Board.

Public officials such as the senior senator and the Governor are legally empowered to provide leadership and insight commensurate with their elected offices by voicing their opinions in public forums. Nonetheless, "public officials must also be mindful of the broader public interest in the fairness and integrity of the adjudicatory process." Waiāhole, 94 Hawai'i at 127, 9 P.3d at 439. Undisclosed ex parte communications with deliberating decision-makers is thus not an avenue available to public officials.

Review of this record is done mindful that it is not actual unfairness or actual partiality that is required to constitute a violation of the right to an impartial tribunal. It is the "probability of unfairness" that is at issue: "our system of [justice] has always endeavored to prevent even the probability of unfairness." Sussel, 71 Haw. at 107, 784 P.2d at 870 (citation omitted).

Given the incomplete record and the significant questions raised by Kilakila regarding the extent of political pressure on the Board, Kilakila is entitled to discover from the Board its record of ex parte communications.

### B.

**1. The Board's Findings of Fact, Conclusions of Law and Decision and Order Depart from the Final Environmental Impact Statement**

The final environmental impact statement prepared for UHIfA in support of its conservation district use application found the project would have major, adverse, and long-term direct impacts on traditional cultural resources.[41]

Construction and operation of the proposed ATST Project at either the Pre-

ferred Mees or Reber Circle sites would result in major, adverse, short- and long-term, direct impacts on the traditional cultural resources within the [region of influence]. No indirect impacts are expected. Mitigation measures would be implemented, and while helpful, they would not, however, reduce the impact intensity to moderate: impacts would remain major, adverse, long-term and direct.

The FEIS explained that Native Hawaiians in interviews stated the ATST project will not only cause major adverse impacts to cultural resources, but will "compound the adverse impacts of the already existing facilities." In finding that the construction activities alone will have a major, adverse direct impact on cultural resources, the FEIS noted evidence of the cultural connection of Native Hawaiians to the Mees Site. For example, the FEIS stated that "[f]or some Kanaka Maoli (Native Hawaiians), the physical excavation of the cinder, in and of itself, is seen as a desecration of the kinolau or body of Pele." "[T]here is a belief that to go forward with the proposed ATST Project would result in the desecration of a sacred site, with some equating the effects to building an observatory next to the Wailing Wall in Jerusalem or within the city of Mecca." The FEIS also noted that comments and testimony from the Native Hawaiian community indicated that "there is a necessity for many people to have an unimpeded view plane from mountain to ocean, particularly when participating in ceremonial activities." The height and color of the ATST project would "impede the view plane which is seen by some as a personal affront to their cultural beliefs." The FEIS also noted that "[r]esponses to the proposed ATST Project were deeply emotional and, for some, the idea of an additional building atop the summit was physically painful."

To grant the CDUA, the Board was required to find that the ATST project would

---

41. For the ATST project, a joint federal and state FEIS was prepared by the National Science Foundation (NSF). In general, an environmental impact statement is an informational document that "discloses the environmental effects of a proposed action, effects of a proposed action on the economic welfare, social welfare, and cultural practices of the community and State, effects

of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects and alternatives to the action and their environmental effects." HRS § 343–2 (2010); see also Mauna Kea Power Co. v. Bd. of Land & Natural Res., 76 Hawai'i 259, 265, 874 P.2d 1084, 1090 (1994).

not cause a substantial adverse impact on cultural resources.[42] Thus, approval of conservation district permit MA–11–04 by the Board was based on a departure from the conclusion of the final environmental impact statement that the project would cause major, adverse, long-term and direct impacts on traditional cultural resources.[43] Based on the same facts considered in the FEIS, the Board found that because other facilities were constructed on Haleakalā "the addition of the ATST Project would only slightly increase the degradation of the summit as a traditional cultural property." The Board's conclusion that the presence of previously constructed telescopes meant that the ATST would just slightly degrade Haleakalā as a

cultural resource was not a determination shared by the FEIS.[44] The Board's focus on the slight increase in the degradation of Haleakalā ignores the FEIS's determination that the ATST project would have a major, adverse direct impact.

In support of its determination that the project would not have a substantial adverse impact, the Board also relied upon the mitigation measures discussed in the FEIS that UHIfA and the NSF committed to in order "to reduce the impact to all resources." The Board stated "[t]he impacts of the ATST Project . . . must be considered together with the proposed mitigation measures that UHIfA and NSF have already committed to put into effect as set forth in the FEIS." The

42. Subsection (4) of HAR § 13–5–30(c) requires that a CDUP only be granted if "the proposed land use will not cause substantial adverse impact to existing natural resources within the surrounding area, community, or region." (Emphasis added). Natural resources include "resources such as plants, aquatic life and wildlife, cultural, historic, recreational, geologic, and archaeological sites, scenic areas, ecologically significant areas, watersheds, and minerals." HAR § 13–5–2.

43. Section 13–5–30(c)(4) does not allow proposed actions that would cause a "substantial adverse impact," but does not define this term. Rather than discussing the impact in terms of "substantial" impact, the FEIS refers to the potential impact as "major adverse impact." A major adverse impact on cultural, historic, and archaeological resources is defined as:

> disturbance of a site(s) results in loss of integrity and impact(s) would alter resource conditions. There would be a block to, or great effect on, traditional access, site preservation, or the relationship between the resource and the affiliated group's body of practices and beliefs, to the extent that the survival of a group's practices and/or beliefs would be jeopardized. This is analogous to a determination of adverse effect under Section 106 of the [National Historic Preservation Act], and measures to minimize or mitigate adverse effects cannot be agreed upon that would reduce the intensity of impacts under [the National Environmental Policy Act's mitigation requirements] from major to moderate.

Given that permit applicants are required to provide an environmental assessment or environmental impact statement pursuant to HAR § 13–5–31(a)(1) (1994), it appears the FEIS's definition of "major adverse impact" would be at least the equivalent of "substantial adverse impact."

44. The FEIS considered the cumulative effect of the ATST Project at the Mees Site on cultural resources as incremental, but also major, adverse, long-term, and direct:

> The effects on traditional cultural resources resulting from past and present actions are major, adverse, direct long-term. The construction and operation of the proposed ATST Project within the [region of influence] for traditional cultural resources at the Preferred Mees site would continue to, cumulatively, have major, adverse, long-term, direct effects. The proposed ATST Project would have a major impact on Native Hawaiians from conducting their traditional cultural practices, in particular, because of the size and color of the proposed ATST. Also, conducting traditional cultural practices often requires an uninterrupted view of the summit area is often cited as necessary to make an emotional and physical connection to a place of importance. Therefore, because of the past construction of manmade structures on the summit and the current view, which is already interrupted, the addition of the proposed ATST Project would be incremental in the degradation of the summit as a traditional cultural property.
>
> . . . .
>
> While there is no way to quantify the cumulative effects of the incremental addition on traditional cultural practices and spiritual values, in consideration of the past and present actions, the addition of the proposed ATST Project and foreseeable future actions would result in readily detectable, localized effects, with consequences at the regional level to traditional cultural practitioners within greater Hawai'i. Therefore, the cumulative effects on traditional cultural resources of the proposed ATST Project combined with past and present and foreseeable future actions would be major, adverse, long-term, and direct[.]

Board concluded that "[t]he proposed land use, when considered together with all minimization and mitigation commitments discussed above and with the additional conditions contained in this Decision, will not cause substantial adverse impact to existing natural resources within the surrounding area, community or region." The Board's conclusion directly contradicts the FEIS's determination that "[i]mplementation of these mitigation measures would be helpful, but they would not reduce the intensity of the impacts to a lower threshold." In other words, based on a review of the same proposed mitigating measures, the FEIS rejected the position that the implementation of the mitigation measures would remove the major, adverse, long-term, and direct impact of the ATST.

The final basis for the Board's determination that the ATST project would not cause a substantial adverse impact on cultural resources was its consideration of mitigation measures not discussed in the FEIS.[45] The mitigation measures included: construction of an east-facing ahu, the establishment of an ATST Native Hawaiian Working Group, the removal of unused facilities at the project site, the feasibility of a shelter for cultural practitioners at the project site, acknowledgment of the significance of Haleakalā and an expression of NSF's gratitude in all scientific publications, and the setting aside in perpetuity of an area within the project site of 0.55 acres "for the sole reverent use of [N]ative Hawaiians for religious and cultural purposes." Kilakila contends "there is ... no nexus between the impacts ... and the mitigation measures" and "there is no evidence in the record that the mitigation measures would actually reduce the impact of the ATST to less than substantial."

Our court has held that "where the record demonstrates considerable conflict or uncertainty in the evidence, the agency must articulate its factual analysis with reasonable clar-

ity, giving some reason for discounting the evidence rejected." Waiāhole, 94 Hawai'i at 163–64, 9 P.3d at 475–76; see also In Re 'Iao Ground Water Mgmt. Area High–Level Source Water Use Permit Applications, 128 Hawai'i 228, 251, 287 P.3d 129, 152 (2012) (remanding the case because the water commission did not explain its focus on amphidromous species above the evidence of other instream uses). The need for this requirement is apparent in this case, where the Board heavily relies on the mitigation measures to justify its decision to find no substantial adverse impact on natural and cultural resources.[46] In addition, the agency must also explain its proposed mitigation measures:

> While the agency is not required to develop a complete mitigation plan detailing the precise nature of the mitigation measures, the proposed mitigation measures must be developed to a reasonable degree. "A perfunctory description or mere listing of mitigation measures, without supporting analytical data, is insufficient to support a finding of no significant impact."

Malama Makua v. Rumsfeld, 163 F.Supp.2d 1202, 1218 (D. Haw. 2001) (citations omitted). However, no explanation is provided as to how these allegedly mitigating factors—such as publications acknowledging the cultural significance of Haleakalā, construction of an additional ahu, a shelter for cultural practitioners, or the set aside of a half-acre—would ameliorate the effects of the construction of a telescope the size of the ATST. See id. Absent such an analysis, the mitigation measures referenced by the Board lack a meaningful connection to the cultural impact identified in the FEIS. Compounding the issue of whether the Board's departure from the findings of the FEIS was an arbitrary decision constituting an abuse of discretion is the appearance of impropriety and political pressure arising from undisclosed ex parte communication by the deliberating Chair-

45. The Board stated "[m]itigation measures are intended to reduce the duration, intensity or scale of impacts or to compensate for the impact by replacing or providing substitute resources or environments.... UHIfA and NSF have committed to mitigation measures to reduce the impact to all resources."

46. As discussed supra, HAR § 13–5–2 defines natural resources to include cultural resources. HAR § 13–5–30(c)(4) does not authorize a conservation district use permit unless the proposed project "will not cause substantial adverse impact[s] to existing natural resources."

man; the appearance of prejudgment arising from the granting of the original permit without a contested case hearing that remained valid throughout the subsequent contested case hearing for the second permit; and the refusal of the Board to allow discovery of any documents in its possession reflecting ex parte communication with the Board during its deliberations.

On this record, the issue of whether the Board's decision was based upon undisclosed ex parte communications and political influence—rather than the merits—lingers. The concurrence duly notes that the Board has a duty to consider "the State's obligations" under two unique provisions of our constitution:

Article XI, section 1:

For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.

All public natural resources are held in trust by the State for the benefit of the people.

Article XII, section 7:

The State reaffirms and shall protect all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes and possessed by the ahupua'a tenants who are descendants of native Hawaiians who inhabited the Hawaiian Islands prior to 1778, subject to the right of the State to regulate such rights.

Concurrence at 410–11, 382 P.3d at 222–23 (Citing Haw. Const. art. XI, § 1; id. art XII, § 7).

However, Kilakila cannot know if the State properly considered its constitutional obligations when approving the 2012 permit.[47] It was not present for the ex parte communications that occurred in person and through emails with the Chairman. It was not informed of the communications even though they took place while the Board was deliberating. Nor, after learning about the Chair's communications with political officials whose interests aligned with its opposition, was Kilakila permitted to obtain documents describing the ex parte communication. Without completion of the discovery sought by Kilakila, its opportunity to know whether its cultural and environmental rights under Article XI Section 1 and Article XII Section 7 of the Hawaii Constitution were impartially considered is lost.

Under these circumstances, the record does not contain evidence sufficient to support a finding that Kilakila was accorded equal access to an impartial decision-maker. Kilakila has again not received a hearing comporting with due process—notwithstanding its successful due-process challenge to the first decision of the Board granting the Conservation District Use Permit for construction of the ATST telescope. See Kilakila 'O Haleakalā v. Bd. of Land & Nat. Resources, 131 Hawai'i 193, 206, 317 P.3d 27, 40 (2013).

### III. Conclusion

Prejudgment of the conservation district use permit application prior to the contested hearing, undisclosed ex parte communications with adjudicative officers during deliberations, and the failure of the Board of Land and Natural Resources to supply with reasonable clarity a factual analysis in support of its departure from the finding of the FEIS that the construction and operation of the ATST telescope would cause major, adverse, and long-term direct impacts on traditional cultural resources require that the conservation district use permit be vacated. Also war-

---

47. Access to justice requires access to information. The need for access to information is apparent where, as here, indigenous people seek information supplied to deliberating judicial officials regarding their cultural lands. See U.N. Declaration on the Rights of Indigenous Peoples, G.A. Res. 61/295, U.N. Doc. A/RES/61/295 (Sept. 13, 2007), 46 I.L.M. 1013 (2007) (providing that indigenous peoples are entitled to "a fair, independent, impartial, open and transparent process"). These international ideals are in accord with the Hawai'i Constitution, which provides for the protection of "all rights, customarily and traditionally exercised for subsistence, cultural and religious purposes." Haw. Const. art. XI, § 1; id. art XII, § 7.

**462**

ranted is a remand of this case to the Board of Land and Natural Resources with instructions to grant Kilakila's request to the Board for production of any ex parte communications with members of the Board regarding the ATST excepting (1) communications between Board members; and (2) communications between any Board member and the Board's counsel. After discovery, Kilakila would have sufficient information to request any remedies it deems necessary to ensure its next contested case hearing would be a fair one.